# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

SEAN SHANAPHY, Individually and on
Behalf of All Others Similarly Situated,

        Plaintiff,

    v.

KOHL'S CORPORATION, MICHELLE GASS,
JILL TIMM, MICHAEL BENDER, PETER
BONEPARTH, YAEL COSSET, CHRISTINE
DAY, H. CHARLES FLOYD, ROBBIN
MITCHELL, JONAS PRISING, JOHN E.
SCHLIFSKE, ADRIANNE SHAPIRA, and
STEPHANIE A. STREETER,

        Defendants.

Case No. 2:22-cv-1016-LA

## AMENDED CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF FEDERAL SECURITIES LAWS

1.     Lead Plaintiff Thomas Frame ("Plaintiff"), on behalf of all other persons similarly situated, by and through Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters. This investigation included, but was not limited to, a review and analysis of: (i) court records; (ii) public filings of Kohl's Corporation ("Kohl's" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (iii) transcripts and investor presentations; (iv) Kohl's press releases; (v) publicly available letters, press releases, and SEC filings of Macellum Capital Management ("Macellum"); (vi) analyst reports and independent media reports regarding Kohl's, its stock price movement, pricing and volume data; (vii) other publicly available material and data; and (viii) interviews of persons with knowledge of the allegations contained herein, including former employees of Kohl's and relevant third parties. Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants (defined below) and/or are exclusively within their custody or control. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after further investigation and after a reasonable opportunity to conduct discovery.

## NATURE OF THE ACTION

2.     Plaintiff brings this securities class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b)) and Rule 10b-5(a), (b), and (c) promulgated thereunder by the SEC (17 CFR § 240.10b-5) on behalf of persons who purchased Kohl's securities between August 19, 2021 and July 1, 2022, inclusive (the "Class Period"), and Section 14(a) of the Exchange Act (15 U.S.C. § 78t(a)), and Rule 14a-9 promulgated thereunder by the SEC (17 CFR § 240.14a-9), on behalf of all shareholders as of the March 7, 2022 Record Date (the "Record Date") who were entitled to vote in the 2022 Annual Shareholder Meeting on May 11, 2022 (the "Shareholder Meeting") against Kohl's, Former Chief Executive

Officer ("CEO") Michelle Gass; Chief Financial Officer ("CFO") Jill Timm; and relevant members of the Kohl's Board of Directors (the "Board") (collectively, "Defendants").

3.     In the face of a fiercely contested proxy battle for control of the Board, Defendants engaged in a scheme and course of conduct in order to maintain control of the Company and artificially inflate the price of the Company's stock. Defendants manipulated a review of strategic alternatives to inflate Kohl's stock price and further maintain control of the Company. When activist investor Macellum initially disclosed to the market that Kohl's had received offers to sell the Company, Defendants falsely denied the report as "***unfounded speculation***." Then, when news outlets began reporting the details of the offers, which were at a 30+% premium to Kohl's then-current and artificially inflated stock price, Defendants pivoted to falsely characterizing the offers as ***"not adequately reflect[ing] the Company's value,"*** which only served to increase the artificial inflation that already existed in Kohl's stock price. After adopting a poison pill to chill bids and prevent any unsolicited offers (no matter how favorable), Defendants were able to control the process. As the 2022 Shareholder Meeting approached and the proxy vote loomed, Defendants claimed that any change in the Board would hamper a potential sale, a factor which weighed heavily in favor of their reelection. To silence the activists, Defendants claimed to enter "exclusive talks" with a seller, Franchise Group, Inc. ("FRG"), causing a significant rise in the share price. However, once FRG, the only bidder with a history of keeping prior management in place, began its due diligence, it reduced its offering price drastically. The Company then announced it was no longer in talks to sell (to FRG or anyone else). In the same press release, Kohl's announced that investors should expect lower than forecasted sales for the second quarter of 2022. On this news, the share price crashed, falling ***19.6% in a single day***.

4.     Defendants also made a series of materially false or misleading statements and

omissions throughout the Class Period. First, in the second half of 2021, Defendants claimed that positive financial results were due to the success of a strategic plan announced in October 2020, when in fact the success was due to macroeconomic factors, such as customers, with government stimulus checks in their pockets, returning to in-person shopping as the COVID-19 vaccine became more widely available. Defendants also downplayed serious challenges the business was facing in obtaining inventory. These statements and omissions made investors believe Kohl's was well-positioned for long-term growth, when, in fact, the success was due to short-term catalysts, and Kohl's business began to suffer as soon as their effects began to wear off. Second, Defendants continued to represent that their strategic plan was successfully working in proxy materials throughout the first quarter of 2022, waiting until the week after the 2022 Shareholder Meeting— at which the existing Board Members secured a complete victory over the slate proposed by activist investor Macellum—to reveal exceptionally poor quarterly results.

5.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities caused thereby, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5) and Section 14(a) of the Exchange Act (15 U.S.C. § 78t(a)), and Rule 14a-9 promulgated thereunder by the SEC (17 CFR § 240.14a-9).

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

8.      This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this district to render the exercise of jurisdiction

by this Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Kohl's is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

10.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange, a national securities market.

## PARTIES

### A. Plaintiff

11.     Lead Plaintiff Thomas Frame, as set forth in the accompanying certification attached hereto as Exhibit A, incorporated by reference herein, purchased Kohl's securities during the Class Period, and suffered significant damages as a result of the federal securities law violations alleged herein. Plaintiff purchased shares of the Company prior to the Record Date and was entitled to vote in the Shareholder Meeting.

### B. Defendants

12.     Defendant Kohl's is a large retail store with locations across the Unites States. Kohl's is incorporated in Wisconsin with principal executive offices located at N56 W17000 Ridgewood Drive, Menomonee Falls, Wisconsin 53051. Kohl's common stock trades on an efficient market, the New York Stock Exchange ("NYSE"), under the trading symbol "KSS".

13.     Defendant Gass served as Kohl's CEO throughout the Class Period until December 2, 2022. Gass also served as a Director of the Board at all relevant times and was a member of the Board's Executive Committee (which met approximately 20 times a year and was "authorized to

4

act on behalf of the Board of Directors in the intervals between the Board's meetings.").

14. Defendant Jill Timm ("Timm") served as Kohl's Senior Executive Vice President and Chief Financial Officer throughout the Class Period.

15. Defendant Michael Bender ("Bender") served as a Director of the Board throughout the Class Period.

16. Defendant Peter Boneparth ("Boneparth") served as a Director of the Board throughout the Class Period. Boneparth was also on the Executive Committee throughout the Class Period. He became Chairman of the Board after the May 11, 2022 Shareholder Meeting and authored a letter to shareholders before the meeting under the title "incoming Chair." After the Shareholder Meeting, he also became Chair of the Executive Committee.

17. Defendant Yael Cosset ("Cosset") served as a Director of the Board throughout the Class Period.

18. Defendant Christine Day ("Day") served as a Director of the Board since on or around May 12, 2021.

19. Defendant H. Charles Floyd ("Floyd") served as a Director of the Board throughout the Class Period.

20. Defendant Robbin Mitchell ("Mitchell") served as a Director of the Board throughout the Class Period.

21. Defendant Jonas Prising ("Prising") served as a Director of the Board throughout the Class Period, where he was the Chair of the Compensation Committee and a member of the Executive Committee.

22. Defendant John E. Schlifske ("Schlifske") served as a Director of the Board throughout the Class Period and was a member of the Executive Committee.

5

23.     Defendant Adrianne Shapira ("Shapira") served as a Director of the Board throughout the Class Period.

24.     Defendant Stephanie A. Streeter ("Streeter") served as a Director of the Board throughout the Class Period and was Chair of the Audit Committee and a member of the Executive Committee. Streeter announced on February 17, 2023 that she had decided not to stand for re-election at the 2023 shareholder meeting.

25.     Defendants Gass, Timm, Bender, Boneparth, Cosset, Day, Floyd, Mitchell, Prising, Schlifske, Shapira, and Streeter are collectively referred to herein as the "Individual Defendants." Defendants Gass, Bender, Boneparth, Cosset, Day, Floyd, Mitchell, Prising, Schlifske, Shapira, and Streeter are collectively referred to herein as "Board Members." Defendants Bender, Boneparth, Cosset, Day, Floyd, Mitchell, Prising, Schlifske, Shapira, and Streeter are collectively referred to herein as "Non-Employee Board Members."

26.     The Individual Defendants possessed the power and authority to control the process by which a sale of Kohl's was purportedly considered, and the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

27.     Kohl's and the Individual Defendants are collectively referred to herein as

"Defendants." The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

### C. Relevant Third-Party

28.    Macellum Capital Management is an activist investment firm focused on the retail and consumer industries, founded in 2009 by Jonathan Duskin ("Duskin"). Macellum, by and through its affiliates, including Macellum Advisors GP, LLC and Macellum Badger Fund, LP, invests in companies that it believes would benefit from a change in leadership or corporate strategy with the goal of advocating for the change and increasing the value of its investments. This may take the form of engaging with the existing management of a company to implement changes or nominating and campaigning for new directors through a proxy contest. Macellum has run successful election contests at a number of large retail companies, including The Children's Place, Citi Trends, Bed Bath and Beyond, and Big Lots.

## FACTUAL BACKGROUND[1]

29.    Kohl's operates one of the largest chains of retail department stores in the United States, with more than 1,100 stores in 49 states. The Company offers a variety of retail goods, including apparel, footwear, accessories, beauty, and home products through its stores and website. In October 2020, as the COVID-19 pandemic was ongoing, Kohl's announced a "a new vision and long-term strategic framework" to become "the most trusted retailer of choice for the active and casual lifestyle," including "a goal of expanding its operating margin to 7% to 8%" by 2023.

30.    On February 22, 2021 (before the Class Period began), a group of activist investors,

---

[1] Unless otherwise noted, all emphasis in quotations throughout this Complaint is added.

including 5% investor Macellum (the "Investor Group"), published a letter stating, "Kohl's stock price has chronically underperformed against its peers and relevant indices because the Board has failed to help develop and oversee a strategic plan to respond to a rapidly changing retail landscape." The letter explained that the 2020 plan was "strikingly similar" to the Company's previous "Greatness Agenda" from 2014, of which Gass (who was the Chief Merchandising Officer at the time) was considered a key leader and architect. For example, both plans included a focus on the Active category, introducing new brands, and increasing inventory turn. The Greatness Agenda was widely seen to have failed: specifically, it called for $21 billion in sales and $1.9 billion in operating profit by 2017 but missed those targets by 9% and 25%, respectively. The letter also noted that Kohl's generated $18.9 billion in net sales in 2019, approximately the same as the $18.8 billion reported for 2011, eight years earlier, while the industry grew 17% over this same period. "This is particularly troubling," the Investor Group wrote, "given the large number of competitive store closures and bankruptcies that the industry experienced during this time period." Indeed, similar retail stores such as Sears, JCPenney, and Nieman Marcus had all filed for bankruptcy shortly before this time. The Investor Group stated that these issues were "fixable" but "will require a high-powered Board with relevant expertise and experience that does not shy away from its oversight role and will hold management accountable." Specifically, the letter criticized the Board's approval of incentive plans that awarded executives targeted bonuses for declining sales results. Additionally, the letter noted that many of the Board members did not have prior retail experience and had invested "a mere $1.2 million in Company stock while collecting over $23 million in director compensation," which the Investor Group saw as a sign that the Board was "woefully misaligned and must lack conviction and confidence in Kohl's." As such, the Investor Group nominated nine candidates for election to the Kohl's Board of Directors at the 2021

annual shareholders' meeting.

31. On the same day, Mr. Duskin appeared for an interview with *Yahoo! Finance Live*. Explaining the Investor Group's objectives, Duskin said, "If you go back to February of 2001, the stock is almost the same price as it was before we launched our campaign at $50. For 20 years, the stock hasn't moved. And so for us, it's kind of the board oversight . . . if you go back a decade, it's mis-execution after mis-execution. They released their Greatness Agenda in 2014 with [targets of] $21 billion and $1.9 billion of EBIT. They missed those two years later. And then they gave another two years to hit those targets, and then they missed those original targets by 36%."

32. The interviewer noted that, after reading the Investor Group's letter three times, what stood out to him was "Kohl's still operates a full-time flight crew and two private jets" and asked, "[w]ould you like to see them get rid of that stuff?" Duskin answered, "to us, it really speaks to the cost culture and a lack of a cost culture. . . . And again, this is a company that will tell you, you know, with a straight face that they're doing an excellent job of controlling costs and are really driving cost cutting throughout the organization. We just don't see it to the bottom line. . . . And the flight crew and two private jets is just kind of another example of that."

33. On the same day, Kohl's published its own press release, stating, "we reject the Investor Group's attempt to seize control of our Board and disrupt our momentum, especially considering that we are well underway in implementing a strong growth strategy and accelerating our performance." The Kohl's Press Release stated "[w]e are already making progress against our strategy"; "we are already gaining traction"; and "[w]e are confident that our new strategy, which includes important sales growth and profitability initiatives, will drive long-term shareholder value, and we are already delivering progress against it." Further, the Press Release stated, "[o]ur executive compensation programs are directly linked to corporate performance with the objective

of increasing long-term shareholder value" and "[o]ur Board and management team will continue to aggressively pursue the best interests of all shareholders." News of the Investor Group's announcement and Kohl's response was reported on by many major news outlets, including *CNBC*, *Reuters*, *Bloomberg*, *Fortune*, and *The Wall Street Journal*. Many of these stories noted that Macellum had previously won takeover bids at retailers such as Bed Bath & Beyond and Big Lots.

34.     In the following months, Kohl's and the Investor Group exchanged several more public communications. On March 2, 2021, Kohl's released its fourth quarter/full year 2020 earnings report.[2] Management also released its sales and earnings guidance for 2021. In an earnings call on the same day, Defendant Gass made positive statements about this new guidance and Kohl's strategic plan, such as: "We have delivered strong initial progress against our strategy in the past two quarters, and we are positioned to deliver a multiyear improvement in sales and operating margin" and "Importantly, these are not one-time benefits, but rather fundamental changes we are making in our operation that will drive sustainable improvements to our business." However, in a letter published on March 5, 2021 the Investor Group expressed disappointment in this new guidance ("sales and earnings to a decline of (8.5%) and (44%), respectively, when compared to 2019"), noting "[i]t is important to keep in mind that 2019 was itself a disappointing year for Kohl's and not a meaningful yardstick for measuring a recovery." The letter stated: "We believe Kohl's fourth quarter earnings report and full year 2021 guidance substantiate the immediate need for change on the Board. The Board seems to be content performing just slightly better than the worst companies in retail. 'Best of the worst' is not a viable strategy, nor does it satisfy shareholders like us seeking long-term superior performance." In response, on March 9,

---

[2] Kohl's fiscal year ends on the Saturday closest to January 31st each year, with each quarter lasting 13 weeks. For example, in 2021 Q1 ended May 1, 2021, Q2 ended July 31, 2021, Q3 ended October 30, 2021, and Q4 ended January 29, 2022. In this Complaint, quarters will be referred by QX:YY, for example, the first quarter of 2021 will be referred to as Q1:21.

2021, Kohl's replied with another press release, in which it warned that the "Activist Investors' campaign for board control threatens continued progress and momentum." Kohl's also set up a website, kohlsmomentum.com, to "provide resources to shareholders" and published a Form 14(a) with the contents of the new website.[3]

35.     The Investor Group published another letter to shareholders on March 29, 2021, largely focused on the topic of executive compensation. The letter stated, "[a]s stewards of shareholder capital, one of a board's most important responsibilities is to have a compensation program that sets fair and thoughtful targets to properly align pay with performance. We believe the Kohl's Board has failed in this regard." It explained that total compensation for Kohl's CEO increased by 43% in 2020, "the highest earned by a Kohl's executive in 15 years, despite the fact that 2020 financial performance was the worst by far over that time period." Further, the letter notes, "[t]his exorbitant CEO compensation stands in stark contrast to the fate of Kohl's employees, 85,000 of which were furloughed for several months and who we estimate were paid nearly 10% less in the aggregate in 2020 compared to 2019." And on April 6, 2021, the Investor Group published a strongly worded letter to the Kohl's Board of Directors. Under the heading "Kohl's Pattern of Misleading Statements," the letter stated, "In an apparent effort to win shareholder support [the Board] have repeatedly made misleading claims about their performance and the success of their 'new' strategy. These claims appear to stem from a desire to protect the seats of five long-tenured incumbent directors at any cost – or more precisely, at the cost of spending an estimated $10 million of shareholder money on proxy defense advisors and related services." The letter continues, "the Investor Group and their nominees see a different story–a Board lacking in credibility and willing to say anything to create a false narrative that they have a

---

[3] This website has since been taken down and any materials posted exclusively on the website are no longer available.

new strategic plan which is showing signs of success."

36.     After this hotly contested back-and-forth, on April 14, 2021, Kohl's published a press release titled, "Kohl's and Investor Group Reach Agreement." As part of the settlement, two of the candidates put forward by the Investor Group—Thomas Kingsbury and Margaret Jenkins—joined Kohl's Board as independent directors, and two of the existing directors would retire from the Board in 2021 and 2022, respectively. Former lululemon athletica CEO Christine Day, who was not nominated by the Investor Group but possessed the retail experience that the Investor Group felt the Board was lacking, was also added to the Board. Additionally, the Board established a standing Finance Committee, which new director Kingsbury would join. The Board also expanded its additional share repurchase authorization to $2 billion from $726 million remaining under the authorization in place at the time. In exchange, the Investor Group would not be submitting its white proxy cards for tabulation at the shareholder meeting.

37.     None of the new directors were tapped to serve on the Executive Committee of the Board. The Executive Committee met approximately 20 times per year, far more than any other committee, and was "authorized to act on behalf of the Board of Directors in the intervals between the Board's meetings." This gave the Executive Committee immense control over the Company. Among the members of the Executive Committee in 2021 were Streeter (who had been on the Board 14 years), Boneparth (13 years), Schlifske (10 years), and Prising (5 years), as well as Gass as the CEO of the Company.

38.     Analysts reacted favorably to news of the agreement. For example, in a note titled, "Settlement with Activists a Triple Win," Jefferies stated, "Key Takeaway: KSS settlement with the activist consortium is a good outcome for stakeholders. . . . We see today's announcement as a positive outcome in what had become a publicly contentious activist campaign. Shareholders

benefit (buyback), company benefits (board), and consumers benefit (pace & degree of prospective change)." Jefferies set a price target of $71 (current price was $60.94) and a rating of "Buy."

39.     Additionally, the Investor Group "agreed to abide by certain customary standstill provisions until 30 days prior to the close of the nomination window for the Company's 2022 Annual Meeting of Shareholders." In other words, Macellum and the other members of the Investor Group—and all their concerns about the state of Kohl's business and strategic plan—were temporarily silenced. However, the Kohl's Board and management knew that another proxy battle was likely imminent in 2022, and that slashing executive pay was at the top of Macellum's agenda.

## DEFENDANTS' SCHEME TO MISLEAD THE MARKET

### A. Macellum Breaks its Silence in January 2022 and Reveals Kohl's had Received Offers to Sell the Business

40.     The standstill period from the 2021 settlement agreement between Kohl's and the Investor Group expired on January 12, 2022. On January 14, 2022, counsel to Macellum and counsel to Kohl's participated in a call on which counsel to the Company proposed that Macellum enter into new standstill agreement for a period of approximately two months, long enough that it would not be able to propose its own slate for the 2022 annual shareholder meeting (the "Shareholder Meeting"). In exchange, the Company offered Macellum a preview of the Company's next quarterly earnings results and investor day materials. Macellum rejected this offer. This attempt to buy Macellum's silence was the first in a series of actions the Kohl's Board and management engaged in in order to maintain their lucrative positions.

41.     January 18, 2022, after market close, Macellum published a letter to Kohl's shareholders, announcing that it was nominating its own slate of director candidates for election at the Shareholder Meeting. Under the heading, "Another Wasted Year," Macellum wrote: "We do not often get the benefit of hindsight. However, today at Kohl's, we do. Macellum ran a campaign last year highlighting what we felt was the Board's material mismanagement of the

13

Company and inability to create value. Now, almost one year later, the Company's shares have significantly underperformed its retail peers and it is clear to us that our criticism was accurate." One of the initiatives Macellum proposed was: "Align executive compensation goals with shareholder value creation. . . . Setting declining targets, then beating them and richly rewarding executives is a recipe for stagnation." (Emphasis omitted).

42.     Macellum also stated, "We firmly believe that without significantly more change to the Board, the Company will fail to deliver acceptable value creation in the years to come. Absent more Board change, we believe the Board must pursue strategic alternatives. Macellum suspects that **there are a number of well-capitalized financial sponsors interested in Kohl's. We also have heard that the Board and its representatives have been approached and rebuffed overtures from credible buyers.** This is unacceptable and, if true, would seem to constitute a meaningful breach of the Board's fiduciary responsibilities." (emphasis in original). This was the first time it was revealed to the market that Kohl's had received offers.

43.     The same day, Kohl's published a press release, calling Macellum's statements "***unfounded speculation.***"

44.     However, investors reacted favorably to the news of the day—the share price increased from $49.75/share at market close on January 18, 2022 to $51.83/share at market close on January 19, 2022, about a 4% increase, on unusually heavy volume.

**B. Kohl's Confirms Receipt of Then Rejects Bids Citing Low Valuation, Adopts Poison Pill**

45.     On Friday, January 21, 2022, after market close, *The Wall Street Journal* published an article titled, "Kohl's Gets $9 Billion Bid From Starboard Value Group." The article reported that hedge fund Starboard Value LP had offered to buy the Company for $64 a share in cash (a 37% premium to the closing price of the stock on Friday, $48.84). According to the article, the

group had received "a 'highly confident' letter" from its bank assuring that it would be able to get financing for the bid. The *New York Times* picked up the story the next day, Saturday, January 22, 2022, adding that "private equity firm Sycamore Partners has also reached out to Kohl's about a potential deal, according to one of the people familiar with the matter, as well as a second person close to the matter. The firm is known for its acquisitions of retailers, including Staples and Belk Department Store." The Sycamore Partners bid was reported to be $65/share, even higher than the Starboard Group bid.

46.     The following Monday morning, January 24, 2022, the stock price opened at $61.71 per share, a ***31.7% increase over the closing price the previous Friday***, signaling strong investor support for a potential sale.

47.     That same day (less than a week after Macellum's letter revealed that the Kohl's board had "rebuffed overtures" from buyers—which Kohl's referred to as "***unfounded speculation***")—Kohl's issued a press release confirming that, in fact, "it *ha[d]* received letters expressing interest in acquiring the Company." The press release continued, "The Kohl's Board of Directors will determine the course of action that it believes is in the best interests of the Company and its shareholders. Shareholders are not required to take any action at this time. Kohl's does not intend to further comment publicly on these matters unless it determines it is in the best interests of shareholders to do so."

48.     With this confirmation, the stock price further rose to $63.71 per share on unusually high trading volume. Once again, this raise signaled that investors supported a potential sale.

49.     The next day, January 25, 2022, Macellum published a press release with a copy of a letter it sent to the Board. The letter stated, "the market's extremely positive reaction to the expressions of interest confirmed this morning indicates to us that investors want an organized

sales process. Multiple sell-side analysts also issued notes yesterday that acknowledge the superior value that can likely be obtained via a sale. In our view, the Board cannot ignore yesterday's approximately 35% spike in the Company's share price and try to chill acquirers' interest."

50.     The Kohl's Board certainly did not ignore the large spike in its share price, but rather than consider how best to generate value for its shareholders, instead, in furtherance of the scheme alleged herein, considered how they could time the news of a potential sale to ensure victory in the upcoming proxy battle.

51.     To this end, on February 4, 2022, Kohl's announced, "The Kohl's Board of Directors (the Board) has determined, following a review with its independent financial advisors and upon the recommendation of its Finance Committee, that the valuations indicated in the current expressions of interest which it has received ***do not adequately reflect the Company's value*** in light of its future growth and cash flow generation." The press release stated that Kohl's had engaged financial advisors at Goldman Sachs to "engage with interested parties," indicating that Kohl's had not foreclosed on the idea of a future sale.

52.     However, at the same time, Kohl's adopted a so-called "poison pill": "Kohl's also announced today that it has adopted a limited-duration shareholder rights plan, which is effective immediately and which is scheduled to expire on February 2, 2023. The rights plan has been adopted in order to ensure that the Board of Directors can conduct an orderly review of expressions of interest, including potential further engagement with interested parties. The rights plan does not preclude the Board from considering an offer that recognizes the value of the Company."

53.     An article published on Law360 titled, "Kohl's Says $9B Takeover Bid Is Too Low, Adopts Poison Pill," explained, "Poison pills are typically put in place to fend off buyers seeking to try a hostile takeover of a business ***at a low valuation***." Kohls did not explain why a poison pill

was appropriate in *this* situation, when the reported offers were more than a 30% premium to the pre-offer share price. In truth, the poison pill was adopted to chill the sale process and prevent any unsolicited offers (no matter how favorable), allowing the Kohl's Board to control the timing of any potential sales announcement. This was directly contrary to protecting the rights of shareholders, who may have benefitted from other, higher offers or increased competition in the bidding process. However, this was not a concern for the Kohl's Board, who had no intention of accepting any offer. Additionally, the Board adopted the so-called "shareholder rights" plan without submitting it for approval at the upcoming Shareholder Meeting. If the plan had truly been adopted to protect shareholders, there would have been no downside to submitting it for a shareholder vote. This fact strongly suggests that the plan was adopted to protect the Board—not shareholders.

54.     In the press release, Kohl's promised it would give further updates at its Investor Day on March 7, 2022.

55.     The Kohl's Board also set its record date (the date by which investors had to purchase shares to be eligible to vote in the Shareholder Meeting) for March 7, 2022: earlier than past years (the 2021 record date was March 24), only one week after the Company was set to report its Q4/full year 2021 earnings, and on the same day as the much touted Investor Day was scheduled. This was also a part of the scheme. Knowing results would be worse than expected, and news of a potential sale would not be forthcoming at the Investor Day, the Board sought to deny shareholders the opportunity to add to their positions in order to have a meaningful say at the Shareholder Meeting. Notably, Kohl's did not release its proxy statement until March 17, 2022— ten days after the record date for eligibility to vote at the Shareholder Meeting.

56.     Numerous news outlets reported both on Kohl's bid rejection and poison pill

adoption, including *The Wall Street Journal*, *CNBC*, *Reuters*, and *Yahoo! Finance*. In an article titled, "Kohl's adopts 'poison pill', says buyout offers undervalue it," Reuters noted, "Morningstar analysts said it is 'risky' to reject credible offers, especially after unfavorable market conditions for Kohl's in 2021."

57.     On February 10, 2022, Macellum published a letter to shareholders stating, "In the wake of the troubling press release issued by Kohl's last Friday, we are convinced – now more than ever – that a majority of the Company's Board needs to be refreshed." It continued, "The Board's decision to hastily reject at least two recent expressions of interest to acquire the Company, both of which included sizable premiums, suggests it is no longer operating with impartiality and objectivity." To this end, Macellum nominated ten director candidates for the Kohl's Board.

58.     In the shareholder letter, Macellum noted that the brief time in between the announcement of offers and the rejection indicated that it was unlikely prospective acquirers were given access to the type of information which would allow for them to adjust their offers higher. The letter explained, "it seems to us the Board is doing everything in its power to chill a normal-course sale process and quell interest from other bidders during what we view as a unique window of opportunity." Specifically, the letter noted that the poison pill was even more stringent than customary: "In fact, simply ***announcing an intent to commence a tender offer*** (as opposed to consummating one) triggers the pill. While the Board may claim it has built in a 'qualified offer' exception, the numerous requirements to be deemed a 'qualified offer' all but ensure that no unsolicited offer will ever be made. The requirements include that an offer must be fully-financed with committed capital, not subject to any due diligence, and not arbitrarily deemed 'inadequate' by the Company's retained investment bank." (Emphasis in original).

59.     In truth, the Board did not want prospective buyers to conduct due diligence at this

time because, as was later revealed, during Q1:22 (which was underway at the time), Kohl's continued to experience inventory issues and lower sales, leading to financials that were far weaker than expected. If a potential buyer discovered this during the due diligence process, it would likely lower its bid, proving that Macellum's concerns were valid. As such, the Board could not afford having any bidders conduct due diligence before the Shareholder Meeting.

60. For the remainder of the month of February 2022, Macellum continued to campaign for its Board candidates, making several more similar public statements. Mr. Duskin was quoted in a number of publications including *Yahoo! Finance*, *Global Cosmetics News*, and *Axios*, reiterating Macellum's position that the existing Board was "entrenched," and no meaningful change for the Company would be possible unless the majority of the Board was refreshed.

61. Macellum also continued to campaign on a platform of lowering executive compensation targets. For example, on February 18, 2022, Macellum released a proxy statement on Form 14(a). The proxy statement noted, "despite the COVID-19 pandemic, store closings and the rampant furlough of employees, the total summary compensation table (SCT) pay for Ms. Gass as CEO in 2020 was the highest of her tenure, increasing from $8.98 mm in 2019 to $12.86 mm in 2020—***an incredible increase of ~43%***. In fact, the pay ratio between Ms. Gass and the median employee increased to ***1,098:1 in 2020*** from 923:1 in 2019. All of this in a year where Kohl's has asked its employees and shareholders to weather the brunt of the pandemic." (Emphasis in original). Macellum's proxy statement stated that this increase in compensation "*seems to be made possible by a compensation agreement, approved by a Board, that sets the target sales and income increasingly lower for executives to achieve a bonus*." (Emphasis in original). The statement noted that the Board adjusted targets set in the 2018 Long Term Incentive Plan ("LTIP") from a three-year cumulative measurement to a three-year average measurement, making it so that management

could exceed the goal and receive a payout, where management would have received no payout under the 2018 LTIP as originally adopted.

### C. Kohl's Does Not Address a Potential Sale in the Q4:21 Earnings Call or Long-Awaited Investor Day

62.     On March 1, 2022, Kohl's issued a press release and held an earnings call regarding its financial results for the full year ("FY") 2021 and Q4:21. Just before the question-and-answer portion of the call, Gass made a statement about a possible sale of the Company: "Before we move to Q&A, I want to address some of the uninformed and inaccurate commentary regarding the Board's openness to maximizing value. We have a strategic and financial plan that will deliver substantial value. The Board is testing and measuring that plan against other alternatives. . . . The Board is committed to fulfilling its fiduciary duties and will choose the path it believes will maximize the value to shareholders. So contrary to what others might say, the Board's approach is robust and intentional. ***We won't be commenting further on this topic during today's call***." In other words, Kohl's management refused to comment on a topic that was so relevant to shareholders that it caused a +30% jump in the share price during the *same quarter being discussed in the call*. This was yet another example of Kohl's tightly controlling the narrative about any potential sale in order to leverage announcements to best serve the interests of the Board.

63.     At last, on Monday, March 7, 2022, Kohl's held its long-awaited Investor Day. Despite previous statements that more information would be forthcoming on Investor Day, like in the earnings call a few days prior, management pointedly did not discuss any potential sale of the Company.

64.     Largely due to management's refusal to discuss any news regarding the sale process, investors reacted negatively to the Company's Investor Day. The stock price fell from $58.77/share at close of market on Friday, March 4, 2022 to $51.15/share at close on Monday,

March 7, 2022, about a 13% decline, on slightly higher than usual trading volume.

65. The Investor Day did not silence Macellum, which continued to campaign for board change. On March 22, 2022, Macellum published a letter to shareholders raising additional concerns it had with the Company. The letter listed a number of actions the Board took " [r]ather than begin a credible and open sale process over the past several weeks," including, "Hastily rejected indications of interest from two credible and well-capitalized acquirers before providing sufficient access to management, a data room and other information that could inform upward adjustments to bids," "[r]ushed to implement an onerous, two-tiered poison pill that could only serve to chill acquirers' interest," "[f]ailed to communicate clearly and effectively about its purported process for evaluating potential acquirers' proposals and overtures." Additionally, Macellum noted that, even though the SEC had announced amendments to federal proxy rules requiring the use of universal proxy cards in all contested director elections occurring after August 31, 2022, just a few months after the 2022 Shareholder Meeting, Kohl's had denied Macellum's request for a universal proxy card and filed its definitive proxy materials with its own independent proxy card. Where a universal card would allow shareholders to compare all proposed candidates in one place and vote for any combination of candidates, individual cards only allow shareholders to vote for either the Company's slate or the activist's slate, preventing shareholders from voting for a combination of candidates.

**D. Kohl's Continues to Mislead Investors Regarding Potential Sales Leading Up To Shareholder Meeting**

66. On March 21, 2022, Kohl's filed a press release with an update, "regarding the Board of Directors' ongoing review of expressions of interest in acquiring the Company." The very brief update stated, "The Board acknowledged receipt of multiple preliminary indications of interest. The proposals received are non-binding and without committed financing. The Board has

authorized Goldman Sachs to coordinate with select bidders who have submitted indications of interest to assist with further due diligence so that they have the opportunity to refine and improve their proposals and include committed financing and binding documentation." The update did not say who the offers were from (or even what general industry the bidders were in), for how much, or how a potential deal might be structured.

67.    On March 31, 2022, Kohl's sent a letter to shareholders, which it also filed with the SEC on Form 14(a). In the letter, it criticized Macellum: "Macellum's push for a hasty sale at any price reveals a short-term approach that is not in the best interest of Kohl's shareholders. Macellum has repeatedly criticized Kohl's for rejecting an offer to acquire the Company at $64 per share, a price that is well below the value that Macellum itself publicly declared.[4] Their focus on short-term value is further evidenced in the selling of stock in the low $60s over the last month." However, this statement overlooked several facts: 1) The stock was trading in the low $60s *because* a potential sale was announced. Before the announcement, the stock was consistently trading in the low-mid $40s; and 2) Kohl's business was getting weaker, not stronger. The 2020 Strategic Plan was not working. While the Sephora stores were bringing in a small amount of new business (mid-single digit), the remodels necessary to accommodate the new stores were capital intensive and unlikely to be re-couped for at least ten years down the line. Additionally, Kohl's continued to struggle with inventory—both acquiring enough inventory at key times (despite other retailers recovering from COVID-related out-of-stocks) and acquiring the type of inventory customers actually wanted. Kohl's also began implementing a strategy known as "pack-and-hold," where seasonal items that arrived too late to make it to store shelves would be held in warehouses until

---

[4] Kohl's repeatedly misquoted Mr. Duskin on this point. Duskin stated in an interview with *Yahoo! Finance Live* that, if it were to refresh its Board and "truly sign off" on measures such as spinning off its e-commerce division and a sale-leaseback of its real estate, "Kohl's is easily worth $100 a share." He clearly was not indicating that such a valuation was possible if management and the Board continued.

the following year, when they could be sold during the appropriate season. While Timm framed this as a positive in later earnings calls, stating, "we didn't want to have to just mark [] down" seasonal inventory received too late to be saleable, management did not discuss the costs involved in storing and re-shipping the inventory, nor the fact that Kohl's had spent money purchasing inventory on which it would not see returns for nearly a year. Due to these issues, which Gass and Timm knew about due to their weekly business review meetings, management knew that the price of Kohl's stock was likely to decline further in the future, and as such, a sale of the business would likely generate the most value for shareholders.

68.     On April 4, 2022, Macellum published a letter it wrote to the Kohl's Board of Directors, also filed with the SEC on Form 14(a), in which it once again requested the Board to consider—or at least to be more transparent about—a sale of the Company. The letter stated, "In all of our years investing in the public market, we have never seen a corporate leadership team operate in a more defensive and insular manner when many shareholders seem very supportive of a sale and various suitors have expressed interest." As this letter highlighted, there were numerous indications that investors were enthusiastic about the possibility of a sale. The stock price rose significantly when news of the bids was announced and steadily dropped as it became clear Kohl's had no intention of being transparent with investors about a potential sale. The Kohl's Board recognized this fact and schemed to use it to its advantage in the upcoming proxy contest.

69.     The Macellum letter concluded by asking Kohl's for more transparency around the Q1:21 quarterly earnings prior to the Shareholder Meeting. In addition to having previously pre-released earnings results in the past, the Board had offered Macellum a preview of the fourth quarter results back in January, indicating that the Company had some meaningful view of quarterly results before releasing them to the public. However, since the results were poor, which

would weigh heavily in favor of Macellum in the proxy contest, it opted to conceal the results until after the Shareholder Meeting.

70.     On April 12, 2022, Reuters published an article titled, "EXCLUSIVE Franchise Group joins bidding for Kohl's." "Franchise Group has informed Kohl's it would be willing to pay ***$69 per share*** to acquire the department store retail chain, subject to due diligence, the sources said." "Franchise Group's bid is not the highest offer," the article continued, "Luxury department store operator Hudson's Bay Company has indicated it is willing to pay at least $70 per share for Kohl's, the sources said." It noted that the sources declined to be identified "because the discussions are private." On this news, the Company's share price rose from $57.24/share at market close on April 11, 2022 to $60.30/share at market close on April 12, 2022, an approximate 5.3% increase, on unusually heavy trading volume.

71.     On April 13, 2022, Kohl's filed with the SEC on Form 14(a) the transcript of a video message Gass sent to Kohl's employees. Gass revealed: "we've asked selected bidders to further refine their offers and to secure financing. They are doing a lot of diligence and homework, and we have provided access to thousands of documents and lots of data to help facilitate this process." In other words, Kohl's announced that several potential acquirers had moved on to the due diligence phase—a crucial late-stage step in the acquisition process—less than a month before the contested Shareholder Meeting. However, as later events revealed, Kohl's did not give the bidders access to meaningful information about its poor Q1:21 financial results, which would have resulted in the bidders withdrawing or lowering their bids.

72.     On April 25, 2022, approximately two weeks before the Shareholder Meeting, the *New York Post* published an article revealing that shopping mall real estate magnate Simon Property Group ("Simon") and Brookfield Asset Management, the post-bankruptcy owners of

Kohl's rival JCPenney, had made an offer to acquire Kohl's for approximately $8.6 billion, or approximately $68 a share.[5] Numerous other news outlets picked up the story, including *Fox Business*, the *Daily Mail*, and the *Milwaukee Journal Sentinel*. While Simon later refuted these claims, investors once again reacted positively to the news of a potential sale: the share price rose from $57.36/share at market close on Friday, April 22, 2022, to $60.39/share on Monday, April 25, 2022, about a 5% increase.

73.     On April 29, 2022, Kohl's published a press release with a letter from Chairman Defendant Boneparth, which it also files with the SEC on Form 14(a). In the letter, he expounded on the ongoing due diligence process: "Select bidders who have put forward preliminary, non-binding proposals have been given access to a data room containing over 55,000 documents with more than 550,000 pages and they and their representatives have had due diligence meetings with management." He further stated: "This Board has been conducting a robust and thorough process and ***keeping this Board in place will ensure the process is not disrupted or hindered***. Your Board's focus throughout this process is choosing the path that maximizes shareholder value." This statement implied: 1) the Board was actively pursuing a potential sale, and 2) electing the Macellum candidates would "disrupt" the potential sale.

74.     On May 3, 2022, Kohl's published a Press Release titled, "Leading Proxy Advisor Glass Lewis Recommends Shareholders Vote 'FOR ALL' of Kohl's Director Nominees." Specifically, the press release stated, "Glass Lewis further noted that adding dissident nominees could negatively impact the Board's ongoing sale process." It quoted Glass Lewis as stating, "…investors have to consider how the potential election of some or all of the Dissident Nominees might impact the Company's ongoing sale process, whether that means a delay in the sale process

---

[5] https://nypost.com/2022/04/25/jcpenney-owners-offer-to-buy-archrival-kohls-for-8-6b/

so that the Dissident Nominees can get up to speed with all matters pertaining to the Company, a reworking of the Company's financial projections that will have to be evaluated and scrutinized by prospective bidders, or a new dual-track process that includes a review of a potential sale-leaseback transaction." Once again, this press release, filed by Kohl's, emphasized that election of Macellum's candidate would jeopardize a potential sale of the Company.

75.     Additionally, the press release omitted that not all independent proxy advisory firms supported the Kohl's slate: at least two other firms, Institutional Shareholder Services and Egan-Jones, both recommended that shareholders vote for boardroom change using Macellum's proxy card.

76.     Macellum published a final letter to shareholders on May 9, 2022, just a few days before the Shareholder Meeting, which was also filed with the SEC on Form 14(a). Regarding Boneparth's statement that change in the boardroom would disrupt a potential sale, it stated: "Voting for Macellum's nominees will not change that outcome of a sale. In fact, our nominees would likely serve at a handful of meetings to discuss and approve a transaction and then would be another set of eyes in the boardroom for shareholders to help ensure a transaction is successfully completed."

77.     However, the damage had already been done. The Kohl's Board had put its shareholders in a hostage situation: if they wanted a successful sale, they would need to keep the existing Board in place.

### E.  Kohl's Is Victorious in Proxy Battle but Delivers Disastrous Quarterly Results; Macellum Continues to Pressure the Board

78.     On May 11, 2022, Kohl's issued a press release (not filed with the SEC) announcing that shareholders have voted to re-elect its 13 Board Members. Macellum issued their own press release, filed with the SEC on Form 14(a), titled, "Macellum Issues Statement Regarding Kohl's'

Annual Meeting and Its Commitment to Holding the Board Accountable Until Meaningful Shareholder Value is Unlocked," in which it stated: "if Kohl's is not sold, all directors need to be held accountable for any value that is not realized. We certainly will be there to bring that accountability if very meaningful value is not created in the coming months." This statement made clear that, despite the Board's hopes that a victory would silence the activists, Macellum would not be quiet.

79.     One week later, on May 18, 2022, Kohl's filed a Form 8-K with the SEC announcing that two of its top executives would be leaving the Company: Greg Revelle, the Company's Chief Marketing Officer, would be departing the Company effective June 1, 2022 and Doug Howe, the Company's Chief Merchandising Officer, would be departing the Company "effective immediately." Management certainly knew about these departures before the Shareholder Meeting (particularly given that Doug Howe was named President of DSW Designer Shoe Warehouse and Executive VP of Designer Brands only two days later), but withheld the information, as any news which reflected negatively on the Company may have jeopardized its Board in the proxy battle. Due to this news, coupled with the announcement of disappointing earnings results by another off-mall retailer, Target, the stock price declined from $48.47/share at close on May 17, 2022 to $43.13/share on May 18, 2022, approximately an 11% decline.

80.     Prior to market opening, on May 19, 2022, just one week after the Shareholder Meeting, Kohl's released its first quarter 2022 ("Q1:22") financial results. They were very poor. Kohl's cut its full-year net sales outlook to be flat to up to 1% from its previous guidance of a 2-3% rise, and on an adjusted basis, the Company earned 11 cents per share, missing estimates by a whopping 70 cents. Kohl's lowered its full year per share forecast for adjusted earnings to between $6.45 and $6.85, down from $7.00 to $7.50. Kohl's also reported that its total revenue for the

quarter dropped from $3.8 billion to $3.7 billion year over year, and its operating income collapsed by about 70% in the first quarter to $82 million.

81.     Later that morning, Kohl's held its earnings call with analysts. Gass began the call by stating: "Before we share details on Q1 results and long-term strategy, I want to acknowledge the much broader context of this past quarter. Over the past 3 months, Kohl's has been at the center of an unusual amount of attention and speculation . . . At this point, *we have formally communicated to the multiple parties in our process the specific procedures for the submission of actionable bids due in the coming weeks*." This was the only statement made during the call about the potential sale of the Company.

82.     Gass called the previous quarter "a challenging few months," revealing, "[o]ur first quarter results were below our expectations." Gass and Timm cited several factors which led to the "disappointing" results, including inflation, a difficult comparison period due to stimulus checks received in the same quarter of the previous year, and bad weather in some of Kohl's key markets. Timm also explained that, due to the aggressive buying the Company had bragged about in the November Earnings Call, coupled with low sales in the previous quarter, Kohl's was now *over*-inventoried, due to seasonal and holiday inventory that arrived too late to be saleable. The Company was forced to use a pack-and-hold strategy on the out-of-season inventory, meaning there would be no return on investment on the late-arriving inventory until the following year. Notably, Timm stated that sales "considerably weakened *in April* . . . which resulted in a 5% decrease in net sales to last year." In other words, Kohl's management *knew about negative trends affecting their sales long before the contested Shareholder Meeting* yet gave no indication to shareholders of these negative headwinds. Kohl's also rejected bids from credible buyers in February 2022 even though it knew several of these headwinds—such as the difficult comparison

period and the continuing inventory issues—were imminent and likely to affect the value of the Company in the eyes of potential buyers.

83. Despite Kohl's dismal financial report, the Company's stock price increased slightly after the earnings call. An analyst from Deutsche Bank noted that, while financial results missed expectations, "we believe the stock is seeing support today given the company plans to consider 'actionable bids' over the coming weeks."

84. After market close on May 19, 2022, the *New York Post* published an article titled, "Kohl's sales process is a 'disaster': sources."[6] Citing confidential sources, the article stated: "Dismal financial results at Kohl's have raised concerns that the company's auction to sell itself will be a bust – even as management continues to tout the strong interest by potential suitors." Additionally, a source "close to the sales process" told the *Post*: "'I don't believe there will be any acceptable bids offered now.'" The results themselves were not the sole reason sources gave for the declining interest amongst bidders: "enthusiasm for the deal has likely been extinguished . . . *in part because of a lack of transparency from Kohl's*. Last week, Kohl's won a proxy fight to replace 10 of its directors. But they might not have affirmed the board had they known about the company's most recent performance, sources said." A source "close to the sales process" stated, "Basically the company knew their results stunk and they didn't tell anyone and they got the shareholder vote for their board of directors." The article also confirmed that, despite statements to the contrary, the Board likely had no intention of actually selling the Company: "sources tell The Post the Wisconsin-based company may be privately rooting for an outcome in which bidders fade away – despite the public image management has put forward."

85. This revelation demonstrated that the Company's statements about bidders' access

---

[6] https://nypost.com/2022/05/19/kohls-sales-process-is-a-disaster-sources/

to a trove of internal Kohl's documents and that bidders were doing a deep-dive into due diligence were misleading; none of the bidders had any insight into Kohl's financial position, because they were all shocked by the dismal financial report and lowered their bids, if not withdrew them entirely.

86.     The next day, May 20, 2022, Macellum published a press release titled, "Macellum Issues Statement Regarding the Kohl's Board's Apparent Breach of Fiduciary Duty and Failure to Disclose Material Information Prior to 2022 Annual Meeting." The press release stated, "**It was alarming to learn yesterday that the current Board appears to have withheld material information from shareholders about the state of Kohl's in the lead-up to this year's pivotal annual meeting.** We believe all of the Company's shareholders should feel betrayed and outraged by the fact that the quarter's massive earnings miss, reduced guidance and the imminent departures of two senior executives, who presumably supported the development of Kohl's' three-year strategy released in March 2022, were not disclosed prior to last week's annual meeting." (Emphasis in original). The press release continued: "If any of the current directors were aware of this material information prior to the annual meeting, their involvement in any decision to withhold the news prior to a monumental shareholder vote suggests to us a clear breach of fiduciary duty."

87.     The partial revelation of the Board's scheme to maintain control of the Company by withholding material information from shareholders caused the share price to fall drastically: from $45.04/share at market close on May 19, 2022 to $39.20/share at market close on May 20, 2022 (the lowest it had been since January 2021, when the stock was still depressed from the COVID pandemic), an approximate 13% decline, on unusually heavy trading volume. However, many shareholders continued to hope that a sale was on the horizon, and as such, the share price remained artificially inflated.

### F. Kohl's Rejects Final Deal, Causing the Stock Price to Crash

88. Recognizing the potential for strong blowback and potential claims of breach of fiduciary duty if they suddenly dismissed all potential bids—especially as Macellum continued to publish regular communications to shareholders—on June 6, 2022, after market close, Kohl's announced it had entered "exclusive negotiations" with Franchise Group, a holding company focused on acquiring brands and expanding them through franchising, for a period of three weeks in relation to FRG's bid to acquire the Company for $60.00/share. The purpose of this three-week period was for FRG and its financing partners "to finalize due diligence and financing arrangements and for the parties to complete the negotiation of binding documentation." Additionally, the press release stated, "The Company will have no further comment until an agreement is reached or the discussions are terminated."

89. On this news, the Company's share price rose from $42.12/share at market close on June 6, 2022 to $45.59/share at market close on June 7, 2022, an approximately 9% increase, on unusually high trading volume. *Yahoo! Finance*, reporting on the exclusive negotiation announcement and the jump in the stock price, stated, "news of a favorable evaluation has to be music to the ears of KSS investors."

90. However, analysts worried that the offer was too little, too late. On June 7, 2022, BofA Securities published a report on the announcement stating, "On KSS consideration side, we note management has spent half a year defending its strategic plan vs. an activist and only three months ago reportedly had an internal valuation >$70/share so willingness to reach an agreement might face a higher hurdle vs. earlier in the year." The report also noted, "*Reuters* previously reported in April that FRG was willing to pay $69/share." Cowen & Co. similarly surmised that there was a "40-60% chance the deal is done at $60 and 40-60% deal breaking and the stock trading at $36." While Cowen believed "FRG has been diligent in securing financing" and "Kohl's fits

well within FRG's core strategy as a $1bn annual FCF company that offers a broad selection of categories to a diverse set of core customers," it also acknowledged emerging risks, including "the state of the current retail environment as inflation pressures disposable income" and "less investor appetite following challenging market conditions and volatility."

91.     Additionally, Kohl's had an ulterior motive for choosing FRG as the party to advance to exclusive negotiations. A June 22, 2022 *Reuters* article noted, "Franchise Group executives have signaled confidence in Gass and members of her management team, the sources said, noting that Franchise Group is known to buy businesses that have operating teams in place and does not specialize in bringing in new management teams."[7] Thus, the selection of FRG ensured that, even the Company was pressured to complete a sale, Gass and her team would be able to remain in their roles.

92.     The announcement that Kohl's was proceeding to the next phase of the sale process temporarily silenced Macellum, as it appeared shareholders would finally be getting the deal they had pressed for since the beginning of the year.

93.     On June 22, 2022, shortly before the conclusion of the three-week exclusive negotiation period, *CNBC* published an article titled, "Franchise Group considers lowering Kohl's bid closer to $50 a share from about $60, source says."[8] The article stated that a confidential source had stated that FRG was "actively considering whether buying Kohl's is the best use case of Franchise Group's capital." This story was picked up by a number of other publications, including *Reuters*, *Bloomberg*, and the *Milwaukee Journal Sentinel*. Almost immediately after the *CNBC*

[7] https://www.reuters.com/markets/us/exclusive-franchise-group-talks-keep-kohls-management-team-after-sale-sources-2022-06-21/

[8] https://www.cnbc.com/2022/06/22/franchise-group-considers-lowering-kohls-bid-closer-to-50-a-share-from-60.html

article was published, Kohl's stock began trading down.[9] The share price closed at $38.61/share on June 22, 2022, an approximately 8.8% decline from $42.33/share, the closing price the previous day, on unusually heavy trading volume.

94. Then, on July 1, 2022, Kohl's filed a press release announcing that the Board had "unanimously determined to conclude its strategic review process." It continued, "Despite a concerted effort on both sides, the current financing and retail environment created significant obstacles to reaching an acceptable and fully executable agreement. Given the environment and market volatility, the Board determined that it simply was not prudent to continue pursuing a deal."

95. With this announcement, it was finally revealed to the market what the Kohl's Board and management knew all along—regardless of potential benefit to shareholders, there would be no sale of the Company.

96. In the same press release, Kohl's presented an update on its Q2:22 results: "As inflationary pressures on the consumer continue, the Company is seeing a softening in consumer spending and now expects sales to be down high-single digits for Q2, as compared to our prior expectations of down low-single digits relative to last year." The press release stated that more information would be forthcoming during its earnings call on August 18, 2022. The fact that Kohl's was able to present an update on its quarterly financial results over a month and a half before its earnings call once again demonstrates that it could have given a similar preview of its Q1:22 results prior to the Shareholder Meeting.

97. On this news, the Company's share price crashed from $35.69/share at market close on June 30, 2022, to $28.68/share at market close on July 1, 2022, an astonishing *19.6% drop* on

---

[9] *See* https://news.bloomberglaw.com/mergers-and-acquisitions/kohls-falls-on-report-franchise-group-might-reduce-offer-price?context=search&index=5, noting shares were trading down 8.1% within 20 minutes of the publishing of the *CNBC* report.

unusually heavy trading volume.

98.     Notably, a sale price of $53/share, which Kohl's deemed unacceptable, would have been a 46% premium to this post-rejection sale price.

99.     During Franchise Group's August 7, 2022 earnings call, its CEO Brian Kahn gave insight into the bidding process. First, Kahn explained that because Kohl's was not seen as a franchisable business, Franchise Group initially had no interest in making a bid for Kohl's. Indeed, only after Franchise Group was approached *multiple times*, and was offered a "transaction structure that was too good to ignore," one that did not "hav[e] any net cash investment risk out of FRG," did Franchise Group even consider the deal. Then, after the initial offer, "the goalposts moved" and then Franchise Group had to bear investment risk and the deal became less attractive.

## POST-CLASS PERIOD EVENTS

100.     Events occurring after the Class Period shed further light on Defendants' fraudulent scheme and course of conduct.

101.     On August 18, 2022, Kohl's published a press release and held an earnings call regarding their financial results for the second quarter of 2022 ("Q2:22"). As the Company had previewed in its press release on July 1, 2022, results continued to be poor, in part due to the continuation of "supply chain-related challenges." Kohl's also slashed its yearly guidance: "Net sales is now expected to decline in the range of (5%) to (6%) as compared to the prior year" (previously expected to be in the range of 0% to 1% as compared to the prior year). While the share price had slowly begun to creep back up after the news that a sale would not be forthcoming, on this news, it fell right back down, from $33.95/share on August 17, 2022 to $31.33 on August 18, 2022, a 7.7% decrease.

102.     Around this same time period, other lower-budget retailers, like Walmart, actually began to shift to a slightly more positive outlook for the remainder of the year, as inflation drove

consumers who previously shopped at higher end stores toward more budget-friendly alternatives.[10] In fact, in November 2022, Walmart actually raised its guidance, citing gained market share from consumers looking to be more frugal.[11] While Kohl's, a retailer known to cater to the low-to-mid income consumer, should have benefited from this shift, instead, its sales continued to steeply decline. This indicated that any strategic plans implemented by Kohl's management had failed.

103. On September 16, 2022, the S&P downgraded Kohl's credit rating to junk, indicating a high likelihood that the Company will default on debt. On September 20, 2022, Moody's similarly downgraded Kohl's rating.

104. On September 22, 2022, Ancora Holdings Group, LLC ("Ancora"), who had been a member of the Investor Group back in 2021, called on the Board to terminate Gass and remove Boneparth as Chairman of the Board and replacing them with individuals who "possess operating expertise and turnaround pedigree." Ancora revealed that it, like Macellum, "spent nearly 18 months privately engaging with leadership to share recommendations for reversing the Company's sustained underperformance and unlocking value for long-suffering shareholders." However, Ancora had "withheld public critiques during this period to provide Kohl's time to bounce back from the COVID-19 pandemic, conduct a productive review of strategic alternatives and produce a viable standalone plan that investors could rally behind."

105. On October 13, 2022, after months of silence, Macellum published a shareholder letter, stating: "The Board contends that the shareholder vote at the 2022 Annual Meeting of

---

[10] *See, e.g.*, https://www.reuters.com/business/retail-consumer/walmart-expects-smaller-profit-drop-discounts-drive-demand-2022-08-16/, "Surging inflation also drove many mid-to-high income customers to Walmart."

[11] See, e.g., https://www.nytimes.com/2022/11/15/business/walmart-inflation-sales-profit.html, "The relatively robust results in its latest quarter led Walmart's executives to raise the company's full-year profit outlook, saying they now expect profit to fall less sharply and revenue to rise more strongly than before. Executives said they had also improved their outlook because the retailer gained market share during the quarter as Americans looked for ways to save money."

Shareholders . . . is proof they have shareholders' support today. We believe that had the true degree of business deterioration, senior executive departures and flawed sale process been known by shareholders at the time of the 2022 Annual Meeting, there may have been a different outcome, which is why we write today. We believe there is an urgent need for change now, rather than waiting another eight months for another contested election at the 2023 Annual Meeting."

106. Then, on November 8, 2022, Kohl's announced that Gass was resigning to accept another opportunity, the position of CEO at Levi Strauss & Co ("Levi"). In the same press release, Kohl's announced preliminary results for its third quarter of 2022 (Q3:22"). Sales decreased 6.9% and net sales decreased 7.2% as compared to the Q3:21, a dismal result. However, *CNBC* noted that, upon this news, "Shares of Kohl's closed Tuesday at $28.82, up about 7%. Shares of Levi ended the day at $14.86, down about 3%."[12] Notably, Gass took a significant pay cut. While her base salary remained the same, $1.475 million, her potential bonus at Kohl's was 262.5% of her base salary plus an additional potential bonus of 6 times her salary under the LTIP (which resulted in a total compensation package worth $12,924,834 in 2021), where her potential bonus at Levi was only 17% of her base salary.

107. The Board appointed Thomas Kingsbury, one of the Board Members appointed in the 2021 settlement between Kohl's and the Investor Group, as interim CEO. Kingsbury had previously been CEO of Burlington Stores from 2008 to 2019 and was credited with reviving the brand after many believed it had lost its relevance.[13]

108. Finally, on February 2, 2023, Kohl's published a press release, also filed with the SEC on Form 8-K, announcing the permanent appointment of Kingsbury as CEO. Kingsbury was

---

[12] https://www.cnbc.com/2022/11/08/kohls-ceo-michelle-gass-to-step-down.html

[13] *See, e.g.*, https://footwearnews.com/business/retail/burlington-coat-factory-stores-stock-price-wall-street-investors-1202761545/

appointed as part of a cooperation agreement with Macellum, and in exchange, Macellum agreed to a standstill agreement "ending on the 18-month anniversary of the date Mr. Kingsbury is no longer CEO of the company" where Macellum would vote all its shares "in favor of each of the directors nominated by the board and, subject to limited exceptions, consistent with the recommendation of the board on all other matters at each annual and special meeting of the company's shareholders." The Kohl's Board killed two birds with one stone: the Company gained a CEO with relevant retail experience and the Board gained the promise of multiple years of silence from Macellum.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISISONS

### A. Statements and Omissions Attributing Kohl's Performance to the Strategic Plan

109. In the wake of the 2021 proxy battle with the Investor Group, and with another proxy battle likely imminent in 2022, the Kohl's Board and management knew strong 2021 results, attributable to management's actions, would be necessary to prevent Macellum from prevailing. As such, leading up to the Shareholder Meeting, Defendants Gass and Timm made a number of fraudulent statements attributing an increase in sales and operating margin at Kohl's to the strategic plan put in place in October 2020.

#### i. August 19, 2021

110. On August 19, 2021, Kohl's published a press release reporting the Company's financial results for Q2:21. In the press release, Gass is quoted as saying: "Our performance in the second quarter marked another important step in further establishing Kohl's as the leading destination for the active and casual lifestyle. We delivered record second quarter earnings with sales and margins materially exceeding expectations. As pleased as we are with ***our ongoing strategic progress***, much of our opportunity is still ahead of us."

111.    In the August 19, 2021 Earnings Call, Gass stated, "We delivered record Q2 earnings of $2.48 per diluted share as both sales and margins, materially exceeded our expectations." She then made numerous statements attributing this success to the 2020 Strategic Plan: "This underscores our confidence in the future and commitment to creating shareholder value, and we still ended in a very strong cash position of $2.6 billion. As pleased as we are with our ***ongoing strategic progress***, much of our opportunity is still ahead of us."; "***Since launching our strategy last October***, our organization is executing a clear plan to build sales momentum with an intense focus on improving our profitability."; "As evident in our results, ***we are already seeing the benefits of our strategic efforts***, which have positioned us to achieve many of our 2023 goals this year, well ahead of plan."; "***Our strategy is working*** and the favorable industry environment has only amplified our performance."; "We debuted our strategy last October in the midst of the pandemic, recognizing a significant opportunity to transform the business and drive more sustainable and profitable growth well into the future. . . . ***Everything that we envisioned with this new strategy is playing out as planned***, and in many cases, sooner than we expected. We are now at an important milestone in our strategic journey." Similarly, CFO Timm stated, "I want to start by echoing, the results are ***truly reflective of our strategy work***."; "***[E]xecuting against our strategy***, we have structurally improved our margin efficiency and are confident in our ability to sustain the recent improvement."; "In summary, we are really pleased with our second-quarter results and ***the progress we are making with our strategy***. Our efforts are gaining traction."; "[W]e did take advantage of a great market, but I think ***the big thing is our strategies are working***."

112.    These statements were materially false or misleading and/or omitted information necessary to make them not misleading because the positive results had nothing to do with any sort of plan management had put in place. Gass and Timm's statements failed to disclose that the

two major catalysts which led to higher sales during this quarter completely were unrelated to the strategic plan: customers returning to shopping in person as the COVID-19 vaccination became more widely available and increased retail spending due to the stimulus checks the U.S. Government began sending out in March 2021.[14] In fact, Timm *specifically stated* that the "big thing" which caused Kohl's success during the quarter was the Strategic Plan. Similarly, Gass represented that the main factor for the positive results was the Strategic Plan, and the "favorable industry environment has only amplified our performance."

113. As the effects of these short-term catalysts began to wear away, Kohl's performance began to decline. In fact, Gass and Timm specifically cited "a difficult comparison period due to stimulus checks" as one of the main reasons for disappointing Q1:22 results. If the growth during this time period was due to the strategic plan, and not the issuance of stimulus checks, the absence of the checks would not have affected the comparison period.

114. Further, the statements made it seem like the Strategic Plan was a new strategy adopted in October 2020. However, the Strategic Plan was virtually identical to the "Greatness Agenda," a three-year plan which Kohl's had put in place in October 2014. Both focused on an "active lifestyle," adding new brands, increasing inventory turns, fixing the overly complicated loyalty program, and driving traffic with outside partnerships. The Greatness Agenda was an abject failure. In August 2015, just months after the Greatness Agenda was put in place, Kohl's reported exceptionally weak quarterly results, causing some to wonder "whether its turnaround strategy is living up to its name."[15] The Greatness Agenda called for $21 billion in sales and $1.9 billion in

---

[14] The government began sending checks in March 2021 (during Kohl's Q1:21) to those who had filed a 2019 or 2020 tax return, received Social Security, or otherwise applied online. The IRS continued to send out checks to individuals who did not meet those criteria if they filed a 2021 tax return, so the distribution of checks continued well into Kohl's Q2:21. *See* https://www.taxoutreach.org/blog/what-to-know-about-the-third-stimulus-checks/

[15] https://www.washingtonpost.com/news/business/wp/2015/08/13/even-with-a-greatness-agenda-kohls-is-struggling-to-lure-new-shoppers/

operating profit by 2017, but missed those targets were missed by 9% and 25%, respectively. However, when she became CEO in May 2018, Gass recommitted to the Greatness Agenda. By 2019, the operating profit target was missed by 36%.

115.    Specifically, Gass identified several elements of the plan which she claimed contributed to the positive quarterly results: "***Our customer base is growing to record levels***. And we have significantly strengthened our brand portfolio. We are investing in our stores, enhancing our loyalty program, and have rolled out new Omni and ***digital capabilities*** to further our best-in-class positioning."

116.    However, the growth of Kohl's customer base was not due to their Strategic Plan, but rather, was due to a temporary preference of customers for off-mall locations, rather than crowded shopping malls, as the COVID vaccine slowly rolled out. Additionally, a confidential witness Plaintiff spoke to ("CW1"), who was the former VP of User Experience and Digital Operations at Kohl's from February 2020 to September 2022 (and held various other positions at Kohl's going back to 2008), reporting to the SVP of Digital, stated that he left the Company after 14 years because of disagreements over "strategic decisions" management made to shift focus and resources to Kohl's in-store retail business segment and away from online ecommerce. CW1 stated that in 2020 there had been "massive growth" in ecommerce sales because of the pandemic, but in 2021 there was essentially "no investment or growth strategy for digital" and in 2022 ecommerce performance was "flat." CW1 stated that Gass and Timm were certainly aware of how ecommerce was performing since they participated in regularly scheduled "business review" meetings that were held every Monday (and sometimes Tuesday) morning, remotely during the pandemic and then, in 2022, in-person in a boardroom located amongst the Company's executive suites.

### ii. November 18, 2021

117. On November 18, 2021, Kohl's published a press release reporting its results for Q3:21. Just as they did in the August 2021 Earnings Call, Gass and Timm attributed the positive results during the quarter to the strategic plan. Gass stated: "***Our strategic effort*** to transform Kohl's into the leading destination for the active and casual lifestyle ***continues to gain traction***. We delivered another outstanding performance in the third quarter, continuing our momentum from the first half of the year" and "[W]e can be more pleased with the progress that we made ***against our strategy*** this year. Obviously, this performance in 2021 exceeded our expectations. And I didn't point out, our guidance really puts us in a place that we're going to exceed our 2023 goals this year. ***We believe our business has momentum***. We have a lot of really great new initiatives that just literally set the end of Q3, and we're going to continue to build on that which gives us really great confidence on us being able to ***continue on this strategic mission*** of repositioning ourselves to grow more profitably going forward. So, you have our commitment for growth." With regards to holiday shopping, Gass stated, "we've got terrific response from our customers. And we saw it across the board, but in particular, we're excited that ***a lot of our key strategies***, where we leaned in, especially on inventory like active, they are really responding." Similarly, Timm stated: "we are really pleased with our third quarter results and ***the progress we're making against our strategy***. As you've heard today, our business has clear momentum, and we look to build on it as we close 2021 and enter the New Year" and "Michelle and I and the leadership team have ***incredible confidence in our strategy***."

118. These statements were materially false or misleading and/or omitted information necessary to make them not misleading for the same reasons described above in ¶¶ 112-16, namely, any success Kohl's experienced during the quarter was largely due to macroeconomic factors rather than any plan put into place by management. Customers continued to gain confidence in

returning to retail stores after the pandemic, government stimulus checks continued to trickle out to those who had not received them earlier in the year, and the unemployment rate began to steadily decline after pandemic-related lay-offs subsided, allowing consumers more money for discretionary spending.[16] Consumer research showed that shoppers were "highly optimistic" about spending during the 2021 holiday season, intending to spend heavily and early due to both concerns about supply chain issues and, after months of quarantine, "because they want to do 'something fun right now.'"[17] Additionally, Kohl's continued to be a destination of choice due to its off-mall locations, as consumers continued to be suspicious of crowded malls.

119.    Gass and Timm also indicated that one of the strongest headwinds of the quarter—difficulty in sourcing inventory—was actually an intentional part of the Strategic Plan. Gass stated: "we *planned inventory to be down this year* as compared to 2019, *aligned with our strategy* to drive margins and turnover." Timm stated: "We're in the midst of a transformation here. And so, when we exited 10 brands, that took a lot of inventory out of the ecosystem." Gass further explained: "women's is clearly very important to us. *We embarked in the biggest, boldest transformation* as Jill was just saying, we plan the year down. So, inventory being down 25% for the entire business, women's more so than that. *With the strategy to chase*, as we saw, really what were going to be the outstanding winners, we got lots of them."

120.    These statements were materially false or misleading and/or omitted information necessary to make them not misleading because the lack of inventory was due, in truth, to another macroeconomic trend—a global shortage in retail goods, coupled with higher freight costs and other supply-chain issues. The statements that the lack of inventory was (at least partially)

---

[16] *See* https://www.bls.gov/news.release/archives/empsit_12032021.pdf

[17] https://www.mckinsey.com/capabilities/growth-marketing-and-sales/our-insights/us-holiday-shopping-2021-strong-demand-meets-big-challenges

intentional implied that management could access other inventory if necessary or take other steps to increase inventory just as it had purposefully decreased it. However, this was not the case. In fact, management continued to cite "supply chain-related challenges" as a factor in their poor financial results as late as August 2022.

### iii. March 31, 2022

121. On March 31, 2022, Kohl's published a letter to shareholders, also filed with the SEC on Form 14(a). It stated, "Since announcing our new strategy in October 2020, Kohl's has made substantial progress in transforming our business, achieving record earnings per share in 2021. Total shareholder returns ("TSR") have been 146% from October 19, 2020 through January 21, 2022, significantly outperforming the SPDR S&P Retail ETF and the S&P 500."

122. These figures were materially false or misleading. The fact that Kohl's share price had increased since October 2020—a date squarely in the midst of the pandemic-related recession—had very little to do with the strategic plan, rather, it was a natural consequence of the recession subsiding. Further, when comparing itself to its peers, Kohl's used a "hypothetical undisturbed share price" ("HUSP")[18] of approximately $56 per share. However, Kohl's based the HUSP on the performance of three of its strongest peers: Dillard's, Macy's, and Nordstrom. While Kohl's had announced disappointing results for Q4:21 due to supply chain and inventory issues during the holiday season, and Kohl's stock fell 13% after its March 7, 2022 Investor Day, on March 2, 2022, Macy's revealed that it had experienced stronger than expected sales over the holidays, causing its share price to increase 11%.[19] Similarly, Nordstrom provided positive

---

[18] The HUSP was a made-up number which purportedly adjusted the Company share price to account for stock price increases associated with media coverage of expressions of interest to buy the Company.

[19] *See* https://www.cnbc.com/2023/03/02/macys-m-earnings-q4-2022.html

guidance on March 1, 2022, causing its stock to increase 38%.[20] Meanwhile, Dillard's stock had increased from $48.85/share on October 19, 2020 (the date Kohl's chose for its own returns calculation) to $268.39/share on March 31, 2022 (the day Kohl's published its shareholder letter), an approximate 450% increase—far greater than Kohl's share price during the same period. In fact, according to its March 17, 2022 Proxy Statement, Kohl's excluded Dillard's from its Compensation Peer Group and Performance Peer Group, indexes used to determine executive compensation. It was highly misleading to represent to the market that, absent the influence of the potential sale, Kohl's stock would perform as well as these three particularly strong competitors. If Kohl's had instead used the S&P Retail Index (the most widely used yard stick for a retailers' performance), which had declined 1.5% in the relevant time frame, the HUSP would have been $46.11 – nearly a full $10 lower than the figure Kohl's used.

123. Using a starting date before pandemic-related closures began and an ending date of the trading day before Kohl's announced it had received offers, Kohl's actually underperformed both its direct peers and the broader S&P Retail Index by a long shot:



SINCE PRE-COVID (12/31/2019) TSR

---

### iv. April 21, 2022

124. On April 21, 2022, Kohl's published a presentation titled, "The Right Team to Maximize Shareholder Value," which it filed with the SEC on Form 14(a). The Company also published a press release titled, "Kohl's Releases Investor Presentation Highlighting Strong, Highly Qualified Board of Directors and Strategy to Create Value." Both the presentation and the press release stated, "Our *transformative strategy set in October 2020 delivered record EPS and margin improvement in 2021*."

125. As discussed above, Kohl's "record EPS" in 2021 was due to macroeconomic factors such as customers returning to in-person shopping as the COVID vaccine became more widely available, and government stimulus checks. Kohl's especially benefitted from its off-mall locations during early 2021, as consumers were cautious about returning to malls. Additionally, retail businesses who were forced to temporarily close stores in 2020 were almost guaranteed to experience margin improvement in 2021. Neither of these factors was attributable to Kohl's "transformative strategy."

### v. The Strategic Plan Statements Were Material

126. The statements attributing positive results to the Strategic Plan were not mere puffery or expressions of corporate optimism. Specifically and repeatedly attributing the positive results of the quarter to the Strategic Plan signaled to investors that management expected the success to continue long-term, and even accelerate (as Gass stated, "much of our opportunity is still ahead of us…"). However, the fact that the positive results were due to macro-economic factors, like the return of consumers to in-person shopping and government stimulus checks, as well as temporary factors, such as a customer preference for off-mall locations due to lingering concerns about the spread of COVID, strongly indicated that the success would be short-term and not sustainable. As such, the statements were material to investors.

127.    Confidence in the Strategic Plan was one of the key reasons the Board rejected pending offers to sell the Company on February 4, 2022, as the Board stated, "We have a high degree of confidence in Kohl's transformational strategy, and ***we expect that its continued execution will result in significant value creation*** . . . the Board is committed to acting in the best interest of shareholders and will continue to closely evaluate any opportunities to create value." Regarding a potential sale, in the March 1, 2022 Earnings Call, Gass stated: "We have a strategic and financial plan that will deliver substantial value. The Board is testing and measuring that plan against other alternatives." In other words, the perceived success of the Strategic Plan was the yardstick against which any potential offers would be measured.

**B.  Statements and Omissions Regarding a Sale of the Company**

128.    In a shareholder letter published on January 18, 2022, Macellum stated, "[We] suspect[] that there are a number of well-capitalized financial sponsors interested in Kohl's. We also have heard that the Board and its representatives have been approached and rebuffed overtures from credible buyers. This is unacceptable and, if true, would seem to constitute a meaningful breach of the Board's fiduciary responsibilities."

129.    In response to this letter, Kohl's published a press release the same day, stating, "We have continued to engage with Macellum since the settlement and are disappointed with the path they have taken and the ***unfounded speculation*** in their announcement and letter." The press release further stated that the Board "regularly works with specialized advisers to evaluate paths that have the potential to create long-term value" and that it would "continue to aggressively pursue the best interests of all shareholders."

130.    However, just days later, on Friday, January 21, 2022, news outlets began reporting that Kohl's had, in fact, received bids from multiple parties. The share price shot up over the weekend, opening on Monday nearly 30% higher than it had the previous Friday.

131.     Suddenly, after witnessing this increase in the share price, Kohl's no longer termed the news of potential bids "unfounded speculation." On Monday, January 24, 2022, Kohl's issued a press release titled, "Kohl's Confirms Receipt of Expressions of Interest." The press release stated: "Kohl's . . . today confirmed that it has received letters expressing interest in acquiring the Company. The Kohl's Board of Directors will determine the course of action that it believes is in the best interests of the Company and its shareholders. Shareholders are not required to take any action at this time. Kohl's does not intend to further comment publicly on these matters unless it determines it is in the best interests of shareholders to do so." On this news, the share price rose approximately **30%**, from $48.84/share at market close on Friday, January 21, 2022.

132.     On February 4, 2022, Kohl's issued a press release, also filed with the SEC on Form 8-K titled, "Kohl's Board of Directors Provides Update on Review of Unsolicited Expressions of Interest," in which it stated that it had rejected the bids because: "the valuations indicated in the current expressions of interest which it has received ***do not adequately reflect the Company's value*** in light of its future growth and cash flow generation."

133.     This statement was materially false or misleading and/or omitted information necessary to make it not misleading. The rejected bids were well-above Kohl's value. Before news of potential offers was reported by Macellum on January 18, 2022, the share price was $47.77/share, 57% lower than the lowest end of the Board's benchmark, for rejecting these bids. After Kohl's released its favorable financial results on November 18, 2022, analysts generally set price targets in the $65-$73/share range, with some analysts, like Guggenheim, setting price targets as high as $75/share. No analysts set targets of $88/share. And after news of the sale was announced, Guggenheim wrote, "We believe a price between $70-$75 would be an acceptable

47

takeout value for shareholders. The 37% premium offered last Friday *appears credible and a sufficient starting point for consideration for a transaction*, in our view."

134. However, the February 4, 2022 Press Release also stated: "The Board has designated its Finance Committee to lead the ongoing review of any expressions of interest . . . The Company and the Board have also engaged financial advisors, including Goldman Sachs and PJT Partners, and have asked Goldman Sachs to engage with interested parties." This statement indicated that the door which had opened when Kohl's announced it had received expressions of interest had not yet closed. The fact that the sale process would remain ongoing was further supported by the adoption of a "shareholder rights plan." The Press Release explained, "The rights plan has been adopted in order to ensure that the Board of Directors can conduct an orderly review of expressions of interest, including potential further engagement with interested parties. The rights plan *does not preclude the Board from considering an offer that recognizes the value of the Company*."

135. This statement was materially false or misleading, and/or omitted information necessary to make it not misleading, because, as described above in ¶ 52, the "rights plan" (more commonly referred to as a "poison pill") was designed specifically to chill buyer interest in the Company and prevent any unsolicited bids—regardless of how high these bids may value the Company or how favorable such bids might be to shareholders. Additionally, in truth, Defendants rejected the offers and adopted the poison pill, not because of a low valuation, but in order to control the timing of any potential sale process in order to best serve their objective of retaining control over the Board and their high-level positions in the Company.

136. The information in the February 4, 2022 Press Release was material to investors for two reasons. First, even though the initial bids had been rejected, the Press Release indicated that

the sale process was ongoing, and the Board had put a framework in place to review offers in the future. Second, the Press Release implied that, if Kohl's were to accept an offer, it would value the company at greater than $64/share, signaling that management believed the stock was worth more than this price. If Kohl's had not made such material misrepresentations in this February 4, 2022 Press Release, any inflation in the stock price due to the potential sale would have been removed, and the stock price would have declined. However, since Kohl's still indicated that the possibility of a sale was still imminent, the stock price moderately increased.

137.    In the following months, the Company made several other announcements about the potential sale:

- "As we announced on February 4, the company retained Goldman Sachs to engage with interested parties. That effort continues and has included engaging with unsolicited bidders as well as proactive outreach. Engagement with those parties is ongoing. Our proxy, when filed, will provide more detail. The Board is committed to fulfilling its fiduciary duties and will choose the path it believes will maximize the value to shareholders. So contrary to what others might say, the Board's approach is robust and intentional. We won't be commenting further on this topic during today's call." Gass, March 1, 2022, Earnings Call;

- "The Board acknowledged receipt of multiple preliminary indications of interest. The proposals received are non-binding and without committed financing. The Board has authorized Goldman Sachs to coordinate with select bidders who have submitted indications of interest to assist with further due diligence so that they have the opportunity to refine and improve their proposals and include committed financing and binding documentation." March 21, 2022, Press Release, filed with the SEC on Form 8-K;

- "At this point, we have formally communicated to the multiple parties in our process the specific procedures for the submission of actionable bids due in the coming weeks. We continue with our detailed diligence phase and are pleased with the number of parties who recognize the value of our business and plan. We will update the market when it's appropriate to do so." Gass, March 19, 2022, Earnings Call;

- "I believe it's crucial that you understand the effort your Board has put into overseeing Kohl's strategy . . . following the receipt of unsolicited bids earlier this year, your Board has designated its Finance Committee to lead a robust and intentional process to explore strategic alternatives to maximize value with the assistance of Goldman Sachs. I can attest to the fact that this is a thorough,

disciplined process. . . this Board has been conducting a robust and thorough process and keeping this Board in place will ensure the process is not disrupted or hindered." April 29, 2022, Letter to Shareholders from Incoming Chairman Boneparth on Form 14(a);

- "Kohl's . . . announced today that following the receipt of final proposals, the Kohl's Board of Directors has entered into exclusive negotiations with Franchise Group, Inc. ("FRG"), a holding company of a collection of market-leading and emerging brands, for a period of three weeks in relation to FRG's proposal to acquire the Company for $60.00 per share. The purpose of the exclusive period is to allow FRG and its financing partners to finalize due diligence and financing arrangements and for the parties to complete the negotiation of binding documentation." June 6, 2022, Press Release, filed with the SEC on Form 8-K.

138. These statements were materially false or misleading, and/or omitted material necessary to make them not misleading, because, as discussed extensively herein, the Board had no intention of actually selling the Company. Additionally, it was materially false or misleading to imply that the sale process would be "disturbed or hindered" if the Kohl's Board was not reelected at the 2022 Shareholder Meeting, as Macellum had vocally expressed its support for a sale of the Company, and, if anything, would have encouraged a more transparent sales process.

### C. Statements and Omissions Regarding Success of the Strategic Plan Despite Knowledge of Poor Q1:21 Results

139. Q1:21 was, by Defendant Gass's own admission, "a challenging *few months*" for Kohl's business. Supply chain issues persisted, inflation caused consumers to cut back on discretionary spending, and bad weather in some of Kohl's key markets made it difficult for customers to get to the stores. Kohl's was also over-inventoried, as it had "aggressively" purchased Spring items at the height of the global inventory shortage the previous year. Seasonal and holiday items ordered for the previous quarter but delayed in shipping also arrived during the quarter. Some of this inventory arrived too late to be saleable, so the Company was forced to use a pack-and-hold strategy, meaning it would not be sold until the following year. Gass stated, "Our first quarter results were below our expectations. While the quarter started off strong with positive low single-

digits comp growth through late March, ***in April***, demand considerably weakened." Similarly, Timm stated that sales "considerably weakened ***in April*** . . . which resulted in a 5% decrease in net sales to last year."

140.    In addition to these admissions, other factors confirmed that Kohl's management had visibility into its financial results in advance of the end of the quarter. Kohl's often previewed its results to investors, for example, the Company released a preview of the quarter ending July 30, 2022 on July 1, 2022: a month before the quarter ended. Also, according to CW1, in 2022, Gass and Timm attended weekly in-person meetings with both digital and in-store teams in which they discussed sales. Both of these facts confirm that Gass and Timm were aware of the weakening demand as it was occurring.

141.    However, throughout the months of April and May 2022, in the context of the proxy battle with Macellum, Defendants made numerous statements which indicated *positive* financial results.

142.    On April 13, 2022, Kohl's filed with the SEC on Form 14(a) the "Transcript of a Video of Michelle Gass Sent to Associates on April 13, 2022." The purpose of the video was purportedly to address "two discreet, yet connected issues that we're currently navigating": "an activist campaign that will culminate in a shareholder vote on May 11" and "an evaluation of what we call, expressions of interest – or potential bidders – who are exploring the opportunity to buy Kohl's." Gass stated, "Before we get into the details of all of this, let me just make one thing really clear – ***we are a very healthy company***. ***We have a great strategy in place***, we just posted record results for 2021, and we are in the midst of scaling one of the biggest and most transformational initiatives that this company has ever had, with Sephora." She further stated, "The board is doing its job in representing our shareholders to evaluate alternatives and other options – and all of those

explorations are being held up against the current strategy that we're executing. ***The plan we're executing is very powerful and it will deliver substantial value to our shareholders*** – so that's a ***high bar*** that the board is looking at when evaluating these alternatives."

143.    These statements were materially false or misleading and/or omitted information necessary to make them not misleading, because, at or before the time the statements were made, Kohl's ***admittedly*** knew that demand had weakened, and sales were falling below expectations. Gass knew that these results would not "deliver substantial value." If Defendants wanted to attribute all positive growth to their "powerful" Strategic Plan (even when the growth was due to macroeconomic factors), they had to also accept the corollary that *negative* results were due to a *failure* of the Strategic Plan. Additionally, just *one day* before this video transcript was filed, news broke that FRG had submitted a bid of $69/share to acquire the Company (a 20% premium to the pre-announcement share price). As such, Gass' statement that the Strategic Plan was so "powerful" that it would be a "high bar" to weigh alternatives against indicated that she was confident that the Company's financial results would drive the share price above this. However, at the time, Gass knew that the current quarterly results would not be strong enough to generate this lift.

144.    On April 21, 2022, Kohl's filed with the SEC on Form 14(a) a presentation deck titled, "The Right Team to Maximize Shareholder Value." The presentation was dated "April 2022," indicating it contained up-to-date information. The presentation discussed several "initiatives" that were part of the strategic plan, including the oft-cited tag-line "destination for the active & casual lifestyle." According to the presentation, these initiatives were "Driving ***sustainable*** Low-Single-Digits % Sales Growth" and would "support sales growth ***in 2022*** and beyond." Further, the presentation stated Kohl's had "Fundamental business model improvements in place, driving a ***consistent*** 7% to 8% operating margin"; "Kohl's is well-positioned to deliver

*continued robust EPS growth*…Combination of *sales growth* and solid margins, coupled with commitment to share repurchases, drives *mid-to-high single digits % EPS growth*"; and "We are confident in our ability to navigate ongoing margin pressure from cost inflation, higher freight expense, wage investments, and increasing digital penetration."

145.    These statements were materially false or misleading and/or omitted information necessary to make them not misleading. At the time these statements were made, management knew that the sales growth previously reported by the Company was not "sustainable" because sales had already begun steeply *decreasing*. For the same reasons, it was materially false or misleading to state that the Company was experiencing growth "in 2022," was experiencing a "consistent" 7-8% operating margin (the Q1:22 operating margin was just 2.2%) and was experiencing "mid-to-high single digits % EPS growth" (EPS for Q1:21 was just *$0.11*, compared to $2.10 the previous quarter, an approximately *95% decrease*). These statements were not phrased as targets or forward-looking statements, they were all phrased in the present tense, indicating that the Company was experiencing growth at that time. Additionally, some of the key reasons Defendants cited for the decline in sales included inflation and supply chain issues, including higher freight expenses. Thus, it was materially misleading for Defendants to state, at the same time they were seeing declining sales due to these headwinds, that they were "confident in [their] ability to navigate" these issues.

146.    On April 29, 2022, Kohl's filed with the SEC on Form 14(a) a letter to shareholders from incoming Chairman Boneparth. In the letter, in which Boneparth encouraged shareholders to vote for Kohl's existing directors over the slate proposed by Macellum, he stated: "We are also *continuing to deliver on the strategy* we unveiled in October 2020, which helped us *achieve record EPS last year* and allowed us to double our annual dividend to $2 per share for 2022."

147. This statement was materially false or misleading and/or omitted information necessary to make it not misleading, because it implied, contrary to the declining sales at the time, both that Kohl's was continuing to deliver similar financial results to those which allowed it to achieve a high EPS for the full year 2021 during the current quarter and that these results justified keeping the current Board in place.

148. Finally, on May 11, 2022, Kohl's published a press release titled "Kohl's Shareholders Re-elect All Directors at 2022 Annual Meeting." The press release quoted Boneparth as saying: "We are especially thankful to Kohl's associates, who have **continued to execute on our strategy** and focus on customers during this process. Kohl's has **a bright future ahead**."

149. This statement was materially false or misleading and/or omitted information necessary to make it not misleading, because stating that the Kohl's associates were *continuing* to execute on the Strategic Plan and that Kohl's had a "bright future" implied that the quarterly results, which were set to be released *just one week* after this statement was made, would be positive, justifying shareholders' decision to re-elect the Board, when in fact, Defendants knew the declining sales would lead to poor results.

150. The statements regarding the success of Kohl's Strategic Plan in April and May 2022 were material to investors for three reasons. First, by stating that the strategic plan was working and driving "consistent" and "sustainable" growth, Defendants implied that this growth was what they were currently seeing in the business, even though, at the time, sales were trending down. In a quarter where many other retail stores were struggling, this indicated that Kohl's was a superior investment over its peers. Second, if shareholders had known about the negative quarterly results in advance, they may have voted differently in the 2022 Shareholder Meeting. Third, and relatedly, was the bearing successful results would have on any pending offers to

acquire the Company. After the truth about the disappointing results came out, sources cited by the New York Post stated that, due to the lack of transparency of the Kohl's Board and management about the negative quarterly results, the source didn't "believe there will be any acceptable bids offered now."

151. Given this important context, and the critical nature of both the shareholder vote and the potential sale for the Company, the statements were not mere puffery or expressions of corporate optimism.

## PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY

152. The PSLRA Statutory Safe Harbor provided for forward-looking statements under certain circumstances does not apply to the scheme or any of the allegedly materially false and misleading statements pleaded herein. Many of the statements were regarding present or past events, or were mixed statements of past/present and future conditions—and thus were not forward-looking. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Additionally, the Safe Harbor only protects misstatements, not omissions of material information.

153. Alternatively, to the extent that the Safe Harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

154. In April 2021, Kohl's and an Investor Group reached a settlement which prevented

what could have been a contentious proxy battle leading to a board takeover. In the latter half of 2021, knowing that another proxy battle was likely on the horizon, and a second settlement would not be possible, the Kohl's Board and management schemed to downplay negative headwinds, including serious inventory issues and declining sales. After publishing press releases and holding earnings calls regarding quarterly earnings on both August 19, 2022, and November 18, 2022, the Kohl's share price increased, reflecting this artificially positive view.

155. On January 18, 2022, Macellum (one of the members of the Investor Group) published announced for the first time that it had learned from sources that Kohl's had received bids to sell the Company. Kohl's responded with its own press release calling this news "unfounded speculation," however, the stock price rose 4%, indicating shareholder support for a potential sale, even if it was mere speculation. Less than a week later, Kohl's issued a press release confirming "it ha[d] received letters expressing interest in acquiring the Company" and that the Board would "determine the course of action that it believes is in the best interests of the Company and its shareholders." This caused the stock price to rise even further, from $46.84 per share at market close on Friday, January 21, 2022, to $63.71 per share at market close on Monday, January 24, 2022, an approximately *36% increase*, on unusually heavy trading volume. Hereafter, every time Kohl's would announce news of a potential sale, even vague statements that the process was "ongoing" and the Company would not be answering any questions about it, the stock price rose, even at times when the Company announced other negative news. For example, in both the quarterly earnings call on March 1, 2022 and Investor Day on March 7, 2022, Gass made comments that Kohl's banker continued to engage with potential buyers but refused to make any additional comments. While Kohl's delivered bad news on both these days, the effect of the negative news on the share price was minimal, as shareholders continued to hope a successful sale

of the Company was on the horizon. As such, the stock price remained artificially inflated.

156. After market close on May 18, 2022, a week after the Kohl's Board secured a full victory at the 2022 Shareholder Meeting, Kohl's issued a press release foreshadowing the negative results from Q1:22, disclosing to investors that two of its top executives, Greg Revelle, the Company's Chief Marketing Officer, would be departing the Company effective June 1, 2022 and Doug Howe, the Company's Chief Merchandising Officer, would be departing the Company "effective immediately." Then, around 7:00 a.m. on May 19, 2022, before market opening, Kohl's released its dismal financial results for Q1:22, which revealed the falsity of its prior statements touting strong performance. Among other things, cut its full-year net sales outlook to be flat to up to 1% from its previous guidance of a 2-3% rise, and on an adjusted basis, the Company earned 11 cents per share, missing estimates by a whopping 70 cents. Kohl's lowered its full year per share forecast for adjusted earnings to between $6.45 and $6.85, down from $7.00 to $7.50. Kohl's also reported that its total revenue for the quarter dropped from $3.8 billion to $3.7 billion year over year, and its operating income collapsed by about 70% in the first quarter to $82 million.

157. The revelations had an immediate impact on Kohl's stock price, which dropped from $43.13 at close on May 18, 2022, to $40.60 at market open on May 19, 2022. Investing.com noted that the share price of Kohl's stock had ***fallen 6.8%*** in pre-market trading.[21]

158. However, Kohl's held its earnings call at 9:00am shortly after the market opened, and Gass informed the market that Kohl's would be reviewing "actionable bids" in "the coming weeks." Due to this positive news about the sale process, the stock rebounded, closing at $45.04/share, an approximately 4.4% increase over the previous day's closing price of $43.13/share.

---

[21] https://www.investing.com/news/stock-market-news/kohls-slashes-2022-profit-sales-guidance-considerable-weakening-in-april-2828018

159. That temporary rebound was short-lived, because after market close on May 19, 2022, the *New York Post* published an article titled, "Kohl's sales process is a 'disaster': sources." A source "close to the sales process" told the *Post*: "'I don't believe there will be any acceptable bids offered now.'" In addition to the poor quarterly results, the article cited a "lack of transparency from Kohl's." A source stated, "Basically the company knew their results stunk and they didn't tell anyone and they got the shareholder vote for their board of directors." The article also confirmed that, despite statements to the contrary, the Board likely had no intention of actually selling the Company: "sources tell The Post the Wisconsin-based company may be privately rooting for an outcome in which bidders fade away – despite the public image management has put forward." The article revealed that not only was the sales process not going as Defendants conveyed to the market, but also the bidders were not given transparent access to Kohl's financial information as Defendants had repeatedly claimed.

160. As a result of the *New York Post* article's revelations, much of the gains of the prior day were removed, and Kohl's stock opened at $43.06, down from $45.04 at close the night before.

161. Then, on May 20, 2022, Macellum published a letter to shareholders stating that the Board "withheld material information from shareholders" about the state of the Company leading up to the shareholder meeting. The revelations from the *New York Post* article, coupled with Macellum's release, wiped out the gains from the previous day and eroded the artificial inflation caused by Defendants' misleading statements regarding the sales process, Kohl's financial position, and the Board's scheme to maintain control of the Company by withholding material information from shareholders. Kohl's share price fell ***approximately 13%***, from $45.04/share at market close on May 19, 2022 to $39.20/share at market close on May 2, 2022, on unusually heavy trading volume.

162.     Knowing Macellum would continue to continue to vocally decry Board misconduct if nothing was to come of the sales process, and to prevent the artificial inflation from being removed from the stock price, on June 6, 2022, after market close, Kohl's announced it had entered "exclusive negotiations" with a bidder, FRG, to sell the Company for approximately $60/share. On this news, the share price ***increased approximately 9.5%***, from $42.12/share at market close on June 6, 2022 to $45.59/share at market close on June 7, 2022.

163.     However, soon after, the truth began to emerge that Kohl's had no intention of actually selling the Company. First, on June 22, 2022, CNBC published an article, quoting confidential sources, that, after conducting diligence on the Company, FRG had reduced its bid to closer to $50/share. This news caused an ***8.8% decrease*** in the share price.

164.     Then, finally, on July 1, 2022, Kohl's revealed that it was no longer in talks to sell the Company. With this announcement, investors finally learned the truth about the fraudulent scheme, causing the stock price to ***decrease 19.6%***, from $35.69/share at market close on June 30, 2022 to $28.68/share at market close on July 1, 2022, on unusually heavy trading volume.

165.     The timing and magnitude of Kohl's stock price rise and decline negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changes in market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. A clear pattern emerged: when the Company announced positive news about a potential sale, the stock price went up. When they announced the process was "ongoing," the stock price remained steady, even when otherwise disappointing news was released. And when news was released that was detrimental to the potential sale, particularly the announcement that the Company had concluded the sale process, the share price steeply declined.

166.     The economic loss suffered by Plaintiffs and the other members of the Class was a

direct result of Defendants' materially false or misleading statements or omissions and fraudulent scheme to artificially inflate the price of Kohl's stock and remain in control of the Board. The economic loss, *i.e.*, damages suffered by Plaintiffs and other members of the Class, was a direct result of Defendants' fraudulent conduct being revealed to investors, and the subsequent significant decline in the value of the Company's shares was also the direct result of Defendants' prior fraudulent scheme being revealed.

## THE PRESUMPTION OF RELIANCE

167. Plaintiff and other members of the Class are entitled to a presumption of reliance on Defendants' material misrepresentations, deceptive devices, and fraudulent scheme pursuant to the fraud-on-the-market doctrine because, among other things, during the Class Period:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The misrepresentations and omissions were material;

(c) Kohl's securities were actively traded in an efficient market on the NYSE;

(d) Kohl's securities were liquid and traded with moderate to high weekly volumes;

(e) As a regulated issuer, Kohl's filed periodic public reports with the SEC;

(f) Kohl's was eligible to file registration statements with the SEC on Form S-3 or F-3;

(g) Kohl's regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(h) The market reacted promptly to public information disseminated by and about Kohl's;

(i) Kohl's was covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. These reports were publicly available and entered the public marketplace;

(j) The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Kohl's common stock; and

(k) Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiff and other members of the Class purchased or acquired Kohl's securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

168.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

169.     Additionally, Defendants corrupted the market for Kohl's securities through a scheme and course of conduct that misled the market as to the value of Kohl's securities. To the extent that these Defendants disrupted the integrity of the market for Kohl's securities, Plaintiff and members of the Class are not required to provide further proof of reliance, pursuant to the Supreme Court's decision in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 153 (1972).

## <u>SCIENTER</u>

### A.  Defendants Had Motive to Conduct a Fraudulent Scheme

170.     In light of the proxy battle leading up to the 2021 shareholder meeting, and with the knowledge that a similar settlement would not be possible in 2022, the members of the Board were highly motivated to engage in conduct which would allow them to maintain control over the Company, even at the detriment of shareholders. Non-employee Board positions at Kohl's were lucrative: for services rendered in 2022, each Board member was given a base award of $125,000 in cash and $145,000 in stock (rounded to the nearest share). Board Members were given an additional stock award for membership on a committee, and the Chairman was given an additional award on top of that. In total, in 2022, Chairman Boneparth received a total compensation package

worth $469,997. Additionally, Board membership—especially of a large public Company like Kohl's—has other benefits: professional credibility, exposure and networking opportunities, an increased likelihood of securing similarly lucrative board positions at other companies, and, as illustrated in this case, the ability to influence key decisions which can affect the stock price of the company and increase the value of any stock based awards. If Macellum had been successful in its Board takeover bid, at least some of the Kohl's Board Members would have lost access to these benefits.

171.    As Macellum pointed out, in 2019, despite the Company's operating margin *decreasing* by ~42% since 2010, compensation for the top five executives *increased* by ~43%, the top five executives made $30 million in compensation versus $21 million in 2010. Particularly, Macellum noted that Gass (who also served on the Board) earned the highest compensation of her tenure in 2020, despite the ongoing COVID pandemic, which led to store closings and numerous employees being terminated or furloughed. Gass's compensation rose from $8.98 mm in 2019 to $12.86 mm in 2020—***an increase of ~43%***—widening the pay ratio between Gass and the Kohl's median employee from 923:1 in 2019 to ***1,098:1 in 2020***. Timm was also awarded over $3.6 million in stock awards in 2019 (nearly six times her base salary at the time) and $1.4 million in stock awards in 2020 (almost double her base salary). This was made possible because of retroactive modifications the Board made to the 2018 LTIP in 2020, moving from a three-year cumulative measurement period to a three-year average measurement period, which allowed management to meet the financial goals for securing targeted bonuses. Without this modification, management would not have received an incentive plan payout. As Macellum made clear, if its candidates were elected to the Board, this incentive plan would be reviewed and spending on executive compensation would be curbed in future years. This gave both Gass and Timm

significant motive to support the existing Board and engage in the scheme to prevent Macellum's takeover.

172.    Additionally, both Gass and the Non-Employee Board Members were given access to the Company's two private jets and flight crew for both business and personal use, an expense which Macellum publicly criticized, making it clear if their nominees were given sufficient control over the Kohl's Board, the expense of maintaining the planes and flight crew would likely be eliminated. According to Macellum, and as later reported on by *Yahoo! Finance*,[22] in 2019 alone, Gass incurred $197,490 in compensation related to the use of the Company's private aircraft.

**B.  Defendants Repeatedly Confirmed Board Oversight of the Sale Process**

173.    As evidenced by the significant stock price changes each time news regarding the potential sale of the Company was released, the sale process was of the utmost importance to Kohl's investors. This, in and of itself, would indicate that the Board and Executives were closely monitoring the situation. However, in this case, Company statements affirm that the Board was closely monitoring and overseeing the sale process, for example:

- "The Kohl's Board of Directors (the Board) has determined, following a review with its independent financial advisors and upon the recommendation of its Finance Committee, that the valuations indicated in the current expressions of interest which it has received do not adequately reflect the Company's value." February 4, 2022, Kohl's Press Release on Form 8-K;

- "The Board is committed to acting in the best interest of shareholders and *will continue to closely evaluate any opportunities* to create value." February 4, 2022, Kohl's Press Release on Form 8-K;

- "The Board designated its Finance Committee . . . *to lead the review of any expressions of interest*." February 10, 2022, Kohl's Press Release on Form 14(a);

- "The Board is committed to fulfilling its fiduciary duties and will choose the path it believes will maximize the value to shareholders. So contrary to what others might say, *the Board's approach is robust and intentional*." Gass,

---

[22] https://www.yahoo.com/video/kohls-activist-investor-get-rid-of-the-full-time-flight-crew-and-2-private-jets-221330172.html

March 1, 2022, Kohl's Quarterly Earnings Call;

- "[I]t is *the fiduciary responsibility of the board, as new paths emerge, to assess those* . . . Let me just reassure you that our board is deeply committed to make sure that we're going to return the most value to our shareholders and will take the best path forward." Gass, March 1, 2022, *Milwaukee Business Journal* Interview, Filed by Kohl's on Form 14(a);

- "[T]he Board is reviewing alternatives through an intentional and ongoing dialog with potential bidders." March 18, 2022, Kohl's Proxy Statement on Form 14(a);

- "The *Board acknowledged receipt* of multiple preliminary indications of interest . . . The *Board has authorized* Goldman Sachs to coordinate with select bidders who have submitted indications of interest to assist with further due diligence so that they have the opportunity to refine and improve their proposals and include committed financing and binding documentation. As announced on February 4, 2022, *the Finance Committee of the Board is leading* the ongoing review of any expressions of interest." March 21, 2022, Kohl's Press Release on Form 8-K;

- "Our engaged Board is *thoroughly testing Kohl's standalone strategic plan against potential alternatives* and has designated its Finance Committee to lead the ongoing review of expressions of interest." April 21, 2022, Kohl's Investor Presentation on Form 14(a);

- "*I believe it's crucial that you understand the effort your Board has put into overseeing Kohl's strategy* . . . Additionally, as we previously disclosed, following the receipt of unsolicited bids earlier this year, your Board has designated its Finance Committee to lead a robust and intentional process to explore strategic alternatives to maximize value with the assistance of Goldman Sachs. *I can attest to the fact that this is a thorough, disciplined process*. . . . As part of this process, your Board is *thoroughly testing* Kohl's standalone strategic plan against potential alternatives." April 29, 2022, Letter to Shareholders from Incoming Chairman Boneparth on Form 14(a);

- "*This Board has been conducting a robust and thorough process and keeping this Board in place will ensure the process is not disrupted or hindered.*" April 29, 2022, Letter to Shareholders from Incoming Chairman Boneparth on Form 14(a);

- "*This Board is committed to overseeing the successful transformation of the company and fulfilling its fiduciary responsibility to maximize shareholder value*. . . shareholders want to ensure that the Board will continue to run the sale process with shareholders' best interest in mind. We *continue to engage with multiple interested parties*. As we have described, they are working to prepare fully financed binding proposals." Gass, May 19, 2022, Kohl's

Quarterly Earnings Call.

174.    Taking these statements at face value, the Board had extensive knowledge and exclusive control over the sale process.

## C.  The Board Adopted the Poison Pill

175.    The Board was also responsible for adopting the "poison pill" on February 4, 2022, ensuring they would have even more control over who could submit bids, how, and when. Poison pills are normally adopted to prevent a hostile takeover at an unusually low valuation. However, in this case, the reported offers were at more than a 30% premium to the pre-offer share price. The poison pill in this case was also especially stringent, significantly chilling the interest of potential bidders. As Macellum noted, "simply announcing an intent to commence a tender offer (as opposed to consummating one) triggers the pill." Additionally, even though the Board adopted an exception for a "qualified offer," "the numerous requirements to be deemed a 'qualified offer' all but ensure that no unsolicited offer will ever be made. The requirements include that an offer must be fully-financed with committed capital, not subject to any due diligence, and not arbitrarily deemed 'inadequate' by the Company's retained investment bank." If the Board intended to run a fair sale process which would result in the best overall value for shareholders, it would not have adopted such a strict poison pill—if it adopted one at all.

## D.  The Board Set the Record Date to Vote in the 2022 Shareholder Meeting

176.    The Kohl's Board also had exclusive control of setting the Record Date—the date by which investors had to purchase shares to be eligible to vote in the 2022 Shareholder Meeting. The Board set the date for March 7, 2022, nearly three weeks earlier than the previous year (March 24, 2021). The Record Date was only one week after the Company reported its 2021 financials on March 1, 2022, and was on the same day as the much-touted Investor Day (at which management had promised to give shareholders more information on the sale process, though they did not end

up doing so). It was also ten days *before* Kohl's released its Annual Proxy Statement on March 17, 2022, which contained a great deal of information pertinent to the measures being voted on in the meeting. The Board knew this timing would prevent investors from being sufficiently informed before they had to decide whether to take or increase their position in the Company in order to be able to vote in the meeting.

### E. The Board Refused to Use Universal Proxy Cards

177.    Even though the SEC had announced amendments to federal proxy rules requiring the use of universal proxy cards in all contested director elections occurring after August 31, 2022, just a few months after the 2022 Shareholder Meeting, the Board denied Macellum's request for a universal proxy card and filed its definitive proxy materials with its own independent proxy card. Separate cards prevented shareholders from comparing all proposed candidates in one place and voting for any combination of candidates.

### F. Refusal of Executives to Candidly Discuss the Sale Process

178.    Another indication of scienter was the refusal of management to candidly discuss the sale process. From the first time the Company acknowledged receiving indications of interest, it stated, "Kohl's does not intend to further comment publicly on these matters."

179.    In the March 1, 2022 Earnings Call, just before the question-and-answer period, "The Board is committed to fulfilling its fiduciary duties and will choose the path it believes will maximize the value to shareholders. So contrary to what others might say, the Board's approach is robust and intentional. ***We won't be commenting further on this topic during today's call***."

180.    In an interview the same day for an article in the *Milwaukee Business Journal* (which Kohl's filed with the SEC on Form 14(a)), the interviewer asked Gass, "You addressed the shareholder activism and made a statement during the analyst call. I'm wondering why you decided not to take any questions on that issue today." Gass replied, "First off, we have strong conviction

on our strategic and financial plan ahead and fully expect that's going to deliver a lot of value to shareholders. But it is the fiduciary responsibility of the board, as new paths emerge, to assess those. And so, we have been testing and assessing those opportunities against our core strategic plan. It is why we rejected the bid at $64, as we shared publicly. We see a lot of value in our company. But we are going through a rigorous process. We are engaging with the unsolicited bidders. We've also done proactive outreach to be very thorough. ***A lot of detail will be shared around that when we file our proxy (later this month)***."

181.    However, in Kohl's 2022 Definitive Proxy Statement, filed on March 17, 2022, there was no information whatsoever about a potential sale. A presentation filed the same day had a single slide titled, "Our Board is committed to evaluating all opportunities to increase shareholder value," on which Kohl's presented the same information they had previously shared: that Goldman Sachs had been retained to engage with potential bidders, and that the Board was pursuing a "robust and intentional" approach.

182.    Similarly, in the May 19, 2022, Earnings Call, "shareholders want to ensure that the Board will continue to run the sale process with shareholders' best interest in mind. We continue to engage with multiple interested parties. As we have described, they are working to prepare fully financed binding proposals. At this point, we have formally communicated to the multiple parties in our process the specific procedures for the submission of actionable bids due in the coming weeks. We continue with our detailed diligence phase and are pleased with the number of parties who recognize the value of our business and plan. ***We will update the market when it's appropriate to do so***." Once again, management allowed no questions about the sale process.

183.    Even in the press release in which Kohl's announced it had entered exclusive talks with FRG, it stated "The Company will have ***no further comment*** until an agreement is reached

or the discussions are terminated." Even when reports swirled about FRG lowering its bid price, which negatively affected the stock price, management made no comment. Management may have prevented some deterioration to the stock price at this time, as it was reported FRG had lowered its bid to $50/share, when in fact it had only lowered the bid to $53/share, however, they chose to remain silent.

184.    The intentional gatekeeping of any additional information related to the sale process, and the refusal to even allow, much less answer, and questions on the subject during calls with investors, contributes to a strong inference of scienter.

## G. Choice of Franchise Group as Final Bidder

185.    The choice of Franchise Group as the final bidder also contributes to a strong inference of scienter. It was reported that other parties, such as JCP parent Brookfield Asset Management, had put forth bids as high as $68/share, while Franchise Group's bid was only $60/share. However, according to a June 22, 2022 article published on *Reuters*, "Franchise Group executives have signaled ***confidence in Gass and members of her management team***, the sources said, noting that Franchise Group is known to buy businesses that have operating teams in place and ***does not specialize in bringing in new management teams***." Thus, the selection of Franchise Group ensured that, even the Company was pressured to complete a sale, Gass and her team would be able to remain in their roles.

## H. Executive Knowledge of Poor Financial Results

186.    Due to their high-level positions, Defendants Gass (CEO of the Company) and Timm (CFO of the Company), and the Board Members (particularly the members of the Executive Committee, which met approximately 20 times a year), were well-aware of and informed of matters relating to the Company's core operations, as well as its established business policies and practices. Consequently, their experience and responsibilities necessarily further support a strong

inference that they knew (or at least recklessly disregarded): 1) positive results in the second half of 2021 were due to short-term macroeconomic factors such as stimulus checks and a return of customers to in-store shopping after the COVID-pandemic, not due to any sort of plan put in place by management; 2) headwinds in the second half of 2021 were stronger than communicated and would affect the financial results of the upcoming quarters; and 3) the poor results of the first quarter of 2022 well in advance of the Shareholder Meeting.

187.    Because of the Individual Defendants' positions within the Company, they each had access to adverse undisclosed information about Kohl's business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers, employees, and Board Members, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them connection therewith.

188.    Additionally, according to CW1, Gass and Timm attended weekly "business review" meetings, virtually during COVID quarantine and in-person thereafter. With regards to inventory, Gass further stated, during the March 1, 2022 Earnings Call, "We've also put in even additional tools. So we have ***very tight visibility*** between the supply chain teams and the merchants to make sure that we can track at a very detailed level when we're expecting arrivals on receipts." While it was not abundantly clear when these "additional tools" were put in place, the context of the statement implied it was "late last summer"—far in advance of the November 2021 Earnings Call. However, the phrase "*additional tools*" implies that management had *some* tools in place for tracking inventory and the supply chain throughout the Class Period.

189.    Further, the Company represented repeatedly in April and May 2022 that Kohl's was successfully executing against its Strategic Plan, that the plan was delivering a "consistent" 7-8% operating margin, and that the initiatives put in place under the Plan would "support sales growth in 2022 and beyond." However, ***by their own admissions***, Gass and Timm knew of weakening demand by April 2022. As such, they had ***actual knowledge*** that these statements were materially false or misleading.

## I.    Executive and Board Departures

190.    Another indication of scienter is the departure of three of the six top executive officers[23] during or soon after the Class Period: Revelle, Howe, and Gass. Merchandising and marketing were two key aspects of the strategic plan, so the departure of the Chief Marketing Officer and Chief Merchandising Officer the day before the Company announced poor results strongly indicated a causal relationship between the two events. Additionally, the fact that Gass was Chief Merchandising Officer before becoming CEO demonstrates the importance of that role in the Company organization.

191.    Additionally, the departure of CEO Gass was announced in the same press release as equally disappointing third quarter results, a further signal that the strategic plan had failed. The Kohl's stock price actually went up on the day Gass's resignation was announced, demonstrating shareholder support for her departure—another indication that, with all information available, shareholders may have voted differently in the 2022 Shareholder Meeting.

192.    Further, Stephanie Streeter, Director of the Board and member of the Executive Committee, announced on February 17, 2023 (very shortly after Kingsbury was appointed CEO) that she had decided not to stand for re-election at the 2023 shareholder meeting. She had served

---

[23] See named executive officers in Kohl's 2022 Proxy Statement, filed March 17, 2022.

on the Kohl's Board for 15 years prior to this time.

**J. Suspiciously Timed Statements**

    **i. Withholding Poor Results Until After the Shareholder Meeting**

193.    Despite Macellum calls for transparency, Kohl's withheld any indication of its poor first quarter results until *one week* after the contested proxy battle ended. In fact, the Company made numerous statements in its proxy materials such as, "we are successfully executing on a compelling strategy" (April 21, 2022, Kohl's shareholder presentation filed on Form 14(a)) and "We are also continuing to deliver on the strategy we unveiled in October 2020, which helped us achieve record EPS last year and allowed us to double our annual dividend to $2 per share for 2022" (April 29, 2022, Boneparth letter to shareholders filed on Form 14(a)).

194.    Several factors indicate that Kohl's knew the results were poor before the meeting. First, the temporal proximity of the Shareholder Meeting to the earnings release one week later is a strong indication that management knew the results were poor before the meeting. Additionally, in an attempt to reach a settlement, the Kohl's Board offered to allow Macellum to see a preview of the 4Q:21 results in January 2022, indicating it had access to results before releasing them to the public. The Company had also previously given public previews of their quarterly results before, for example, on February 4, 2021, Kohl's published a press release previewing its results for the quarter ending January 30, 2021 (just five days earlier), even though it did not report the full results until March 2, 2021.

195.    Kohl's also provided an update on its 2Q:22 results on July 1, 2022, a month *before* the quarter ended, in the same press release in which they announced that the Company was no longer considering a sale, strategically releasing two major pieces of bad news at the same time, in an apparent effort to reduce the later effect on the stock price.

196.    Defendants' lack of transparency about the results was clearly intentional and

motivated by the Board's desire to retain control in the face of a contested proxy battle, as previewing poor results would have supported Macellum's arguments that the strategic plan was not working and new leadership of the Company was necessary.

### ii. Suspiciously Timed Announcement of Executive Departures

197.    Defendants also purposefully withheld the announcement of the departures of two top executives, Chief Marketing Officer Revelle and Chief Merchandising Officer Howe, until the week after the Shareholder Meeting. Defendants also purposefully made this announcement the day before the Company's May 19, 2022 Earnings Call, causing the share price to fall before the disappointing results were announced, in a sense cushioning the blow.

### K. Corporate Scienter

198.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency, because all of the wrongful acts complained of herein were carried out within the scope of their employment. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

### CONTROL PERSON ALLEGATIONS

199.    The Individual Defendants, by virtue of their high-level and controlling positions at Kohl's, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the actions, individually and in concert, of these individuals.

200.    The Individual Defendants were participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on those who purchased or otherwise acquired Kohl's common stock during the Class Period. The scheme/course of conduct deceived the investing public regarding Kohl's business, operations, financial condition, and the intrinsic value of Kohl's common stock, and caused Plaintiff and other members of the Class to purchase or otherwise acquire Kohl's common stock at artificially inflated prices.

201.    The Individual Defendants each had a duty, in their capacity as Executives and Directors of the Company, to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, and financial condition, so that the market price of Kohl's publicly traded common stock would be based on accurate information. The Individual Defendants each violated these requirements and obligations during the Class Period. Defendants were also under a continuing duty to update and/or correct any false or misleading statements alleged herein.

202.    The Individual Defendants, because of their positions of control and authority, were able to and did control the content of Kohl's SEC filings, press releases, and other public statements issued by or on behalf of the Company during the Class Period. Each would have been provided with copies of the statements made in the SEC filings other public statements at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public statements alleged herein.

203.    Each of the Individual Defendants similarly made materially false or misleading statements, or omitted material facts necessary to make their statements not misleading, in proxy documents filed with the SEC. Because of their positions of control and authority, the Individual

Defendants were able to and did control the content of these proxy documents. Accordingly, the Individual Defendants are responsible for the accuracy of the statements in the proxy documents.

## CLASS ACTION ALLEGATIONS

204.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased publicly traded Kohl's securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Kohl's and its subsidiaries, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

205.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Kohl's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

206.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

207.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

208.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Exchange Act was violated by Defendants' acts as alleged herein;

(b) whether Defendants engaged in a fraudulent scheme or course of conduct;

(c) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the condition and business of the Company;

(d) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of the Company;

(e) whether the Defendants caused the Company to issue materially false and misleading filings during the Class Period;

(f) whether Defendants acted knowingly or recklessly in issuing materially false and misleading filings;

(g) whether the prices of Kohl's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(h) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

209.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

210.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Kohl's shares met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

(b) As a public issuer, the Company filed periodic public reports;

(c) Kohl's regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) Kohl's securities were liquid and traded with moderate to heavy volume during the Class Period; and

(e) The Company was followed by a several securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

211.     Based on the foregoing, the market for Kohl's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

212.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## **CLAIMS FOR RELIEF**
### **COUNT I**
**For Violations of §10(b) of the Exchange Act and Rules 10b-5(a) and (c)**
**Promulgated Thereunder – Against All Defendants**

213.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

214.     During the Class Period, Defendants, individually and in concert, directly or indirectly, violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder by the SEC, in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of conduct that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of Kohl's securities during the Class Period. This scheme is detailed in ¶¶ 40-99, herein, and but also included, yet was not reliant upon, the preparation of and/or disseminated or approved the false statements specified in s¶¶ 109-51 above, that Defendants knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements

made, in light of the circumstances under which they were made, not misleading.

215. Defendants acted with scienter in that they participated in this scheme knowing or with deliberate recklessness that it would artificially inflate Kohl's stock price. These Defendants, by virtue of their receipt of information reflecting the true facts of the Company, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

216. Individual Defendants, who are or were the senior officers and/or directors and members of the Board of Directors of the Company, had actual knowledge of the fraudulent scheme or course of conduct set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Kohl's personnel to members of the investing public, including Plaintiff and the Class.

217. As a result of the foregoing, the market price of Kohl's securities was artificially inflated during the Class Period. Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Kohl's securities during the Class Period in purchasing Kohl's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

218. Had Plaintiff and the other members of the Class been aware that the market price of Kohl's securities had been artificially and falsely inflated by Defendants' fraudulent scheme and course of conduct and by the material adverse information which Defendants did not disclose, they would not have purchased Kohl's securities at the artificially inflated prices, or at all.

219. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

220. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Kohl's securities during the Class Period.

## COUNT II
### For Violations of §10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants

221. Plaintiffs repeat and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

222. During the Class Period, Defendants, individually and in concert, directly or indirectly, violated Rule 10b-5(b) in that they disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

223. Defendants acted with scienter in that they knew, or, in the alternative, recklessly disregarded the truth, that public documents issued or disseminated in the name of the Company contained materially false or misleading statements or omitted information necessary to make the statements not misleading, and that such statements or documents would be issued or disseminated to the investing public. Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Kohl's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, knowingly (or recklessly) participated or acquiesced in the issuance or dissemination of such statements or documents, a primary violation of Federal Securities Laws.

224. Individual Defendants, who are or were the senior officers and/or directors of the

Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Kohl's personnel to members of the investing public, including Plaintiffs and the Class.

225. As a result of the foregoing, the market price of Kohl's securities was artificially inflated during the Class Period. Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Kohl's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

226. Had Plaintiffs and the other members of the Class been aware that the market price of Kohl's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Kohl's securities at the artificially inflated prices that they did, or at all.

227. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

228. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Kohl's securities during the Class Period.

## COUNT III
### For Violations of §14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder Against All Defendants

229. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except in that this Count is based on negligence and strict

liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiff or members of the Class. In the alternative, if the Court finds fraudulent intent to be an element of this claim, Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

230. Defendants had a legal obligation not to solicit a proxy with false or misleading statements or omissions nor to associate themselves with a proxy containing false or misleading statements or omissions.

231. The Proxy and documents incorporated by reference therein, and other solicitations described above, contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

232. Defendants solicited and/or permitted use of their names in solicitations contained in the Proxy documents described above.

233. By means of the Proxy and documents incorporated by reference therein, and other solicitations described above, Defendants sought to secure Plaintiff's and other Class Members' support for the re-election of the Board Members in the face of a contested proxy battle with activist investor Macellum, who proposed its own slate of ten new candidates for the Board. Without access to complete material information, shareholders voted to re-elect the existing Board Members rather than the candidates proposed by Macellum.

234. Each Defendant named in this Count acted at least negligently by associating himself with a false or misleading Proxy and/or in making false and misleading statements of

material facts, omitting material facts required to be stated in order to make the statements contained therein not misleading, and failing to update their statements, which were false at the time they were issued and were also rendered false and misleading by additional material information which arose after the dissemination of these statements and before the Shareholder Meeting. The solicitations described herein were essential links in the accomplishment of the re-election of the Board.

235. The value of the stock has declined substantially subsequently due to Defendants' violations. These injuries were exclusive to shareholders and not inflicted on the Company.

236. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

**COUNT IV**
**For Violations of §20(a) of the Exchange Act**
**Against the Individual Defendants**

237. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

238. The Individual Defendants acted as controlling persons of Boston Beer within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these

statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

239.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

240.    As set forth above, the Individual Defendants each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

241.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

242.    **WHEREFORE**, on behalf of himself and the Class, Plaintiff prays for relief and judgment as follows:

(a) declaring this action to be a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b) Awarding damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: October 19, 2023

Respectfully submitted,

*/s/ Kim E. Miller*
Kim E. Miller
**KAHN SWICK & FOTI, LLC**
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
E-Mail: kim.miller@ksfcounsel.com

Lewis S. Kahn
**KAHN SWICK & FOTI, LLC**
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
E-Mail: lewis.kahn@ksfcounsel.com

*Counsel for Lead Plaintiff Thomas Frame
and Lead Counsel for the Class*

K. Scott Wagner (SBN 1004668)
**ATTOLLES LAW, S.C.**
700 W. Virginia Street Suite 307
Milwaukee, Wisconsin 53204
Telephone: (414) 644-0391
Facsimile: (414) 455-0758
E-Mail: swagner@attolles.com

*Local Counsel for Lead Plaintiff Thomas
Frame and the Class*