# EXHIBIT C

# KOHL'S®

## 2022 NOTICE OF ANNUAL MEETING & PROXY STATEMENT

**May 11, 2022**
8:00 a.m. Central Time

Kohl's Corporation
N56 W17000 Ridgewood Drive
Menomonee Falls, Wisconsin 53051

Case 2:22-cv-01016-LA    Filed 12/04/23    Page 2 of 24    Document 54-3

# KOHL'S

## Achieved strong results in 2021

**23% Net Sales**
INCREASE Y/Y

**8.6% Operating Margin**
HIGHEST SINCE 2014

**$7.33 Adj. EPS***
ALL TIME COMPANY RECORD

**Strengthened Balance Sheet**
RETURNED TO PRE-PANDEMIC HEALTH

**$1.5 Billion**
CAPITAL RETURNED TO SHAREHOLDERS

## Significant progress against key strategic initiatives

**Launched Sephora Partnership**
*200 STORES AND DIGITAL EXPERIENCE*



**40%+ Active Sales**
INCREASE Y/Y



**Introduced Highly Relevant New Brands**



*Figures presented based on 2021 results.*
*\* Adjusted earnings per share is a non-GAAP financial measure, please find a reconciliation to earnings per share calculated in accordance with GAAP in Appendix A.*



# NOTICE
## OF ANNUAL MEETING OF SHAREHOLDERS

### May 11, 2022
8:00 a.m. Central Time

Kohl's Corporation

To Our Shareholders:

We are pleased to invite you to attend the Annual Meeting of Shareholders of Kohl's Corporation on May 11, 2022, at 8:00 a.m. Central Time. This year's Annual Meeting will again be held exclusively online via a live interactive webcast. You will be able to vote and submit your questions in advance of, or during, the Annual Meeting of Shareholders and/or attend virtually by visiting www.cesonlineservices.com/kss22_vm.

The proxy statement for the Annual Meeting and accompanying **BLUE** proxy card is first being mailed to shareholders on or about March 21, 2022.

The purposes of the Annual Meeting are:

1. To elect thirteen individuals to serve as Directors for a one-year term and until their successors are duly elected and qualified;
2. To approve, by an advisory vote, the compensation of our named executive officers;
3. To ratify the appointment of Ernst & Young LLP as our independent registered public accounting firm for the fiscal year ending January 28, 2023; and
4. To consider and act upon any other business that may properly come before the meeting or any adjournment thereof.

We believe that the nominees recommended by our Board of Directors (the "Company Nominees") are best positioned to serve our Company and our shareholders. Accordingly, our Board of Directors unanimously recommends that you vote **"FOR ALL"** of the Company Nominees on the **BLUE** proxy card.

Macellum Badger Fund LP (together with its affiliates, "Macellum") has notified us that it intends to nominate a slate of ten nominees (the "Macellum Nominees") for election as Directors at the Annual Meeting in opposition to the Company Nominees recommended by our Board of Directors. You may receive solicitation materials from Macellum, including proxy statements and proxy cards.

Our Board of Directors urges you to disregard any such materials. The Company is not responsible for the accuracy of any information provided by or in relation to Macellum or the Macellum Nominees contained in the solicitation materials filed or disseminated by or on behalf of Macellum or any other statements that Macellum or its representatives may make.

Our Board of Directors unanimously recommends that you vote **"FOR ALL"** thirteen of the Company Nominees recommended by our Board of Directors on the **BLUE** proxy card, and strongly urges you not to sign or return any proxy card that may be sent to you by Macellum. If you have previously submitted a proxy card sent to you by Macellum, you can change your vote by using the enclosed **BLUE** proxy card to vote for the thirteen Company Nominees recommended by our Board of Directors.

Only shareholders of record at the close of business on March 7, 2022 are entitled to notice of and to vote at the meeting.

It is extremely important that your shares are represented and voted at the Annual Meeting no matter how large or small your holdings may be. You are urged to date, sign and return the **BLUE** proxy card. **Please vote as soon as possible in one of these three ways, even if you plan to attend the meeting:**

 **INTERNET**
Follow the instructions on your **BLUE** proxy card to vote via the Internet.

 **BY TELEPHONE**
Follow the instructions on your **BLUE** proxy card to vote by telephone.

 **BY MAIL**
You may complete, sign, date and return your **BLUE** proxy card by mail using the envelope provide.

Case 2:22-cv-01016-LA    Filed 12/04/23    Page 4 of 24    Document 54-3

Even if you vote in advance, you may still decide to attend the virtual Annual Meeting of Shareholders, withdraw your proxy, and vote your shares at the Annual Meeting. For more information, see "May I change or revoke my vote after I submit my proxy," which begins on page 18.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Shareholders to be Held virtually on May 11, 2022:** The 2021 Annual Report on Form 10-K and proxy statement of Kohl's Corporation are available at www.proxyvote.com.

We appreciate your continued confidence in our company and your support for our strategy. We look forward to seeing you on May 11, 2022.

By Order of the Board of Directors

*Michelle Gass*

**Michelle D. Gass**
*Chief Executive Officer*
Menomonee Falls, Wisconsin
March 17, 2022

Case 2:22-cv-01016-LA   Filed 12/04/23   Page 5 of 24   Document 54-3

# GENERAL INFORMATION

## Background to the Solicitation

2021 was a pivotal year for the Company, demonstrating significant progress against its strategy and positioning it for long-term value creation for all shareholders. The Company achieved record earnings per share and successfully launched several key strategic initiatives that the Company believes will position it to drive growth for years to come. In 2021 the Company delivered all-time record adjusted earnings per share of $7.33, eclipsing the previous high of $5.60 in 2018. Operating margin of 8.6% exceeded our goal of 7% to 8% two years ahead of plan. The Company made important progress towards our goal of becoming a leading destination for the active and casual lifestyle. Core to the Company's strategy is building a meaningful Beauty business, leveraging its new strategic partnership with Sephora, continuing to grow the Active business, improving the Women's business, and introducing iconic relevant brands to further differentiate the brand portfolio.

In 2021, the Company generated substantial free cash flow and returned approximately $1.5 billion in capital to shareholders through reinstating the dividend and accelerating share repurchases. The Company further announced on March 1, 2022 that the Board of Directors approved a $3.0 billion share repurchase authorization, and that the Company plans to repurchase at least $1.0 billion in shares in 2022, of which $500 million is expected to be repurchased through open market transactions or an accelerated share repurchase (ASR) program executed in the second quarter of 2022. In addition, the Company doubled the quarterly cash dividend on its common stock to $0.50 per share, which equates to an annual dividend of $2.00 per share.

The Company has also engaged in a program of regular Board refreshment that has introduced eight new directors in the past five years, four of whom joined in 2021. The Board refreshment has been undertaken with attentiveness to continually enhancing the Board's set of relevant skills and diversity of experience, and successively strengthening the Board's oversight capabilities. The current Board of Directors features thirteen independent directors, which includes Chair Frank Sica who will be retiring in connection with the Annual Meeting, and the Company's Chief Executive Officer.

## The 2021 Disbanded Investor Group Campaign, Nominations and Settlement

The following is a chronology of material communications and events leading up to this proxy solicitation. As described below, beginning in early 2020, the Company engaged with a group of its shareholders including Macellum, Ancora Advisors, LLC, Legion Partners Holdings, LLC, and 4010 Partners, LP (collectively, the "Disbanded Investor Group"), which ultimately resulted in a settlement agreement between the Company and the Disbanded Investor Group (the "Settlement Agreement"). Pursuant to the Settlement Agreement:

- The Company agreed to appoint to the Board of Directors two independent nominees of the Disbanded Investor Group, Margaret Jenkins and Thomas Kingsbury, as well as Christine Day, an additional independent director identified by the Company and agreed to by the Disbanded Investor Group;

- As part of the Board of Directors' refreshment process, the Company confirmed to the Disbanded Investor Group that the Board of Directors had received notice from (1) Steven Burd that he would retire from the Board of Directors by August 31, 2021 and (2) Frank Sica that he intended to retire and not stand for election at the 2022 Annual Meeting of Shareholders;

- The Company agreed to make the existing ad hoc Finance Committee a standing committee of the Board of Directors and to appoint Thomas Kingsbury as a member;

- The Disbanded Investor Group agreed to withdraw its solicitation for election of the Disbanded Investor Group Nominees; and

- The Disbanded Investor Group agreed to certain voting commitments and customary standstill obligations, and the parties agreed to mutual non-disparagement provisions until 30 days prior to the deadline for the submission of shareholder nominations for the Annual Meeting (such period, the "Standstill Period"). In particular, the Settlement Agreement precluded Macellum and the other members of the Disbanded Investor Group from, among other things,

Case 2:22-cv-01016-LA    Filed 12/04/23    Page 6 of 24    Document 54-3

(1) taking actions in support of changing the Board of Directors or management, (2) seeking or proposing a sale of the Company or any of its assets during the Standstill Period, (3) entering into any discussions, negotiations, agreements or understandings with any person with respect to these or any other prohibited actions or (4) advising, assisting, knowingly encouraging or seeking to persuade any person to take these or other prohibited actions. The Board of Directors viewed these commitments from Macellum and the other members of the Disbanded Investor Group as important undertakings in the best interest of the Company and its shareholders that would allow Company management to focus on its initiatives to deliver long-term sustainable growth.

Macellum is the only member of the Disbanded Investor Group that is participating in this year's proxy contest. References to communications with the Disbanded Investor Group are provided solely for context around the material communications with Macellum leading up to this solicitation.

In spring and summer of 2020, the Company actively engaged with members of the Disbanded Investor Group, seeking to understand their ideas and underlying assumptions about the Company. The Company's Vice President of Investor Relations, Mark Rupe, repeatedly met with representatives of the Disbanded Investor Group and responded to questions concerning the Company's business, including its response to the COVID-19 pandemic, top-line growth, capital expenditures, and how the terms of the Company's bond indenture impacted its ability to engage in sale leasebacks.

In the months of September, October, and November of 2020, Mr. Rupe continued to engage with and provide information to members of the Disbanded Investor Group with respect to the business of the Company.

On September 9, 2020, a representative of Macellum cancelled a meeting Macellum had previously scheduled with the Company's Chief Financial Officer, Jill Timm, and Mr. Rupe for September 10, 2020.

On October 20, 2020, the Company released an investor presentation sharing the Company's new strategic framework. Highlights from this presentation included:

- Expanding Operating Margin goal of 7% to 8% through end-to-end supply chain transformation, SG&A efficiency, and operational excellence;
- Driving top-line growth by becoming the destination for the active and casual lifestyle, leading with loyalty and value, and offering a differentiated omni-channel experience;
- Creating long-term shareholder value through disciplined capital management, a strong balance sheet, expanded operating margin, and return of capital to shareholders; and
- Maintaining an agile, accountable and inclusive culture.

On November 19, 2020, Mr. Rupe met with representatives of Macellum and another member of the Disbanded Investor Group to discuss the recent third quarter earnings release. During these meetings, Mr. Rupe discussed the Company's updated strategic framework to increase long-term shareholder value and responded to questions. Representatives of Macellum requested a follow-up meeting with the Company. The Company offered a meeting with Ms. Timm, which Macellum accepted.

On December 1, 2020, the Company announced, as part of its updated strategic framework, its long-term strategic partnership with Sephora to create a new era of elevated beauty at the Company, combining the Company's expansive customer reach and omni-channel convenience with Sephora's prestige service, product selection and beauty experience.

On December 3, 2020, Ms. Timm and Mr. Rupe met with representatives of Macellum about the Company's business, discussing the Company's recent performance in various categories, including sales growth, margins, SG&A expenses, inventory and category growth. During the meeting, Ms. Timm invited the representatives of Macellum to provide any detailed plans that the Disbanded Investor Group had for the Company so that the Board and management could consider them, but Macellum declined to do so.

On December 23, 2020, the members of the Board received a letter from the Disbanded Investor Group requesting a meeting with the Board to share the Disbanded Investor Group's perspectives on performance and better understand the Board's plans for the Company. As part of the Company's continued efforts to work constructively with the Disbanded Investor Group and further understand their ideas and underlying assumptions about the Company, the Board accepted the meeting, which was attended by independent Board members.

On January 5, 2021, the Disbanded Investor Group delivered a presentation to the Company that provided background information on the Disbanded Investor Group as well the Disbanded Investor Group's perspectives on the Company's historical performance (the "Disbanded Investor Group Deck"). The Disbanded Investor Group Deck did not contain any detailed plans regarding a proposed operational or value creation strategy for the Board of Directors and management to consider.

On January 6, 2021, independent members of the Board, consisting of the Chair of the Company's Nominating and ESG Committee, Peter Boneparth, and the Chair of the Company's Audit Committee, Stephanie Streeter, as well as Mr. Rupe met with representatives of the Disbanded Investor Group as requested in the Disbanded Investor Group's prior letter. During this meeting, the representatives of the Disbanded Investor Group committed to providing plans regarding the Company's operating margin for the Board and management to consider, but ultimately failed to deliver those plans.

On January 11, 2021, Macellum delivered a Notice of Intention to Nominate Individuals for Election as Directors for Consideration at the 2021 Annual Meeting of Shareholders of Kohl's Corporation (the "2021 Annual Meeting") to the Company's Senior Executive Vice President, General Counsel and Corporate Secretary, Jason Kelroy. In the notice, Macellum notified the Board that it would be nominating nine nominees (the "Disbanded Investor Group Nominees") for election to the Board at the 2021 Annual Meeting. Godfrey & Kahn S.C. ("Godfrey") and Latham & Watkins LLP ("Latham"), the Company's outside counsel, responded to Macellum on the Company's behalf, confirming receipt of the notice. The notice also disclosed that on October 23, 2020, the Disbanded Investor Group had entered into a group agreement.

Also on January 11, 2021, counsel to Macellum delivered a notice to Mr. Kelroy pursuant to the Premerger Notification Rules of the Federal Trade Commission, promulgated under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act"). In response, the Company made its required filings under the HSR Act on January 25, 2021. Macellum's waiting period under the HSR Act expired on February 10, 2021.

On January 12, 2021, Macellum delivered a letter to the Company requesting to inspect certain shareholder books, records and documents, which was fulfilled by the Company following entry into the confidentiality agreement described below.

On January 19, 2021, counsel to Macellum and a representative of Latham had a call, during which it was discussed that further engagement between the Disbanded Investor Group and the Company, including independent members of the Board, regarding any detailed plans that the Disbanded Investor Group had for the Company would be helpful so that the Board and management could consider such plans.

On January 22, 2021, the Company and Macellum entered into a customary confidentiality agreement in connection with Macellum's request for inspection of certain shareholder books, records and documents.

On February 5, 2021, independent members of the Board, consisting of Mr. Boneparth and the Chair of the Company's Compensation Committee, Jonas Prising, as well as the Company's Chief Executive Officer, Michelle Gass, and Mr. Rupe met with representatives of the Disbanded Investor Group. Ahead of the meeting, the Disbanded Investor Group shared slides nearly identical to the previously provided Disbanded Investor Group Deck of January 5, 2021. No detailed proposals regarding proposed operational or value creation strategies were included for the Board and management to consider. During the meeting, the Disbanded Investor Group intimated that it had compelling plans for the Company's future, however the Disbanded Investor Group again did not provide parameters of any such plans.

On February 6, 2021, independent Board member Peter Boneparth met with a representative of Macellum with respect to the Disbanded Investor Group's concerns and desire for board seats. The representative of Macellum indicated that the Disbanded Investor Group was interested in filling four to five board seats with members of the Disbanded Investor Group Nominees. Mr. Boneparth specifically indicated the Company's willingness to work constructively with the Disbanded Investor Group and to discuss the potential addition of one or two directors to the Board.

On February 14, 2021, Macellum delivered a letter to the Company requesting that the Board take action under certain Company agreements to address the potential change of control that would result in the composition of the Board if the nine Disbanded Investor Group Nominees were elected. On February 21, 2021, the Company delivered a letter in response to Macellum noting the Board's commitment to fulfilling its fiduciary obligations to the Company and its shareholders and the Board's commitment to make determinations consistent with those obligations at a time that is appropriate and sufficient for shareholders to make any relevant voting decisions.

On February 17, 2021, the Company announced that Robbin Mitchell joined the Board as an independent director, and that as a member of the Fashion & Luxury leadership team at the Boston Consulting Group, Ms. Mitchell brought extensive retail industry operating experience and expertise in areas important to the Company's growth strategy, including women's apparel, active and beauty. Ms. Mitchell's appointment, the result of discussions with Ms. Mitchell since August 2020, was part of the continuous Board refreshment process at the Company.

On February 17, 2021, independent Board member Mr. Boneparth met with a representative of Macellum to review the Company's recruitment of Ms. Mitchell, and the benefits to the Board and the Company's shareholders given her significant apparel, retail and leadership experience. During the meeting, the representative of Macellum stated that the Disbanded Investor Group was not seeking a change of control at the Company. The representative of Macellum reiterated the Disbanded Investor Group's desire to fill four or five of the Board's seats with Disbanded Investor Group Nominees.

On February 19, 2021, Mr. Boneparth met with a representative of Macellum as part of the Company's continued efforts to work constructively with the Disbanded Investor Group and further understand their ideas and underlying assumptions about the Company. Mr. Boneparth offered to provide the Disbanded Investor Group additional meetings with senior members of Company management ahead of the Company's earnings call so that the Company could provide greater detail on its performance and expectations and consider any plans that the Disbanded Investor Group may have for the Company, subject to the Disbanded Investor Group's entry into a non-disclosure and standstill agreement that would expire upon the Company's earnings call. The representative of Macellum noted that he would take the offer back to the Disbanded Investor Group.

On February 22, 2021, the Disbanded Investor Group filed a Schedule 13D, disclosing a combined 9.5% stake in the Company and disclosing its intent to nominate the nine Disbanded Investor Group Nominees for election to the Board at the 2021 Annual Meeting.

On February 23, 2021, the Disbanded Investor Group filed a preliminary proxy statement with the SEC in connection with the 2021 Annual Meeting.

On February 25, 2021, a representative of Macellum reached out to Mr. Boneparth regarding the Company's offer made the prior week to schedule additional meetings between the Company's management and the Disbanded Investor Group in advance of the Company's earnings call. Due to the Company's focus on earnings, the release of which was then just five days away, Mr. Boneparth noted that there was no longer available time for these meetings, but welcomed further engagement after the Company reported earnings.

On March 7, 2021, the representative of Macellum and Mr. Boneparth spoke again telephonically. The two exchanged views about the proxy contest initiated by the Disbanded Investor Group. The representative of Macellum requested a meeting with Ms. Gass and a meeting with the Board of Directors.

On March 8, 2021, Mr. Boneparth advised the representative of Macellum that he would arrange a meeting with Ms. Gass in the near term and suggested that a meeting with members of the Board of Directors would be considered subsequent to the meeting with Ms. Gass.

On March 12, 2021, the Disbanded Investor Group delivered a Notice of Withdrawal of Nomination of Certain Individuals for Election as Directors at the 2021 Annual Meeting of Shareholders of Kohl's Corporation, which purported to withdraw the nomination of four of the Disbanded Investor Group Nominees, including two individuals who are Macellum Nominees.

On March 13, 2021, Mr. Boneparth reached out to a representative of Macellum to schedule a meeting between the two of them to occur after the meeting between the Macellum representative and Ms. Gass previously scheduled for March 16, 2021.

On March 16, 2021, prior to engaging with Ms. Gass or with the Board of Directors, the Disbanded Investor Group mailed its definitive proxy statement. Later that day, Ms. Gass and Mr. Rupe met with a representative of Macellum, as previously scheduled. Ms. Gass conveyed her continued confidence in the Company's strategy. She reiterated the Board's commitment to shareholder engagement and hearing any value-enhancing ideas and feedback.

Also on March 16, 2021, Mr. Boneparth spoke with representatives of Macellum and another member of the Disbanded Investor Group and extended an invitation to schedule the previously requested opportunity to present to the Board of Directors. Later in the day, the Macellum representative called Mr. Boneparth and declined the opportunity to meet with the Board of Directors at that time.

On March 19, 2021, the Company filed a definitive proxy statement with the SEC in connection with the 2021 Annual Meeting.

On March 23, 2021, representatives of Latham engaged with counsel for the Disbanded Investor Group regarding the Company's request for certain information concerning the background of the Macellum Badger Fund pursuant to the Company's Bylaws (the "Badger Fund Background Request"). Counsel for the Disbanded Investor Group indicated that they would follow up with Latham in the near term with responses to the Company's questions.

On March 25, 2021, representatives of Latham again engaged with counsel for the Disbanded Investor Group regarding the Badger Fund Background Request. The parties also discussed the possibility of reaching a settlement. No resolution was reached on either topic.

On March 29, 2021, the Company commenced a cash tender offer for up to $1.0 billion combined aggregate principal amount of its 9.500% Notes due 2025, 4.250% Notes due 2025, 4.750% Notes due 2023 and 3.250% Notes due 2023.

On March 30, 2021, representatives of Latham again spoke with counsel for the Disbanded Investor Group regarding the Badger Fund Background Request. Counsel for the Disbanded Investor Group inquired about the prospect of settlement discussions. Representatives of Latham requested that the Disbanded Investor Group make certain of its nominees available for customary interviews with the Board.

On March 31, 2021, the Disbanded Investor Group delivered a supplement to its Notice of Intention to Nominate Individuals for Election as Directors for Consideration at the 2021 Annual Meeting, providing updates on its ownership of the Company's common stock pursuant to the Bylaws.

Also on March 31, 2021, Mr. Kelroy and a representative of Latham spoke with counsel for the Disbanded Investor Group regarding the Company's previous request to interview certain of its nominees, and the possibility of settlement, but no concrete terms were reached.

Also on March 31, 2021, the Company issued $500 million in aggregate principal amount of 3.375% Notes due 2031.

Between April 1, 2021 and April 12, 2021, representatives of Godfrey and Latham engaged in discussions with counsel to the Disbanded Investor Group regarding a potential settlement agreement.

On April 13, 2021, Ms. Gass, Mr. Boneparth and Mr. Sica interviewed Disbanded Investor Group nominees Margaret Jenkins and Thomas Kingsbury.

Also on April 13, 2021, the Company entered into a Settlement Agreement with the Disbanded Investor Group.

On April 14, 2021, the Company issued a joint press release with the Disbanded Investor Group announcing the Settlement Agreement. The Disbanded Investor Group, including Macellum, stated in reference to the addition of Ms. Day, Ms. Jenkins and Mr. Kingsbury:

"These new directors are all proven leaders in retail who will add valuable expertise to the Board. We are pleased to have been able to reach this constructive resolution with the Company, and we are confident these changes will help further our shared goal of creating long-term value for shareholders. We are excited for the future at Kohl's."

On April 15, 2021, the Disbanded Shareholder Group filed an amendment to its Schedule 13D disclosing the termination of the group.

## Actions After the Settlement Agreement and During the Standstill Period

From and after entering into the Settlement Agreement, the Company's management team and Board of Directors remained actively engaged with Macellum.

On May 20, 2021, Mr. Boneparth met with a representative of Macellum who was inquiring about the Company's first quarter earnings results. Mr. Boneparth connected the representative with the Company's management, and the representative met with the management team twelve days later.

On June 1, 2021, Ms. Gass, Ms. Timm and Mr. Rupe met with representatives of Macellum and discussed the Company's operational performance and capital allocation priorities.

On July 13, 2021, Mr. Boneparth corresponded with a representative of Macellum to schedule a meeting for the following week to discuss the Company's operational performance and capital allocation priorities.

On July 19, 2021, Mr. Boneparth met with representatives of Macellum and discussed Macellum's plans for the Company, including a sale leaseback transaction and larger share repurchases.

On August 11, 2021, consistent with the Company's representations in the Settlement Agreement, the Company announced that Steven Burd would retire from the Board of Directors effective as of August 31, 2021.

On August 19, 2021, the Company reported its second quarter 2021 earnings. The highlights of the report included:

- Second quarter net sales and earnings exceeded expectations;
- Second quarter net sales increased by 31.4%;
- Record second quarter diluted earnings per share of $2.48, and an increase in full year 2021 adjusted earnings per share guidance to $5.80 to $6.10;
- A strengthened financial position during the quarter, ending with $2.6 billion in cash; and
- The repurchase of $225 million of shares in the quarter and plans to repurchase $500 million to $700 million of shares in 2021.

On August 23, 2021, Ms. Gass, Ms. Timm and Mr. Rupe met with representatives of Macellum to discuss the Company's second quarter earnings results, operating performance and capital allocation priorities. Following the meeting, Mr. Rupe corresponded with a representative of Macellum to provide additional information requested by Macellum during the meeting.

On August 30, 2021, a representative of Macellum reached out to Mr. Boneparth to request a meeting, remarking "Great Q" in reference to the Company's second quarter earnings results.

Case 2:22-cv-01016-LA    Filed 12/04/23    Page 10 of 24    Document 54-3

On September 9, 2021, Mr. Boneparth met with a representative of Macellum. The representative of Macellum was complimentary of the Company's second quarter earnings results and requested to meet with the Board of Directors to share Macellum's perspectives on the Company.

On September 13, 2021, Mr. Boneparth informed a representative of Macellum that Mr. Rupe would soon reach out to schedule a meeting with directors Frank Sica, John Schlifske, the Chair of the Board of Directors' Finance Committee, and Michael Bender.

On September 15, 2021, Mr. Rupe reached out to the representative of Macellum to schedule the meeting with Mr. Sica, Mr. Schlifske and Mr. Bender.

On September 22, 2021, Mr. Sica, Mr. Schlifske, Mr. Bender and Mr. Rupe met with a representative of Macellum to discuss the Company's operating performance and capital allocation priorities. During the meeting, the representative of Macellum delivered a presentation regarding Macellum's views on the Company, including suggesting that the Board of Directors consider executing a sale leaseback transaction.

On September 28, 2021, Mr. Rupe, in response to an inquiry from a representative of Macellum, informed the representative of Macellum that the Board of Directors was considering the perspectives Macellum presented on September 22, 2021 and committed to follow up regarding potential additional opportunities for engagement with the Board of Directors and the Company's management.

On October 6, 2021, Ms. Timm and Mr. Rupe met with a representative of Macellum to discuss the Company's operational performance and capital allocation priorities. Following the meeting, Mr. Rupe invited the representative of Macellum to present at a Board of Directors meeting on November 10, 2021.

On October 18, 2021, a representative of Macellum contacted Mr. Boneparth regarding the Saks.com spin-off and encouraged the Company to study a spin-off of its ecommerce business. Mr. Boneparth responded that the Company's management was actively monitoring and assessing retail ecommerce spin-offs.

On October 25, 2021, Mr. Rupe exchanged e-mails with a representative of Macellum regarding the Company's new credit agreement for a five-year unsecured revolving credit facility, announced on October 22, 2021.

On November 10, 2021, the Board of Directors held a meeting during which a representative of Macellum was invited to attend a portion of the Board of Directors meeting and presented Macellum's perspectives on the Company. Following the presentation, the Board of Directors considered and discussed Macellum's perspectives on the Company.

Later on November 10, 2021, consistent with the Company's representations in the Settlement Agreement, the Company announced that Mr. Sica would retire from the Board of Directors and not stand for re-election at the Company's 2022 Annual Meeting. The Company also announced that the Board of Directors, as part of its deliberate succession planning process, unanimously decided to appoint Peter Boneparth as independent Chair following Mr. Sica's retirement effective at the conclusion of the 2022 Annual Meeting, and that independent director Michael Bender would be appointed Chair of the Board of Directors' Nominating & ESG Committee effective as of the 2022 Annual Meeting.

On November 15, 2021, a representative of Macellum sent Mr. Boneparth a message congratulating him on his recently announced appointment as the Company's independent Chair.

On November 18, 2021, the Company reported its third quarter 2021 earnings. The highlights of the report included:

- Third quarter net sales and earnings exceeded expectations;
- Third quarter net sales increased 15.5% and third quarter comparable sales increased 14.7%;
- Record third quarter diluted earnings per share of $1.65 and an increase in full year 2021 adjusted earnings per share guidance to $7.10 to $7.30;
- The repurchase of $506 million of shares in the quarter and plans to repurchase $1.3 billion of shares in 2021; and
- The Company ended the quarter in a strong financial position with $1.9 billion in cash.

On November 22, 2021, Ms. Gass, Ms. Timm and Mr. Rupe met with a representative of Macellum and discussed the Company's third quarter earnings results.

On November 24, 2021, Mr. Boneparth, in response to an inquiry from a representative of Macellum, offered to have a meeting with a representative of Macellum in early December.

On December 6, 2021, Mr. Boneparth met with a representative of Macellum to discuss the Company's operating performance.

On December 9, 2021, over one month before the expiration of the Standstill Period during which Macellum agreed not to take any action or enter into any discussions or understandings in support of changing the Board of Directors, *Reuters* reported that "activist hedge fund Macellum Advisors GP LLC is planning to nominate directors to Kohl's

Corp's board" citing two people familiar with the matter. The article further reported that Macellum "is preparing a slate of nominees with retail and operating experience to again challenge the Kohl's board early next year."

On January 6, 2022, Mr. Boneparth met with a representative of Macellum. During the meeting the representative of Macellum noted Macellum's perspective that the Board of Directors needed more change than the eight new directors added to the Board of Directors in the past five years, including three new independent directors added to the Board of Directors during 2021 in connection with the Settlement Agreement with Macellum and the other members of the Disbanded Investor Group. Jonathan Duskin, the representative of Macellum on the call, implied that he should be added to the Board of Directors. The representative of Macellum promised to call Mr. Boneparth before Macellum launched its proxy contest.

On January 11, 2022, Mr. Boneparth advised the representative of Macellum that Mr. Boneparth had shared their discussion with the Board of Directors and the Company's management team. Mr. Boneparth indicated that the Board of Directors and the Company's management team were continuing to analyze the Company's strategy and alternatives in advance of the Company's upcoming Investor Day. Mr. Boneparth also indicated that the Company would be happy to provide any specific information that would be useful to Macellum.

On January 12, 2022, the day that the Standstill Period expired, Mr. Boneparth met with a representative of Macellum, during which Mr. Boneparth presented the idea of entering into a confidentiality agreement to allow the Company to share more information with Macellum. Also during that call the Macellum representative noted that the Company should retain a financial advisor as the representative of Macellum felt the Company should put itself up for sale, stating that the representative of Macellum heard that Sycamore Partners would be interested in a potential transaction. As Mr. Bonenparth noted, Sycamore Partners had not separately reached out to the Company or the Board of Directors about such interest.

Also on January 12, 2022, as later revealed in Macellum's preliminary proxy statement, Macellum Badger Fund II, LP ("Macellum Fund II"), an affiliate of Macellum, purchased call options expiring on July 15, 2022 with a strike price of $40 per share representing 589,041 shares of the Company's common stock.

Also on January 12, 2022, the Standstill Period expired.

## The 2022 Macellum Campaign and Nominations

On January 13, 2022, as later revealed in Macellum's preliminary proxy statement, Macellum Fund II purchased call options expiring on July 15, 2022 with a strike price of $40 per share representing 555,263 shares of the Company's common stock.

On January 14, 2022, as later revealed in Macellum's preliminary proxy statement, Macellum Fund II purchased call options expiring on July 15, 2022 with a strike price of $40 per share representing 581,081 shares of the Company's common stock.

Also on January 14, 2022, two days after the expiration of the Standstill Period, Ms. Gass met with a representative of Macellum, who noted Macellum's perspective that the Board of Directors needed more change than the eight new directors added to the Board of Directors in the past five years and that the Company should hire a financial advisor to explore a sale of the Company.

Also on January 14, 2022, representatives of Latham spoke with counsel to Macellum, in furtherance of the Company's invitation to Macellum to provide feedback on the Company's operating performance, strategic initiatives and capital allocation plans. The representatives of Latham presented key terms of the proposed confidentiality agreement including that:

- The Company would provide material non-public information to Macellum regarding the Company's fourth quarter earnings and Investor Day materials;
- The Company would provide Macellum the opportunity to provide feedback on the Company's operating performance, strategic initiatives, capital allocation plans and Investor Day materials in advance of the Company's Investor Day;
- The Company would publicly disclose any material non-public information provided to Macellum no later than Investor Day so that Macellum would not be prevented from trading in the Company's securities after such time;
- Macellum would be permitted to make director nominations to the Company at any time, whether before or after the Company's Investor Day; and
- During the period of cooperation until the Company's Investor Day, both the Company and Macellum would refrain from public statements regarding each other.

Also on January 14, 2022, before providing an opportunity for the Company to deliver a draft of the confidentiality agreement, counsel to Macellum informed representatives of Latham that Macellum rejected the terms of the agreement. Instead, Macellum insisted it receive the Company's material non-public information with no customary standstill (which would customarily contain restrictions on trading in the Company's securities) and with no restrictions on speaking publicly as long as Macellum did not reveal the Company's material non-public information. Macellum also rejected the proposed period of cooperation until the Company's Investor Day.

On January 16, 2022, a representative of Latham followed up with counsel to Macellum to provide additional detail regarding the Company's proposed confidentiality agreement. The representative of Latham:

- Noted that the Board of Directors and the Company's management have valued the multiple opportunities for engagement with Macellum;
- Noted that the Board of Directors strongly preferred to be in a position to engage in detail with Macellum regarding the Company's operating performance, strategic initiatives, capital allocation plans and Investor Day materials;
- Highlighted that the proposed agreement would allow Macellum to nominate directors at any time, whether before or after Investor Day;
- Informed Macellum that the Company would commit to not accelerate the timing of the 2022 Annual Meeting, providing Macellum appropriate time after Investor Day to solicit in favor of any Macellum director nominees; and
- Informed Macellum that the Company would also commit to not filing its preliminary proxy in advance of Investor Day, ensuring that both Macellum and the Company would be on equal footing for any potential proxy contest.

On January 17, 2022, without engaging further on the terms of a potential confidentiality agreement, a representative of Macellum called Mr. Boneparth to reject the proposed confidentiality agreement. The representative of Macellum also rejected the period of cooperation in advance of Investor Day and said that Macellum would issue a public statement the next day.

Also on January 17, 2022, the Wall Street Journal published an article summarizing Macellum's position as described in its letter to the Company's shareholders circulated the next day and described below. The article noted that Macellum told the Company that if it does not change the Board of Directors, the Company should explore a sale or other transaction and that Macellum also told the Company it believes there are potential buyers that have shown interest.

On January 18, 2022, Macellum issued a public letter to the Company's shareholders accompanied by a press release stating that Macellum believed that the Company's stock could "trade at up to $100 per share." In the days surrounding this announcement, as described above and below, Macellum purchased call options expiring on July 15, 2022 at a $40 strike price representing approximately 2.59 million shares of the Company's common stock, as later revealed in Macellum's preliminary proxy statement. The letter and press release, which were issued less than a week after the expiration of the Standstill Period, also announced Macellum's intention to nominate a slate of "highly-qualified" director candidates for the 2022 Annual Meeting. The press release also called for the Company to "explore strategic alternatives," claiming that Macellum believes "there are well-capitalized strategic and financial buyers that could pay a meaningful premium to acquire Kohl's."

Later on January 18, 2022, Ms. Gass met with a representative of Macellum. The representative of Macellum said that Ms. Gass and the Company would be "blown away" by the director nominees Macellum intended to nominate. For the second time on the same day, Macellum offered details regarding the qualifications of its director nominees, all less than a week after the expiration of the Standstill Period during which Macellum was prohibited from contacting potential nominees regarding the Company.

Also on January 18, 2022, the Company issued a press release highlighting the significant refreshment of the Board of Directors in the last three years, the Board of Directors' evaluation of value-enhancing opportunities and commitment to maximizing shareholder value and Macellum's refusal to provide input regarding the Company's operating performance, strategic initiatives and capital allocation plans by rejecting the Company's proposed confidentiality agreement.

On January 21, 2022, as later revealed in Macellum's preliminary proxy statement, Macellum Fund II purchased call options expiring July 15, 2022 with a strike price of $40 per share representing 861,111 shares of the Company's common stock.

Also on January 21, 2022, after the markets closed for trading on Friday, the *Wall Street Journal* published an article stating that a consortium backed by Starboard Value LP and led by Acacia Research Corporation, which the *Wall Street Journal* reported Starboard controls, offered to buy the Company for $64 a share.

On January 23, 2022, *Bloomberg* and *Reuters* reported that Sycamore Partners contacted the Company regarding an offer to buy the Company for at least $65 per share.

On January 24, 2022, the following Monday, despite Macellum having issued a public letter to the Company's shareholders less than a week prior informing shareholders that the Company's stock could "trade at up to $100 per

share," Macellum began to swiftly exit the majority of the call options in the Company it had purchased roughly a week prior, as later revealed in Macellum's preliminary proxy statement. Beginning on January 24, 2022, as later revealed in Macellum's preliminary proxy statement, Macellum Fund II sold call options expiring on July 15, 2022 with a strike price of $40 per share representing 646,624 shares of the Company's common stock. Over the course of the week, Macellum sold call options expiring on July 15, 2022 with a strike price of $40 per share representing over 1.6 million shares of the Company's common stock, netting tens of millions of dollars in profits.

Also on January 24, 2022, the Company issued a press release confirming that it received letters expressing interest in acquiring the Company and stated that the Board of Directors was working to determine the course of action that it believes is in the best interests of the Company and its shareholders.

On January 25, 2022, while still in the process of swiftly exiting the majority of the call options in the Company, Macellum issued a press release calling for the immediate appointment of a representative of Macellum to the Board of Directors. Despite having the opportunity to do so, Macellum failed to disclose swiftly exiting the majority of the call options.

Also on January 25, 2022, as later revealed in Macellum's preliminary proxy statement, Macellum Fund II sold call options expiring on July 15, 2022 with a strike price of $40 per share representing 638,298 shares of the Company's common stock.

On January 26, 2022, as later revealed in Macellum's preliminary proxy statement, Macellum Fund II sold call options expiring on July 15, 2022 with a strike price of $40 per share representing 210,490 shares of the Company's common stock.

On January 27, 2022, as later revealed in Macellum's preliminary proxy statement, Macellum Fund II sold call options expiring on July 15, 2022 with a strike price of $40 per share representing 5,745 shares of the Company's common stock.

On January 28, 2022, as later revealed in Macellum's preliminary proxy statement, Macellum Fund II sold call options expiring on July 15, 2022 with a strike price of $40 per share representing 115,808 shares of the Company's common stock.

On February 1, 2022, counsel to Starboard Value and Opportunity Fund Ltd ("Starboard") delivered a letter to the Company pursuant to the HSR Act, stating that Starboard intended to acquire voting securities of the Company sufficient to exceed the initial reporting threshold under the HSR Act, which applicable threshold is $101 million. The waiting period requirements for this acquisition expired on March 3, 2022.

On February 4, 2022, the Company issued a press release announcing that:

- The Board of Directors determined, following a review with the Board of Directors' independent financial advisors, Goldman Sachs and PJT Partners, that the valuations indicated in the expressions of interest submitted to the Company do not adequately reflect the Company's value in light of its anticipated future growth and cash flow generation;
- The Board of Directors is committed to maximizing the long-term value of the Company and will review and pursue opportunities that it believes would credibly lead to value consistent with the Company's performance and future opportunities;
- The Board of Directors designated its Finance Committee, which was formed pursuant to the Settlement Agreement and is comprised exclusively of independent directors, to lead the ongoing review of any expressions of interest;
- The Board of Directors instructed Goldman Sachs to engage with interested parties; and
- The Board of Directors adopted a limited-duration shareholder rights plan in order to ensure that the Board of Directors can conduct an orderly review of expressions of interests, including potential further engagement with interested parties. The Company noted that the rights plan does not prevent the Board of Directors from considering an offer that recognizes the value of the Company.

Also on February 4, 2022, less than three weeks after Macellum issued a public letter to the Company's shareholders stating that Macellum believed that the Company's stock could "trade at up to $100 per share," Macellum issued a press release stating that Macellum was "disappointed and shocked" that the Board of Directors concluded that offers to acquire the Company publicly reported to be in the $64 to $65 per share range did not adequately reflect the Company's value. Despite having the opportunity to do so, Macellum again failed to disclose swiftly exiting the majority of the call options.

During January and February 2022 and continuing into March 2022, at the direction of the Board of Directors and its Finance Committee, Goldman Sachs has engaged with a number of financial sponsors, strategics and real-estate focused investors regarding a range of potential strategic alternatives involving the Company. As part of this engagement, Goldman Sachs engaged not only with parties who submitted expressions of interest to the Company, but also made outbound calls to various financial sponsors, strategics and real-estate focused investors, engaging with over 20 parties. Certain parties have entered into customary confidentiality agreements with the Company and have been provided access to a data room, have received a management presentation led by senior members of the Company's management and have been invited to submit proposals to the Company.

Case 2:22-cv-01016-LA    Filed 12/04/23    Page 14 of 24    Document 54-3

On February 10, 2022, Macellum delivered a Notice of Intention to Nominate Individuals for Election as Directors for Consideration at the 2022 Annual Meeting of Shareholders of Kohl's Corporation (the "2022 Nomination Notice") to Mr. Kelroy. In the 2022 Nomination Notice, Macellum notified the Board of Directors that Macellum would be nominating a control slate of ten nominees at the 2022 Annual Meeting (the "Macellum Control Slate Nominees"). The 2022 Nomination Notice disclosed that a majority of the Macellum Control Slate Nominees have no public company board experience.

Also on February 10, 2022, Mr. Kelroy responded to Macellum on the Company's behalf, confirming receipt of the 2022 Nomination Notice, requesting the Macellum Control Slate Nominees complete the Company's Director & Officer Questionnaire and preserving the Company's right to assert or determine that the nominations were not properly made and take actions with respect to the nominations as permitted by the Company's Bylaws and applicable law.

Also on February 10, 2022, Macellum issued a press release disclosing its delivery of the 2022 Nomination Notice and the Macellum Control Slate Nominees. Despite having the opportunity to do so, Macellum for a third time failed to disclose swiftly exiting the majority of the call options.

Also on February 10, 2022, Macellum delivered a letter to the Company requesting to inspect certain shareholder books, records and documents (the "Books and Records Request"), which was fulfilled by the Company following entry into the confidentiality agreement described below.

Also on February 10, 2022, the Company issued a press release responding to Macellum's director nominations and reaffirming the Board of Directors' commitment to maximize value for all shareholders.

On February 14, 2022, Macellum and its advisors delivered two letters to the Company, one of which requested that the Board of Directors make certain determinations under certain Company agreements with respect to the Macellum Control Slate Nominees and the other of which requested that the Board of Directors change the procedures for proxies at the 2022 Annual Meeting.

On February 16, 2022, representatives of Godfrey and Latham delivered a letter to counsel to Macellum in response to the Books and Records Request confirming that the Company intended to comply with the Books and Records Request as soon as Macellum complied with the New York statute pursuant to which it had made the request and entered into a customary confidentiality agreement.

Also on February 16, 2022, counsel to Macellum delivered a Director & Officer Questionnaire for each of the Macellum Control Slate Nominees.

On February 17, 2022, representatives of Godfrey and Latham delivered a letter to counsel to Macellum informing Macellum that the 2022 Nomination Notice failed to provide all information required by the Company's Bylaws and the Securities Exchange Act of 1934, as amended (the "Exchange Act").

On February 18, 2022, representatives of Godfrey and Latham delivered a letter to counsel to Macellum noting the Board of Directors' commitment to fulfilling its fiduciary obligations to the Company and its shareholders and the Board of Directors' commitment to make determinations consistent with those duties regarding certain Company agreements and the Macellum Control Slate Nominees at a time that is appropriate and sufficient for the Company's shareholders to make relevant voting decisions.

On February 18, 2022, Macellum filed a preliminary proxy statement with the SEC. Only when legally required to do so did Macellum finally disclose to its fellow shareholders that it had swiftly exited options in the Company netting tens of millions in profits.

On February 23, 2022, counsel to Macellum delivered a letter to representatives of Godfrey and Latham confirming that the 2022 Nomination Notice and the completed Director & Officer Questionnaires for the Macellum Control Slate Nominees omitted certain material information required by our Bylaws and the Securities Exchange Act of 1934. Despite acknowledging omissions in the Nomination Notice and completed Director & Officer Questionnaires, Macellum again failed to provide all material information required by the Company's Bylaws and Director & Officer Questionnaires.

On February 23, 2022, Macellum complied with the New York statute pursuant to which its Books and Records Request was made, and the Company and Macellum entered into a customary confidentiality agreement in connection with the Books and Records Request.

On February 24, 2022, Macellum issued a press release stating that the Company "appears to have pushed up this year's record date by three weeks to March 7, 2022, in an apparent attempt to protect itself from investors who are rightfully frustrated by its inaction and poor direction." The Board of Directors set March 7 as the record date as it is consistent with, and within one week of, the Company's historical record dates for more than a decade other than in 2021, which later record date was set to accommodate a potential contested virtual annual meeting during the COVID-19 pandemic.

On February 25, 2022, a representative of Macellum reached out to Mr. Rupe requesting a meeting with Ms. Gass following the Company's earnings call relating to the fourth quarter of the 2021 fiscal year.

On March 1, 2022, the Company reported its fourth quarter 2021 earnings. The highlights of the report included:

- Fourth quarter diluted earnings per share of $2.20 exceeded expectations;
- All-time record full year 2021 adjusted diluted earnings per share of $7.33, eclipsing previous high of $5.60 in 2018;
- The repurchase of $548 million of shares in the quarter and $1.355 billion of shares in 2021;
- The Company expects full year 2022 net sales to increase 2% to 3% as compared to 2021, operating margin to be in the range of 7.2% to 7.5% and earnings per share to be in the range of $7.00 to $7.50;
- The Company increased the quarterly dividend by 100%, which equates to an annual dividend of $2.00 per share, and plans to repurchase at least $1.0 billion in shares in 2022, of which $500 million is expected to be repurchased through open market transactions or an accelerated share repurchase (ASR) program executed in the second quarter of 2022.

On March 2, 2022, Ms. Gass, Ms. Timm and Mr. Rupe met with representatives of Macellum at the investor's request for the purpose of discussing the Company's fourth quarter earnings results. Macellum used the time to focus on criticisms of the Company, including its investments to support its strategic partnership with Sephora.

On March 4, 2022, Macellum issued a press release that, among other things, criticized the Company's investments to support its strategic partnership with Sephora and also conveyed perspectives on monetizing real estate.

Also on March 4, 2022, representatives of Latham delivered a letter to counsel to Macellum reminding Macellum of its obligation under the Bylaws to update the 2022 Nomination Notice as of March 7, 2022, the record date for the Annual Meeting.

Also on March 4, 2022, the Company issued a press release in connection with its virtual investor day event on March 7, 2022, noting that those interested in viewing the event can access the presentation and Q&A by visiting Investors. Kohls.com and that the entire event will be archived and available on such site.

On March 7, 2022, the Company hosted an Investor Day featuring the following presentations. A replay of the Investor Day presentations, listed below, is available to all shareholders and investors at the Company's Investor Relations website:

- Kohl's Strategy and Path Forward, by Michelle Gass, Chief Executive Officer;
- Active & Casual Portfolio to Power the Future, by Doug Howe, Chief Merchandising Officer;
- Engaging Customers in New and Impactful Ways, by Greg Revelle, Chief Marketing Officer;
- Innovating Through Our Leading Omnichannel Platform, by Paul Gaffney, Chief Technology & Supply Chain Officer;
- Financial Framework & Capital Allocation Strategy, by Jill Timm, Chief Financial Officer; and
- Environmental, Social, Governance (ESG), by Michelle Gass, Chief Executive Officer.

Also on March 7, 2022, the Company issued a press release in connection with its virtual investor day event, announcing key updates on the Company's strategic growth initiatives and financial plan. The Company:

- Introduced new long-term financial targets of low-single digits percent sales growth and mid-to-high single digits percent EPS growth;
- Plans to grow Sephora to a $2 billion business across more than 850 stores;
- Expects to open 100 new Kohl's stores in the next four years, supporting continued omnichannel growth;
- Is enhancing Kohl's Card rewards benefit to 7.5% everyday;
- Is continuing to expand omnichannel capabilities with launch of self serve buy online, pick up in store to all stores; and
- Commits to net zero emissions by 2050.

Also on March 7, 2022, the Company filed the preliminary proxy statement.

On March 10, 2022, Macellum filed a revised preliminary proxy statement with the SEC.

On March 11, 2022, Macellum delivered to Latham a supplement updating the 2022 Nomination Notice.

On March 17, 2022, the Company filed this proxy statement.

We continue to be receptive to all our shareholders' input and continue to evaluate the proposals and perspectives that Macellum has shared. However, we disagree with Macellum's view that 2021 was a "lost year" given our record results for 2021 and substantial progress achieved on key initiatives. We similarly disagree with Macellum's intent to take control of the Company given the strength and recent refreshment of our Board, our robust strategy and outlook for future value creation, and our Board's commitment to evaluate all ways to create value for shareholders.

Case 2:22-cv-01016-LA   Filed 12/04/23   Page 16 of 24   Document 54-3

# Company Nominees

The following table lists the Company Nominees.

All of the Company Nominees are independent except Michelle Gass, Chief Executive Officer of Kohl's.

| Directors | Principal Occupation | Age | Director Since | Other Public Boards | Committee Memberships | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Audit | Compensation | Nominating and ESG | Finance |
| Michael J. Bender | President and Chief Executive Officer of Eyemart Express, LLC | 60 | 2019 | 0 | ✓ | | ☆ | |
| Peter Boneparth ⚑ | Former Senior Advisor to a division of The Blackstone Group, LLP, advising on the retail industry | 62 | 2008 | 1 | | ✓ | ★ | ✓ |
| Yael Cosset | Senior Vice President and Chief Information Officer of The Kroger Co. | 48 | 2020 | 0 | ✓ | | | |
| Christine Day | Chief Executive Officer, Executive Chair and Co-Founder of The House of LR&C | 59 | 2021 | 0 | ✓ | ✓ | | |
| H. Charles Floyd | Global President of Operations of Hyatt Hotels Corporation | 62 | 2017 | 1 | | ✓ | | |
| Michelle Gass | Chief Executive Officer of Kohl's | 54 | 2018 | 1 | | | | |
| Margaret L. Jenkins | Former Senior Vice President, Chief Marketing Officer of Denny's Corporation | 70 | 2021 | 1 | ✓ | | | |
| Thomas A. Kingsbury | Former President and Chief Executive Officer of Burlington Stores, Inc. | 69 | 2021 | 3 | ✓ | | | ✓ |
| Robbin Mitchell | Senior Advisor at the Boston Consulting Group | 57 | 2021 | 1 | ✓ | | ✓ | |
| Jonas Prising | Chair and Chief Executive Officer of ManpowerGroup | 57 | 2015 | 1 | | ★ | | |
| John E. Schlifske | Chair and Chief Executive Officer of The Northwestern Mutual Life Insurance Company | 62 | 2011 | 0 | | | ✓ | ★ |
| Adrianne Shapira | Managing Director of Eurazeo Brands | 51 | 2016 | 0 | | | ✓ | ✓ |
| Stephanie A. Streeter | Former Chief Executive Officer of Libbey, Inc. | 64 | 2007 | 2 | ★ | ✓ | | |

⚑ *Independent Chair of the Board effective immediately following the Annual Meeting.*

★ *Committee Chair.*

☆ *Committee Chair effective immediately following the Annual Meeting.*

Case 2:22-cv-01016-LA    Filed 12/04/23    Page 17 of 24    Document 54-3

## 2022 BOARD NOMINEE HIGHLIGHTS



**12/13**
nominees are independent



**6/13**
nominees are women

### Skills, Diversity, and Experience

*The thirteen Company Nominees represent a diverse range of skills*



| | |
|---|---|
| Current or Former Public Company CEO | 6 |
| Senior Leadership Experience | 13 |
| Public Company Board Experience (other than Kohl's) | 11 |
| Board Diversity (Gender or Racial/Ethnic Diversity) | 7 |
| Retail or Consumer-Facing Industry Experience | 13 |
| Finance, Accounting, or Financial Reporting Experience | 11 |
| Mergers and Acquisitions Experience | 10 |
| Technology, E-Commerce or Digital Experience | 10 |
| Marketing, Public Relations, or Brand Management Experience | 12 |
| Operations Management Experience | 11 |
| Human Capital, Culture, or Compensation Experience | 10 |



**Age**

Average age **60**

- Under 50
- 50-59
- 60-69
- 70 or older

**Tenure**

Average tenure **5 years**

- Less than 3 years
- 3-8 years
- 9-12 years
- 13 or more years

# 2021 Performance Highlights

Kohl's made significant progress against its strategy in 2021, delivering strong financial performance materially above its expectations while navigating persistent challenges presented by COVID-19. The Company's strategic transformation into the leading destination for the active and casual lifestyle continued to build momentum. Investments in the active, outdoor and beauty categories are generating positive returns and management's repositioning of the business for profitable growth proved highly successful. Kohl's achieved all-time record adjusted earnings per share of $7.33 in 2021, eclipsing its previous high of $5.60 in 2018.[1]

The Company delivered solid performance across each of its four key strategic focus areas.

## Driving top line growth

Kohl's net sales in 2021 increased 23% year-over-year. Management's focus on driving active and outdoor sales led to a net sales increase of more than 40% year-over-year for these categories. In addition, the Company successfully launched its game-changing partnership with Sephora, opening an initial 200 Sephora at Kohl's shops and launching a comprehensive digital experience. This partnership is attracting new and more diverse customers and enhancing topline growth. Further, Kohl's introduced several highly relevant iconic national brands during the year, including Tommy Hilfiger, Calvin Klein, and Eddie Bauer, as well as its new private athleisure brand, FLX™.

1   *Adjusted earnings per share is a non-GAAP financial measure. Please find a reconciliation in Appendix A.*

Case 2:22-cv-01016-LA     Filed 12/04/23     Page 18 of 24     Document 54-3

## Expanding operating margin

Management's focus on repositioning its business for profitable growth resulted in significant operating margin expansion in 2021. Kohl's achieved an 8.6% operating margin, its highest level since 2014 and exceeding its 2023 goal of 7% to 8% two years ahead of plan. The strong performance in 2021 was driven through gross margin expansion and effective expense management.

## Maintaining disciplined capital management

In 2021, management followed through on its commitment to prudent balance sheet management and its long-term objective of sustaining its Investment Grade credit rating. The Company strengthened its balance sheet, returning it to its healthy pre-pandemic structure. In addition, Kohl's generated substantial free cash flow, whereby it returned $1.5 billion in capital to shareholders through reinstating the dividend and accelerating share repurchases.

## Sustaining an agile, accountable, and inclusive culture

Fostering a diverse, equitable, and inclusive environment for Kohl's associates, customers, and suppliers remains an important focus. The Company made further progress under its new diversity and inclusion framework, and continued to build on its commitment to Environmental, Social, and Corporate Governance ("ESG") stewardship. In 2021, furthering management's commitment to all of our associates, the Company appointed a new Chief Diversity & Inclusion Officer to the executive team reporting directly to the CEO. This leadership role will help further the Company's dedication to improving our overall diversity and inclusion efforts, which have already been recognized by several third party awards and rankings.

Because of the efforts of our management and associates during 2021, Kohl's significantly outperformed its expectations. For more information, please see the Compensation Discussion and Analysis.

# Compensation Highlights

Our compensation program is a pay-for-performance model based on the philosophy that we should incentivize our executive officers to improve Kohl's financial performance, profitably grow the business, and increase shareholder value. That philosophy drove several actions in fiscal 2021. Recognizing the importance of returning to a metric-based approach for the fiscal 2021 plan, the Compensation Committee set performance goals of net sales and operating income. When setting the target net sales and operating income goals for 2021, the Compensation Committee set at a level to drive accountability toward a near-term recovery to 2019 sales, while also making sequential strides toward the operating income margin commitments outlined in the Company's strategic framework announced in October 2020. The 2021 Annual Incentive Plan was created to navigate a complex macroeconomic environment given the

unpredictable nature of the pandemic and the recovery. Targets were set for this plan that were significantly more challenging to achieve at the upper payout levels due to the fact that the breadth of the payout ranges were expanded. The Company achieved the high end of the payout range, even with the more challenging goals. In contrast, our 2019-2021 long-term objectives, as originally set in early 2019, were not achieved and therefore our 2019-2021 LTIP did not pay out even in light of the fact that a majority of this time period was highly impacted by the COVID-19 pandemic, which was entirely outside of the control of management. No adjustments were made due to the COVID-19 economic impact, and executives will receive no PSU payout under the 2019-2021 LTIP. For more information, please see the Compensation Discussion and Analysis.

Case 2:22-cv-01016-LA    Filed 12/04/23    Page 19 of 24    Document 54-3

# COMPENSATION DISCUSSION & ANALYSIS

**TABLE OF CONTENTS**

| | |
|---|---|
| **COMPENSATION DISCUSSION & ANALYSIS** | **53** |
| Executive Summary | 53 |
| Philosophy and Objectives | 58 |
| Structure for Determining Executive Compensation | 58 |
| Performance Evaluation Process | 61 |
| Fiscal 2021 Compensation Decisions | 62 |
| Summary Compensation Table | 68 |
| Grants of Plan-Based Awards in 2021 | 70 |
| Employment and Executive Compensation Agreements | 71 |
| Outstanding Equity Awards at Fiscal Year-End | 72 |
| Option Exercises and Stock Vested in 2021 | 73 |
| Pension Benefits | 73 |
| Nonqualified Deferred Compensation | 73 |
| Potential Payments Upon Termination or Change Of Control | 74 |
| CEO Pay Ratio | 84 |

The Compensation Committee (the "Committee") fulfills the Board's responsibilities related to our officer and director compensation programs and practices, and ensures that our executive compensation program aligns with our corporate objectives. This Compensation Discussion & Analysis (or "CD&A") describes Kohl's executive compensation programs, and provides insight into the Committee's process for determining compensation and its philosophy, objectives, and policies.

This CD&A focuses on the compensation of the following five individuals, who are collectively referred to as the Named Executive Officers, or NEOs:

| **MICHELLE GASS** | **JILL TIMM** | **DOUG HOWE** | **GREG REVELLE** | **PAUL GAFFNEY** |
|---|---|---|---|---|
| Chief Executive Officer | Senior Executive Vice President, Chief Financial Officer | Chief Merchandising Officer | Senior Executive Vice President, Chief Marketing Officer | Senior Executive Vice President, Chief Technology & Supply Chain Officer |

## Executive Summary

The Committee has designed our compensation program to reflect its philosophy that executive compensation should be directly linked to performance, with the ultimate objective of increasing long-term shareholder value. Each primary element of our executive compensation program is tied to Company performance. In addition, the Committee works closely with an independent compensation consultant to ensure that Kohl's compensation policies and practices, as well as our executive compensation program as a whole, are consistent with market practice.

### 2021 Highlights

Company leadership drove significant success in 2021 despite challenging headwinds presented by the second year of the COVID-19 pandemic, including the Delta and Omicron variants, and highly publicized supply chain, labor shortage and other macro-economic challenges. Performance highlights include:

- Net sales increased 22.9% compared to 2020
- Launched several important brand partnerships, including Sephora, Calvin Klein, Tommy Hilfiger and Eddie Bauer
- Active category sales increased more than 40% compared to 2020, growing to 24% of total sales
- Achieved operating income of $1.680 billion, the highest amount reported since 2014
- Operating margin of 8.6% exceeded 2023 goal two years ahead of plan
- Adjusted EPS of $7.33 was an all-time Company record, exceeding previous high of $5.60 in 2018

Case 2:22-cv-01016-LA    Filed 12/04/23    Page 20 of 24    Document 54-3

- Delivered operating cash flow of $2.3 billion and free cash flow of $1.6 billion
- Returned $1.5 billion in capital to shareholders in 2021
- Retired $544 million in debt and returned balance sheet to pre-pandemic health

## All-Time
### Company Record

MANAGEMENT DELIVERED ADJUSTED EPS OF $7.33,
AN ALL-TIME COMPANY RECORD, EXCEEDING
A PREVIOUS HIGH OF $5.60 IN 2018

Regular engagement with our shareholders throughout the year is a core tenet of our strong governance and compensation practices. In Fall 2021, the Company reached out to shareholders representing more than 70% of shares outstanding and engaged with shareholders representing more than 40% of shares outstanding. Open and constructive dialogue with shareholders on governance matters, including executive compensation, facilitates alignment on policies and practices. Throughout our discussions, we heard broad support for our compensation program.

In addition, the Compensation Committee significantly enhanced its governance practices in 2021 by:

- Enhancing executive stock holding requirements
- Returning to only objective metrics in our incentive plans
- Updating the Company peer group to address the competitive, dynamic retail environment
- Increasing level of difficulty to achieve a maximum annual incentive payout
- Hiring a new independent compensation consultant to provide fresh perspective

## Pay for Performance

The Committee has consistently applied a critical pay-for-performance philosophy to its decisions, and in alignment with that philosophy, the goals for incentive compensation performance metrics are intended to be difficult to achieve. Failure to achieve target goals has significant consequences, while success is rewarded. For example, our 2019-2021 long-term objectives, as originally set in early 2019, were not achieved and therefore our 2019-2021 LTIP did not pay out even in light of the fact that a majority of this time period was highly impacted by the COVID-19 pandemic, which was entirely outside of the control of management. No adjustments were made due to the COVID-19 economic impact, and executives will receive no PSU payout under the 2019-2021 LTIP. As another example, in fiscal 2019, the Company did not achieve our financial goals and our NEOs did not receive any performance-based annual incentives.

In 2020, the Committee utilized one-time, relative metrics given the complete closure of our store base at the time performance goals were set. For fiscal 2021, the Committee returned to wholly objective performance metrics. As previously disclosed, the Committee increased the targets for our 2020-2022 LTIP in December 2020 to ensure targets were appropriately challenging and aligned with our pay-for-performance philosophy. Finally, recognizing the difficulty in accurately predicting the speed of any macro financial recovery in fiscal 2021, the Committee increased the challenge level of the annual incentive by expanding the ranges within the plan to make it 2 times more difficult to achieve the maximum net sales goal, as well as increased the difficulty to achieve the maximum operating income goal. Both short-term and long-term goals were set to drive accountability toward a near-term recovery to 2019 sales (two to three years) while also making sequential strides toward, and then achieving, our stated strategic goal of improving the Company's operating income rate (three year).

## Long-Term Business Strategies

As part of our commitment to create long-term shareholder value and stay ahead in the rapidly changing retail environment, management introduced a new strategic framework in October 2020. The Company's vision is to be "*the most trusted retailer of choice for the active and casual lifestyle.*" Our strategy has four key focus areas: driving top line growth, expanding operating margin, maintaining disciplined capital management, and sustaining an agile, accountable, and inclusive culture.

**1. DRIVING TOP LINE GROWTH**

**2. EXPANDING OPERATING MARGIN**

**3. MAINTAINING DISCIPLINED CAPITAL MANAGEMENT**

**4. SUSTAINING AN AGILE, ACCOUNTABLE, AND INCLUSIVE CULTURE**

Case 2:22-cv-01016-LA    Filed 12/04/23    Page 21 of 24    Document 54-3

## 1. Driving top line growth

Management's initiatives include expanding Kohl's active and outdoor business to at least 30% of net sales, reigniting growth in the women's business, building a sizable beauty business, driving category productivity and inventory turn, and capturing market share from retail industry disruption. In 2021, we took significant steps in these areas, including opening the first 200 stores under a new major long-term strategic partnership with Sephora, the largest prestige beauty retailer in the world, where Sephora is now Kohl's exclusive beauty partner. This partnership brought the "Sephora at Kohl's" experience to customers at 200 stores and online last Fall, and will be expanded to at least 850 locations by 2023, including an additional 400 stores this year. This strategic partnership is transforming Kohl's into a leading beauty destination, driving incremental customer traffic, and positively impacting sales across other categories.

# 200 Sephora at Kohl's launched in 2021

THE "SEPHORA AT KOHL'S" EXPERIENCE LAUNCHED IN 200 STORES AND ONLINE IN FALL 2021, AND WILL BE EXPANDED TO AT LEAST 850 LOCATIONS BY 2023.

In 2021, management delivered a significant amount of product newness with the introductions of Calvin Klein, Cole Hahn, Eddie Bauer, Hurley and Tommy Hilfiger.

Management's loyalty and value efforts include simplifying the value delivered to our customers and maintaining our industry-leading loyalty program, which includes Kohl's Rewards and the Kohl's Card. We will also continue to offer a compelling and differentiated omnichannel experience through modernized stores and an enhanced digital platform.

Together, these efforts led to a 22.9% net sales increase in 2021.

## 2. Expanding operating margin

In October 2020, management announced a goal of expanding the Company's operating margin with a multi-year plan of achieving 7% to 8% (up from an adjusted operating margin of 6.1% in 2019). To achieve that goal, management is focused on driving both improvement in gross margin and leverage in selling, general, and administrative expense ("SG&A"). Management's gross margin initiatives include disciplined inventory management and increased inventory turn, optimized promotional strategies, efficient sourcing, a transformed end-to-end supply chain, and driving SG&A expense efficiency through operational excellence focused on store, marketing, technology and corporate expenses.

In 2021, the Company exceeded its operating margin goal of 7% to 8% two years ahead of plan, achieving an 8.6% operating margin.

The strong margin performance was driven primarily by significant gross margin improvement, while effectively managing SG&A expenses.

Based on our performance in 2021, we are positioned to exceed our key 2023 financial goals two years ahead of plan.

## 3. Maintaining disciplined capital management

Management is committed to prudent balance sheet management with the long-term objective of sustaining Kohl's Investment Grade credit rating. In 2021, the Company resumed both its quarterly dividend and its share repurchase activity.

These actions underscore both our confidence in the future and commitment to returning capital to shareholders.

The Company has a long history of strong cash flow generation, investing in the business, and returning significant capital to shareholders – all of which will remain important in the future.

In 2021, the Company accelerated its share repurchase activity and bought back $1.355 billion in shares and paid $148 million in dividends.

## 4. Sustaining an agile, accountable, and inclusive culture

Fostering a diverse, equitable, and inclusive environment for Kohl's associates, customers, and suppliers is an important focus and a key driver of our long-term success. We've established a diversity and inclusion framework that includes a number of key initiatives across three pillars: Our People, Our Customers, and Our Communities.

# Peer Groups

The Compensation Committee has historically utilized three different peer groups for distinct reasons, which sometimes overlap:

- We compare our compensation practices to the Compensation Peer Group;
- We compare our performance for certain purposes under the Annual Incentive Plan and the Long Term Incentive Plan to the Performance Peer Group; and
- We compare our TSR for purposes of long-term equity awards to the TSR Peer Group.

At least annually, the Committee works with its independent compensation consultant to determine whether the various peer groups continue to comprise the most appropriate comparative companies. The Committee monitors the peer groups regularly in light of the dynamic retail environment, and makes adjustments as necessary.

Maintaining a rigorous and appropriate peer group has proven to be a challenge in this dynamic and changing retail environment, as, among other shifts, several of the Company's traditional competitors have been driven into bankruptcy or gone out of business. To ensure continued understanding of the evolving landscape and to supplement the input received from its independent advisors, the Committee engaged in numerous other external and industry discussions over the course of 2021, including with several additional professional consultants.

## Compensation Peer Group

To establish the Compensation Peer Group, the Committee considers many criteria, including:

- Whether each comparator company is in the same or a similar segment of the retail industry as Kohl's;
- Whether each comparator company is similar to Kohl's in terms of size—including revenues, total assets, and market capitalization;
- The complexity and scope of each comparator company's business;
- The similarity of each comparator company's business model to Kohl's business model;
- Whether each comparator company competes with Kohl's for profits and talent; and
- Other characteristics unique to Kohl's or the retail industry, which could include things like growth trajectory and business strategies.

In August 2021, the Committee determined that this year's compensation analysis would be based upon an expanded Compensation Peer Group, incorporating several new additions:

| | 20 Trading Day Market Capitalization ($ Billions)* | Revenue ($ Billions)* |
| --- | --- | --- |
| Best Buy Co., Inc.** | 27.8 | 50.3 |
| The TJX Companies, Inc. | 80.8 | 37.8 |
| Dollar Tree, Inc.** | 23.1 | 25.7 |
| Macy's, Inc. | 5.8 | 19.8 |
| Gap, Inc. | 12.2 | 15.7 |
| Ross Stores, Inc. | 43.8 | 15.2 |
| Nordstrom, Inc. | 5.6 | 11.6 |
| Dick's Sporting Goods, Inc.** | 8.8 | 11.2 |
| Bed, Bath & Beyond, Inc. | 3.1 | 9.9 |
| Foot Locker, Inc.** | 6.3 | 8.5 |
| Burlington Stores, Inc.** | 21.4 | 7.1 |
| Ulta Beauty, Inc.** | 18.7 | 6.9 |



**MARKET CAPITALIZATION** ($ Billions)*

KOHL'S CORPORATION $8.4
$0  $80
DEPARTMENT STORE MEDIAN $5.7
SPECIALTY MEDIAN $10.5
OFF-PRICE MEDIAN $33.45

**REVENUE** ($ Billions)*

KOHL'S CORPORATION $17.4
$0  $50
SPECIALTY MEDIAN $10.6
DEPARTMENT STORE MEDIAN $15.7
OFF-PRICE MEDIAN $20.5

The Committee believes this enhanced Compensation Peer Group includes retail companies with competitive business concepts and that the included companies represent an appropriate range of revenue and market capitalization against which to compare our pay practices in the near term.

\*   All market capitalization and revenue data is rounded. Revenues are trailing four quarters and market capitalization is as of July 15, 2021.
\*\*   New additions to Compensation Peer Group in 2021.

## Performance Peer Group

We've historically measured our performance against a more targeted set of peers for purposes of potentially earning threshold payments under our Annual Incentive Plan awards, as well as the threshold vesting of certain performance-based equity awards. The Performance Peer Group historically consisted of our closest competitors— the 6-7 retailers with the most similar products and customer base. The recent bankruptcy of J.C Penney Company, Inc. – yet another direct competitor of the Company that failed in recent years – necessitated changing the Peer Performance Group. In March 2021, in consultation with Steven Hall & Partners, which was then serving as the Committee's independent compensation consultant, the Committee adjusted the Performance Peer Group to reflect a broader set of peers that compete with the Company in certain product segments. Collectively, in addition to removing J.C. Penney Company, Inc., the Committee added four new retail companies to expand the peer group to nine companies:

| | Customer Segment | Product Segment |
|---|---|---|
| Macy's, Inc. | Mid-Tier | Multiline |
| Gap, Inc. | Mid-Tier | Apparel |
| Bed, Bath & Beyond, Inc.* | Mid-Tier | Home |
| Dick's Sporting Goods, Inc.* | Mid-Tier | Active/Shoes |
| L Brands, Inc.* | Mid-Tier | Apparel |
| Nordstrom, Inc. | High-End | Multiline |
| Ross Stores, Inc. | Off-Price | Apparel |
| The TJX Companies, Inc. | Off-Price | Multiline |
| Foot Locker, Inc.* | Mid-Tier | Active/Shoes |

\* New additions to Performance Peer Group in 2021

## TSR Peer Group

The PSU awards granted under our LTIP include a modifier that can adjust the number of PSUs that pay out based on Kohl's total shareholder return relative to the following companies, which represent a wide cross-section of retailers. While the TSR Peer Group has generally been consistent year-to-year, we remove companies if they go out of business, as was previously done for The Bon-Ton Stores, Inc. and Sears Holding Corporation. Given the significant industry disruption caused by other retailers' inability to survive the COVID-19 pandemic, as forecasted in last year's proxy statement, this TSR Peer Group was further modified in early 2021 to omit Ascena Retail Group, Inc., J.C. Penney Company, Inc., RTW Retailwinds and Stage Stores, Inc. In addition, three retailers were added: Bed, Bath & Beyond, Dillard's and Foot Locker. The TSR Peer Group, as of early 2021, consisted of:

| | |
|---|---|
| Abercrombie & Fitch Co. | Foot Locker |
| American Eagle Outfitters, Inc. | Gap, Inc. |
| Bed, Bath & Beyond, Inc. | The Home Depot, Inc. |
| Best Buy Co., Inc. | L Brands, Inc. |
| Carter's, Inc. | Macy's Inc. |
| Chico's FAS, Inc. | Nordstrom, Inc. |
| The Children's Place, Inc. | PVH Corp. |
| Dick's Sporting Goods, Inc. | Ross Stores, Inc. |
| Dillard's, Inc. | Target Corporation |
| Designer Brands, Inc. | The TJX Companies, Inc. |
| Express, Inc. | |

# Performance Evaluation Process

The Committee uses a disciplined process to assess performance and to ensure that we reward and retain top talent. A primary consideration when setting our executive officers' compensation is each individual's performance against pre-established business-specific performance objectives that are intended to increase long-term shareholder value. The CEO assesses the performance of the other executive officers and recommends performance ratings to the Committee each year.

In early 2021, the Committee determined that Ms. Gass' fiscal 2021 performance considerations would include detailed objectives under four areas: overall growth strategy, operational excellence, organizational leadership and the 2021 annual operating plan. Key performance objectives for fiscal 2021 were also developed for each of the other NEOs by Ms. Gass and reviewed with the Committee in early 2021.

Case 2:22-cv-01016-LA    Filed 12/04/23    Page 24 of 24    Document 54-3