# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

SEAN SHANAPHY, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

KOHL'S CORPORATION, MICHELLE GASS, JILL TIMM, MICHAEL BENDER, PETER BONEPARTH, YAEL COSSET, CHRISTINE DAY, H. CHARLES FLOYD, ROBBIN MITCHELL, JONAS PRISING, JOHN E. SCHLIFSKE, ADRIANNE SHAPIRA, and STEPHANIE A. STREETER,

Defendants.

Case No. 2:22-CV-1016-LA

## PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO CONSIDER DOCUMENTS AND DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL BACKGROUND.................................................................................. 3

III.    LAW AND ARGUMENT ...................................................................................... 6

    A.    Legal Standards......................................................................................... 6

        1.    Rule 12(b)(6) Motions to Dismiss ................................................. 6

        2.    Defendants' self-serving revision of facts should be disregarded ......... 7

        3.    The Wisconsin Business Judgment Rule is not applicable ................... 8

    B.    The Complaint Describes the Scheme in Detail ................................. 9

    C.    The Complaint Also Adequately Alleges Material Misstatements and Omissions.... 11

        1.    Misstatements and omissions attributing Kohl's performance to management's actions instead of macroeconomic factors.................................... 11

        2.    Misstatements and omissions regarding the potential sale of the Company ........ 13

        3.    Misstatements and omissions indicating that Kohl's results for Q1:22 were positive ................................................................ 17

    D.    Defendants' Boilerplate Falsity Arguments Fail ............................... 18

        1.    The alleged misstatements were not mere puffery .............................. 18

        2.    The PSLRA safe harbor does not shield Defendants............................ 20

    E.    The Complaint Adequately Alleges Scienter............................................. 22

        1.    Legal standard for scienter.................................................. 22

        2.    Scienter is Properly Pleaded ................................................ 23

        3.    Each of the Individual Defendants benefitted in a concrete and personal way from the alleged fraud ............................................ 24

        4.    Each of the Individual Defendants knew facts or had access to information suggesting that their public statements were not accurate and their conduct was fradulent ............................................. 25

        5.    The Individual Defendants' scienter is imputed to the Company.......... 28

    F.    The Complaint Adequately Alleges Loss Causation ................................... 29

    G.    The Complaint Adequately Alleges Section 14(a) and Rule 14a-9 Claims................ 30

    H.    The Complaint Establishes Control Person Liability................................... 30

IV.     LEAVE TO AMEND ........................................................................................... 30

V.      CONCLUSION..................................................................................................... 30

Case 2:22-cv-01016-LA    Filed 01/18/24    Page 2 of 37    Document 57

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ...................................................................................... 14

*Allison v. Oak St. Health, Inc.*, No. 22-C-149,
2023 U.S. Dist. LEXIS 22933 (N.D. Ill. Feb. 19, 2023) ...................................... 15, 24

*Amanda Acquisition Corp. v. Universal Foods Corp.*,
708 F. Supp. 984 (E.D. Wis. 1989) ............................................................................ 8

*Azar v. Grubhub, Inc.*, No. 19-CV-07665,
2020 U.S. Dist. LEXIS 258187 (N.D. Ill. Sep. 7, 2020) ......................................... 26

*Beck v. Dobrowski*,
559 F.3d 680 (7th Cir. 2009) ................................................................................ 9, 30

*Brasher v. Broadwind Energy, Inc.*, No. 11-C-991,
2012 U.S. Dist. LEXIS 55194 (N.D. Ill. Apr. 19, 2012) ........................................ 26

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, No. 16-C-10510,
2018 U.S. Dist. LEXIS 31195 (N.D. Ill. Feb. 27, 2018) ......................................... 26

*City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*, No. 17-CV-10014,
2019 U.S. Dist. LEXIS 26962 (S.D.N.Y. Feb. 19, 2019) ........................................ 29

*City of Sterling Heights Police & Fire Ret. Sys. v. Kohl's Corp.*, No. 13-C-1159,
2015 U.S. Dist. LEXIS 41917 (E.D. Wis. Mar. 31, 2015) ........................................ 7

*Coll. Ret. Equities Fund v. Boeing Co.*, No. 22-CV-3845,
2023 U.S. Dist. LEXIS 164802 (N.D. Ill. Sep. 18, 2023) ................................... 22, 28

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) .................................................................................... 7

*Dixon v. ATI Ladish LLC*,
667 F.3d 891 (7th Cir. 2012) .................................................................................... 8

*Dixon v. Ladish Co., Inc.*,
785 F. Supp. 2d 746 (E.D. Wis. 2011) ...................................................................... 14

*Dynamics Corp. of Am. v. CTS Corp.*,
805 F.2d 705 (7th Cir. 1986) .................................................................................. 16

*Eisenstadt v. Centel*,
113 F.3d 738 (7th Cir. 1997) ............................................................................... 17, 20

*Fed. Sav. & Loan Ins. Corp. v. Musacchio*,
695 F. Supp. 1053 (N.D. Cal. 1988) .......................................................................... 9

Case 2:22-cv-01016-LA    Filed 01/18/24    Page 3 of 37    Document 57

*Friedman v. Rayovac Corp.*,
295 F. Supp. 2d 957 (W.D. Wis. 2003)........................................................................ 22

*Fryman v. Atlas Fin. Holdings, Inc.*, No. 18-CV-01640,
2022 U.S. Dist. LEXIS 70597 (N.D. Ill. Apr. 18, 2022)............................................... 7

*Great Neck Capital Appreciation Inv. P'ship, L.L.P. v. PricewaterhouseCoopers, L.L.P.*,
137 F. Supp. 2d 1114 (E.D. Wis. 2001) ............................................................. 6, 7, 18

*Hedick v. Kraft Heinz Co.*, No. 19-CV-1339,
2021 U.S. Dist. LEXIS 151343 (N.D. Ill. Aug. 11, 2021)...................................... 19, 27, 28, 29

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007)...................................................................................... 18

*Hunter v. Elanco Animal Health Inc.*, No. 20-CV-01460,
2022 U.S. Dist. LEXIS 147087 (S.D. Ind. Aug. 17, 2022).......................................... 30

*In re Boeing Co. Aircraft Sec. Litig.*, No. 19-CV-02394,
2022 U.S. Dist. LEXIS 150985 (N.D. Ill. Aug. 23, 2022)........................................... 29

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001) ............................................................................. 21

*In re Credit Suisse First Boston Corp.*,
431 F.3d 36 (1st Cir. 2005) ........................................................................................ 26

*In re Delcath Sys., Inc. Sec. Litig.*,
36 F. Supp. 3d 320 (S.D.N.Y. 2014)........................................................................... 30

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...................................................................... 25

*In re Motorola Sec. Litig.*, No. 03-C-287,
2004 U.S. Dist. LEXIS 16857 (N.D. Ill. Aug. 25, 2004)............................................ 23

*In re Newell Brands, Inc. Sec. Litig.*,
837 F. App'x 869 (3d Cir. 2020).................................................................................. 8

*In re Shopko*, No. 01-C-1034,
2002 U.S. Dist. LEXIS 23887 (E.D. Wis. Nov. 5, 2002) ........................................ 7, 13, 18, 22

*In re Wells Real Estate Inv. Tr., Inc.*, No. 07-CV-862,
2010 U.S. Dist. LEXIS 143057 (N.D. Ga. Aug. 2, 2010)............................................. 9

*Lang v. Tharpe*, No. 18-CV-1077,
2022 U.S. Dist. LEXIS 90083 (E.D. Wis. May 19, 2022)............................................. 6

*Lorenzo v. SEC*,
139 S. Ct. 1094 (2019) ............................................................................................ 9, 10

*Lowry v. RTI Surgical Holdings, Inc.*,
532 F. Supp. 3d 652 (N.D. Ill. 2021) ...................................................................... 24, 25

iii

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) ................................................................ 20, 25

*Marks v. CDW Computer Centers, Inc.*,
  122 F.3d 363 (7th Cir. 1997) ...................................................................... 19

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ...................................................................................... 18

*McHenry Cty. v. Raoul*,
  44 F.4th 581 (7th Cir. 2022) ......................................................................... 8

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ............................................................................... 14, 15

*Pampena v. Musk*, No. 22-CV-05937,
  2023 U.S. Dist. LEXIS 220240 (N.D. Cal. Dec. 11, 2023) ........................ 28

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
  895 F.3d 933 (7th Cir. 2018) ...................................................................... 28

*Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, No. 21-CV-04349,
  2023 U.S. Dist. LEXIS 157803 (N.D. Ill. Sep. 6, 2023) ........................... 20

*Pierrelouis v. Gogo, Inc.*, No. 18-C-4473,
  2021 U.S. Dist. LEXIS 78942 (N.D. Ill. Apr. 26, 2021) ...................... 25, 27

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
  679 F.3d 952 (7th Cir. 2012) ...................................................................... 24

*Pub. Emples. Ret. Sys. of Miss. v. Treehouse Foods*, No. 16-C-10632,
  2018 U.S. Dist. LEXIS 22717 (N.D. Ill. Feb. 12, 2018) ........................... 20

*Ross v. Career Educ. Corp.*, No. 12-C-276,
  2012 U.S. Dist. LEXIS 155037 (N.D. Ill. Oct. 30, 2012) ......................... 27

*Schlifke v. Seafirst Corp.*,
  866 F.2d 935 (7th Cir. 1989) ...................................................................... 18

*Schultz v. TomoTherapy Inc.*, No. 08-CV-314,
  2009 U.S. Dist. LEXIS 58631 (W.D. Wis. July 8, 2009) ........................... 18

*SEC v. Bluepoint Inv. Counsel, LLC*, No. 19-CV-809,
  2021 U.S. Dist. LEXIS 34373 (W.D. Wis. Feb. 24, 2021) ........................ 28

*SEC v. Complete Bus. Sols. Grp., Inc.*,
  538 F. Supp. 3d 1309 (S.D. Fla. 2021) ......................................................... 9

*SEC v. Stifel*, No. 11-C-0755,
  2012 U.S. Dist. LEXIS 131179 (E.D. Wis. Sep. 14, 2012) ....................... 14

*SEC v. Ustian*,
  229 F. Supp. 3d 739 (N.D. Ill. 2017) ......................................................... 11

iv

*SEC v. Winemaster*,
  529 F. Supp. 3d 880 (N.D. Ill. 2021) ................................................................... 10

*Shepard v. Lustig*,
  912 F. Supp. 2d 698 (N.D. Ill. 2012) ..................................................................... 8

*Sw. Carpenters Pension Tr. v. Merge Techs., Inc.*, No. 06-C-349,
  2008 U.S. Dist. LEXIS 108223 (E.D. Wis. Mar. 31, 2008) ................................. 9, 11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................................. 23

*Washtenaw Cty. Emples. Ret. Sys. v. Walgreen Co.,* No. 15-CV-3187,
  2016 U.S. Dist. LEXIS 135080 (N.D. Ill. Sep. 30, 2016) ..................................... 12

**Rules and Regulations**

17 C.F.R. 240.10b-5 ................................................................................................. 9

Fed. R. Civ. P. 8 ..................................................................................................... 29

**Statutes**

Wis. Stat. § 180.0827 ............................................................................................... 8

Wis. Stat. § 180.0828(1) .......................................................................................... 8

## I. INTRODUCTION[1]

Defendants' motion seeks to reframe well-pleaded securities fraud claims into a mere quibble about business judgment. It doesn't work.

Faced with a hotly contested proxy contest, Defendants hatched a scheme to maintain control of Kohl's by orchestrating a fictitious sales process and by informing investors that reelecting the current Board was the only way the Company could execute a lucrative sale. While Plaintiff dedicates a huge swath of the Complaint to alleging violations of Rules 10b-5(a) and (c) based on this scheme, Defendants barely address it. The Complaint further alleges that, without soliciting shareholder consent, Defendants adopted a poison pill to closely control the sales process, a measure typically reserved for hostile takeovers. They falsely represented that the Company's success in mid/late 2021 was due to a strategic plan put in place by management, and that any sale would need to be weighed against this extremely valuable plan. However, they did not allow any bidders to conduct due diligence into the true financial value of the Company because the purported success was actually due to the reopening of the economy in the wake of the Covid-19 pandemic and was not sustainable.

Then, they falsely represented that the Company's 2021 financial success was continuing into 2022. One week before the end of the first quarter, in a presentation titled "The Right Team to Maximize Shareholder Value," Defendants represented that management's plan was driving "***sustainable*** Low-Single-Digits % Sales Growth," "a ***consistent*** 7% to 8% operating margin," and "mid-to-high single digits % EPS growth." In truth, prior to the time this statement was made, Defendants had already seen a sharp decline in sales, the Q1:22 operating margin was just 2.2%, and EPS for Q1:22 was just $0.11, an approximately *95% decrease* from the previous quarter.

---

[1] References to "¶__" are to the Amended Complaint (ECF No. 49) ("Complaint"). References to "Defs. Br." are to Defendants' memorandum in support of their motion to dismiss (ECF No. 52).

Defendants concealed the true Q1:22 results until the week after the Board secured a victory in the proxy battle. After the results were released, a source "close to the sales process" told the *New York Post*, "I don't believe there will be any acceptable bids offered now" due to the "lack of transparency from Kohl's," but that the Company was "privately rooting for an outcome in which bidders fade away – despite the public image management has put forward." ¶ 84. And eventually, the bidders did fade away. When Kohl's announced there would be no sale, the stock price crashed, falling 19.6% in a single day. Investors, including Lead Plaintiff, suffered significant losses.

Defendants have a hard time grappling with these facts, so when they're not rewriting them to their liking – which is plainly not allowed at this stage – they rely heavily on generic falsity arguments, namely that their statements were immaterial puffery or are protected by the PSLRA's safe harbor provision. Both arguments fail. As the Complaint alleges, Defendants' statements about the sale of the Company were of the utmost importance to investors, as evidenced by the significant stock price changes each time news regarding the sales process was released. Statements attributing the Company's success to management's plan were similarly material, as the purported success of the strategic plan was a key factor in the valuation of the Company for the sales process. And the safe harbor only protects *forward* looking statements, whereas most of the statements alleged in the Complaint are statements of present or historical fact.

Moreover, contrary to Defendants' scattershot arguments, Plaintiff sufficiently pleads scienter by alleging Defendants benefitted in a concrete way from the alleged fraud and strong circumstantial evidence of conscious misbehavior or recklessness, not to mention Defendants' admissions that they knew contrary facts at the time they made their misrepresentations. Defendants' challenges to loss causation also fall flat, as loss causation is governed by Rule 8 pleading standards, and Plaintiff alleges that the artificial inflation in the stock price was removed

2

through a series of corrective disclosures. Nothing more is required at this stage.

For these reasons, Defendants' motion to dismiss should be denied in full.

## II.  FACTUAL BACKGROUND

In the latter half of 2021, knowing that a contentious proxy battle was likely on the horizon, the Kohl's Board and management understood that strong financial results, attributable to management's actions, would be necessary to prevent a Board takeover from occurring. *See* ¶ 109. To this end, on August 19, 2022, and November 18, 2022, Defendants Gass and Timm made materially false or misleading statements and omissions downplaying negative trends, such as inventory issues, and attributing an increase in sales to a strategy announced in 2020 rather than to the macroeconomic factors that were the true cause of the increase. ¶¶ 110-120. After both announcements, Kohl's share price increased, reflecting this artificially positive view. ¶ 154.

On January 18, 2022, after market close, Macellum, an activist investor firm, published a press release nominating its own slate of director candidates and announcing that it had learned from sources that Kohl's had received bids to sell the Company. ¶¶ 41-42. That same day, Kohl's responded with its own press release calling this news "***unfounded speculation***." ¶ 43. Nevertheless, Kohl's stock price rose 4%, indicating shareholder support for a potential sale. ¶ 44.

On Friday, January 21, 2022, after market close, multiple news outlets revealed that several parties had made offers to acquire Kohl's for $64-65/share. ¶ 45. On Monday, January 24, 2022, the stock price opened at $61.71 per share, a 31.7% increase over the closing price the previous Friday, signaling strong investor support for a potential sale. ¶ 46. While they had no intention of selling the Company, Kohl's Board and management observed this massive rise in the share price and realized they could leverage a potential sale to ensure success in the upcoming shareholder vote. *See* ¶¶ 3, 48, 159.

That same day, less than a week after Kohl's referred to Macellum's announcement of bids

as "unfounded speculation," Kohl's issued a press release confirming that "it ha[d] received letters expressing interest in acquiring the Company," and that the Board would "determine the course of action that it believes is in the best interests of the Company and its shareholders." ¶ 47. This revelation caused the stock price to rise even further, to $63.71 per share at market close on Monday, January 24, 2022, on unusually heavy trading volume. ¶ 48. From then on, any time Kohl's spoke about a potential sale, even when also announcing negative news, the stock price went up. ¶ 155.

As the proxy battle continued, the Kohl's Board falsely represented to shareholders that the bidding process was successfully progressing, and that any change in leadership would "delay or hinder" a potential sale. ¶ 73. The Board also took several other actions to ensure its victory. First, it adopted a "poison pill" that would allow it to exercise control over who could submit bids and how the bidding process would be conducted. ¶ 134. It set a record date (the date by which investors had to purchase shares to be eligible to vote in the 2022 shareholder meeting) weeks earlier than in years past, and on the same day as its Investor Day was scheduled. ¶ 55. Kohl's had previously promised that it would give further updates regarding a potential sale at this Investor Day (¶ 54). Recognizing that news of a potential sale would not be forthcoming, the Board sought to deny shareholders the opportunity to add to their positions after the Investor Day to limit their ability to have a meaningful say at the shareholder meeting. ¶ 55. Additionally, the Kohl's Board declined to issue a universal proxy card, which would allow shareholders to compare all proposed candidates in one place and to vote for any combination of candidates. ¶ 65.

Management also refused to announce their quarterly earnings results before the shareholder meeting, even though there were numerous indications that they knew these preliminary results long before the meeting. ¶¶ 193-195. In fact, throughout Q1:22, management

4

and the Board, particularly incoming Chairman Boneparth, continued to indicate that the Company expected *positive* results for the quarter. ¶¶ 139-151. These tactics were successful: Kohl's won a full victory over Macellum. ¶ 78. Additionally, the stock price remained artificially inflated, as shareholders continued to hope for a potential sale. ¶¶ 148-49.

The week after the shareholder meeting, on May 19, 2022, prior to market open, Kohl's management published a press release announcing their financial results for Q1:22. ¶ 80. The financial results were well below expectations: Gass was quoted as calling the results "disappointing." ¶ 82. Investing.com noted that the share price of Kohl's stock had ***fallen 6.8%*** in pre-market trading. ¶ 157. However, in the Earnings Call, which took place at 9:00am EST, Gass revealed that Kohl's would be reviewing "actionable bids" in "the coming weeks." ¶ 158. Due to this positive news about the sale, the stock rebounded, closing at an approximately 4.4% increase over the previous day's closing price. ¶ 158.

However, after market close on May 19, 2022, the *New York Post* published an article quoting a source "close to the sales process," who told the *Post*, "I don't believe there will be any acceptable bids offered now" citing a "lack of transparency from Kohl's." ¶ 159. The source stated, "Basically the company knew their results stunk and they didn't tell anyone and they got the shareholder vote for their board of directors." ¶ 159. The article also stated, "[S]ources tell The Post the Wisconsin-based company may be privately rooting for an outcome in which bidders fade away – despite the public image management has put forward." ¶ 159. As a result of the *New York Post* article's revelations, much of the gains of the prior day were removed, and Kohl's stock opened at $43.06, down from $45.04 at close the night before. ¶ 160. Then, on May 20, 2022, Macellum published a letter to shareholders stating that the Board "withheld material information from shareholders" about the state of the Company leading up to the shareholder meeting. ¶ 161.

5

In combination with the article in the *Post*, this partial revelation of the Board's scheme to maintain control of the Company by withholding material information from shareholders caused the share price to fall even further, to close at $39.20/share at market close on May 20, 2022, an approximately 13% decrease from the previous day. ¶ 161.

Knowing Macellum would continue to vocally decry Board misconduct if nothing was to come of the sales process, and to prevent the artificial inflation from being removed from the stock price, on June 6, 2022, after market close, Kohl's announced it had entered "exclusive negotiations" with a bidder, FRG, to sell the Company for approximately $60/share. ¶ 88. On this news, the share price increased approximately 9.5%. ¶ 89. However, on July 1, 2022, Kohl's revealed that it was no longer in talks to sell the Company. ¶ 94. With this announcement, investors finally learned the truth about the fraudulent scheme, causing the stock price to ***decrease 19.6%***, from $35.69/share at market close on June 30, 2022, to $28.68/share at market close on July 1, 2022, on unusually heavy trading volume. ¶ 97.

## III. LAW AND ARGUMENT[2]

### A. Legal Standards

#### 1. <u>Rule 12(b)(6) Motions to Dismiss</u>

"Under Rule 12(b)(6) the complaint will be dismissed only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Great Neck Capital Appreciation Inv. P'ship, L.L.P. v. PricewaterhouseCoopers, L.L.P.*, 137 F. Supp. 2d 1114, 1118 (E.D. Wis. 2001) (Adelman, J.). For purposes of a motion to dismiss, courts "accept as true all well-pleaded allegations in the complaint and draw all reasonable inferences in favor of the plaintiff." *Id*. at 1119. In other words, the "'proper question to ask is still could these things have happened, not did they happen.'" *Lang v. Tharpe*, No. 18-CV-1077, 2022 U.S. Dist.

---

[2] Unless otherwise noted, all emphasis is added and all internal citations are omitted.

LEXIS 90083, at *25 (E.D. Wis. May 19, 2022). Securities fraud allegations are also subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). *Fryman v. Atlas Fin. Holdings, Inc.*, No. 18-CV-01640, 2022 U.S. Dist. LEXIS 70597, at *14 (N.D. Ill. Apr. 18, 2022). "The Seventh Circuit has interpreted this rule to mean that a fraud complaint must include 'the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Id.* (citing *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

### 2. Defendants' self-serving revision of facts should be disregarded

Defendants spend approximately 25% of their Brief re-writing the facts of the Complaint. *See* Defs. Br. at 2-9. While Defendants' "Factual Background" purports to cite to the Complaint, many of those citations are misleading or inaccurate. (*E.g., compare* Defs Br. at 3-4 (the Sephora partnership "caused Kohl's beauty sales to increase by 90% in the fourth quarter of 2022") (citing ¶ 67) *to the real* ¶ 67 ("While the Sephora stores were bringing in a small amount of new business (mid-single digit), the remodels necessary to accommodate the new stores were capital intensive and unlikely to be re-couped for at least ten years down the line.")). At this stage of the litigation, where courts "accept as true all well-pleaded allegations in the complaint," Defendants' factual narrative should be disregarded by the Court. *See Great Neck*, 137 F. Supp. 2d at 1119.

Additionally, Defendants frequently cite the very same documents the Complaint alleges contain misrepresentations for the truth of the matters asserted therein. *See, e.g.*, Defs. Br. at 3 (citing Defs Ex. B); Defs. Br. at 6 (citing Defs. Ex. H); Defs. Br. at 14 (citing Defs. Ex. K); Defs. Br. at 27 (citing Defs. Ex. A). Defendants also move for judicial notice of these and other documents. *See* ECF No. 55-56. While courts may take judicial notice of SEC filings in securities cases, they may do so "only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *In re Shopko*, No. 01-C-1034, 2002 U.S. Dist. LEXIS 23887, at *35 (E.D. Wis. Nov. 5, 2002) (Adelman, J.); *see also City of Sterling Heights*

*Police & Fire Ret. Sys. v. Kohl's Corp.*, No. 13-C-1159, 2015 U.S. Dist. LEXIS 41917, at *13 (E.D. Wis. Mar. 31, 2015) (granting plaintiff's motion to strike where "Defendants use the proxy statements . . . for the truth of their contents."). As such, any factual or legal argument relying on Defendants' SEC filings for the truth of the matters asserted therein should be disregarded.

### 3. The Wisconsin Business Judgment Rule is not applicable

Defendants frequently invoke Wis. Stat. §§ 180.0827; 180.0828(1), which they refer to as the business judgment rule, to argue that the Board was not obligated to disclose omitted information to shareholders. Defs. Br. at 1, 13, 14-15. However, Plaintiff brings claims under the federal securities laws, which are not superseded by state law. *See McHenry Cty. v. Raoul*, 44 F.4th 581, 587 (7th Cir. 2022) ("In cases where federal and state law conflict, 'federal law prevails and state law is preempted.'"). None of the cases Defendants cite regarding the business judgment rule are federal securities cases. *See, e.g.*, Defs. Br. at 13 (citing *Dixon v. ATI Ladish LLC*, 667 F.3d 891, 894 (7th Cir. 2012) (specifying "the business judgment rule blocks Dixon's claim *under state law*" and that all federal law claims had been previously dismissed on other grounds)); Defs. Br. at 15 (citing *Amanda Acquisition Corp. v. Universal Foods Corp.*, 708 F. Supp. 984, 1008 (E.D. Wis. 1989) (regarding the constitutionality of a Wisconsin law)).

Regardless, where a plaintiff's claims are grounded in fraud, as Plaintiff's Section 10(b) claims are here (*see, e.g.*, ¶¶ 214-216), defendants' actions are "not entitled to the presumption of good faith created by the Business Judgment Rule." *Shepard v. Lustig*, 912 F. Supp. 2d 698, 705-06 (N.D. Ill. 2012); *see also In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 876-77 (3d Cir. 2020) ("The business judgment rule does not shield actors from federal securities fraud."). And while Plaintiff's Section 14(a) claims do not sound in fraud (*see* ¶ 229), the Exchange Act creates strict liability for Defendants who solicit or associate themselves with a proxy containing false or misleading statements or omissions, so business judgment is not a defense to these claims.

8

*See Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("a proxy solicitation that contains a misleading misrepresentation or omission violates the section even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials"); *In re Wells Real Estate Inv. Tr., Inc.*, No. 07-CV-862, 2010 U.S. Dist. LEXIS 143057, at \*33 (N.D. Ga. Aug. 2, 2010) (applying *Beck*, finding Defendants' claim of "good faith exercise of business judgment" "irrelevant" to plaintiff's Section 14(a) claims).[3]

### B. The Complaint Describes the Scheme in Detail

Section 10(b) of the Exchange Act and Rule 10b-5(a) makes it unlawful to "employ any device, scheme, or artifice to defraud," while Rule 10b-5(c) makes it unlawful to "engage in any act, practice, or course of business which operates…as a fraud." 17 C.F.R. 240.10b-5, *see also Sw. Carpenters Pension Tr. v. Merge Techs., Inc.*, No. 06-C-349, 2008 U.S. Dist. LEXIS 108223, at \*16 (E.D. Wis. Mar. 31, 2008). "To state a claim under Rule 10b-5(a) and (c), the plaintiff must plausibly allege that (1) the defendant committed a deceptive or manipulative act (2) in furtherance of the alleged scheme to defraud (3) with scienter." *SEC v. Complete Bus. Sols. Grp., Inc.*, 538 F. Supp. 3d 1309, 1339 (S.D. Fla. 2021). The Supreme Court recently found, "These provisions capture a wide range of conduct," including (but not limited to) "dissemination of false or misleading material." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019).

In a section aptly titled "Defendants Scheme to Mislead the Market," the Complaint describes in detail how all of the Defendants – *including* the non-employee members of the Board– participated in a fraudulent scheme and course of conduct to mislead the market about a potential sale of the Company in order to maintain their lucrative board and executive positions in the face

---

[3] Even if the business judgment rule did apply, "a ruling on the applicability of the business judgment rule is peculiarly a question of fact, wholly inappropriate for consideration on a motion to dismiss" *Fed. Sav. & Loan Ins. Corp. v. Musacchio*, 695 F. Supp. 1053, 1064 (N.D. Cal. 1988).

9

of a hotly contested proxy contest. Defendants complain they are unable to "suss out" from this section "a cohesive scheme" (*see* Defs. Br. at 28); however, in addition to the alleged facts which support the existence of a fraudulent scheme and course of conduct, Plaintiff specifically describes how Defendants' conduct furthered the scheme. *See, e.g.*, ¶ 50 ("in furtherance of the scheme alleged herein, [Defendants] considered how they could time the news of a potential sale to ensure victory in the upcoming proxy battle."); ¶ 53 ("This fact strongly suggests that the [Poison Pill] was adopted to protect the Board—not shareholders."); ¶ 55 ("The Kohl's Board also set its record date…earlier than past years…This was also a part of the scheme."); ¶ 59 (due to poor results, "the Board could not afford having any bidders conduct due diligence before the Shareholder Meeting"); ¶ 69 ("since the results were poor, which would weigh heavily in favor of Macellum in the proxy contest, [the Board] opted to conceal the results until after the Shareholder Meeting"); ¶ 77 ("The Kohl's Board had put its shareholders in a hostage situation: if they wanted a successful sale, they would need to keep the existing Board in place.").

While Defendants acknowledge that Plaintiff pleads scheme liability based on the dissemination of false and misleading statements (*see* Defs. Br. at 29), conduct specifically found by *Lorenzo* to fall within the scope of scheme liability (*see* 139 S. Ct. at 1101), they also claim that dismissal is warranted because Plaintiff's scheme liability allegations are "based purely on alleged misrepresentations." Defs. Br. at 29. But Courts in this Circuit have rejected this same argument: "To the extent [Defendants] claim[] that Rule 10b-5(a) and (c) require deceptive acts distinct from an alleged misstatement forming the basis of a Rule 10b-5(b) claim, the Court rejects that contention…'[i]t is no longer tenable…in light of the Supreme Court's decision in *Lorenzo*.'" *SEC v. Winemaster*, 529 F. Supp. 3d 880, 918 (N.D. Ill. 2021).

Additionally, the Complaint contains myriad allegations of conduct in addition to the

dissemination of misstatements, such as: (1) summarily rejecting offers that offers were more than a 30% premium to the pre-offer share price without providing time for the offerors to conduct diligence (¶¶ 51, 53); (2) adopting an especially onerous poison pill in order to chill the sales process (¶¶ 52, 58); (3) not submitting the poison pill for a shareholder vote, even though a shareholder vote was required to exempt an offer from the terms of the poison pill (¶ 63, Defs. Ex. H at 5); (4) setting the record date earlier than previous years (¶ 55); (5) refusing to adopt a universal proxy card (¶ 65); (6) tightly controlling and limiting the flow of information with regards to the sales process despite shareholder calls for more transparency (*see, e.g.*, ¶¶ 62, 68); and (7) concealing the "disappointing" results for Q1:22 until after the Board secured victory in the proxy battle despite indications that they knew results before this time (¶¶ 80, 82). Defendants do not provide any argument as to why these actions cannot comprise a scheme. At this stage, these allegations are adequate to survive dismissal even under pre-*Lorenzo* law. *See, e.g., SEC v. Ustian*, 229 F. Supp. 3d 739, 774 (N.D. Ill. 2017) (scheme liability alleged when "conduct went beyond the alleged misrepresentations.").

C.      **The Complaint Also Adequately Alleges Material Misstatements and Omissions**

To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege that the Defendant: "(1) made a material false statement or omission (2) with scienter (3) in connection with the purchase or sale of securities (4) upon which the plaintiff justifiably relied and (5) that the false statement or omission proximately caused damages." *Sw. Carpenters*, 2008 U.S. Dist. LEXIS 108223, at *16. The statements in this case generally fall into three categories.

1.      **Misstatements and omissions attributing Kohl's performance to management's actions instead of macroeconomic factors**

The Complaint alleges materially false or misleading statements and omissions attributing Kohl's performance to management's actions when, in fact, the success was due to unrelated

macroeconomic factors. For example, on August 19, 2021, Kohl's published a press release and held an earnings call regarding the Company's financial results for Q2:21, in which Gass and Timm attributed the Company's "record Q2 earnings" to a strategic plan they put in place in October 2020. ¶¶ 110-111 (*e.g.*, "As evident in our results, we are already seeing the benefits of our strategic efforts" (Gass); "the results are truly reflective of our strategy work" (Timm)). However, the increase in sales during the quarter were not due to management's actions but rather customers returning to shopping in person as the Covid-19 vaccination became more widely available and increased retail spending due to the stimulus checks the U.S. Government began sending out in March 2021. ¶ 112. Similarly, on November 18, 2021, Gass and Timm attributed the positive results during the quarter to their own efforts. ¶ 117 (*e.g.*, "Our strategic effort …continues to gain traction. We delivered another outstanding performance in the third quarter…" (Gass); "we are really pleased with our third quarter results and the progress we're making against our strategy" (Timm)). However, as with the August 2021 statements, the positive results touted in these November statements were due to the consumers returning to retail stores in the wake of the pandemic, not due to management's actions. ¶ 118.

Plaintiff does not allege, as Defendants aver, that Gass and Timm merely concealed publicly available information about the Covid-19 pandemic. *See* Defs. Br. at 11. Rather, Plaintiff alleges that Gass and Timm affirmatively and misleadingly attributed the success of their business to management's actions rather than the rebounding of the economy. *See, e.g.*, ¶¶ 112-114, 118. While the public may have had access to news stories about retail trends after the pandemic, it did not have visibility into how these trends (versus the strategic plan) were affecting Kohl's, especially when Timm acknowledged, "[W]e did take advantage of a great market," but "*the big thing* is our strategies are working." ¶ 111; *see Washtenaw Cty. Emples. Ret. Sys. v. Walgreen Co.,*

No. 15-CV-3187, 2016 U.S. Dist. LEXIS 135080, at *19-20 (N.D. Ill. Sep. 30, 2016) (pharmaceutical company misrepresentation that "the primary factor" impacting margins was a short-term "reduction in brand-to-generic conversions" "created a duty to disclose the existence of generic drug price inflation where none would have otherwise existed"). These statements bear a striking similarity to the statements this Court found actionable in *In re Shopko*, where defendants falsely represented that "low earnings were 'due largely' to external factors such as 'the economy, not the company's merchandising strategy,'" even though the low earnings *were* due to the company's merchandising strategy. 2002 U.S. Dist. LEXIS 23887, at *26-27.

Further, in the November 18, 2021 Earnings Call, Gass and Timm also indicated that inventory being below previous years was actually an intentional part of the strategic plan. ¶ 119 ("we planned inventory to be down this year as compared to 2019, aligned with our strategy" (Gass); "We're in the midst of a transformation here. And so, when we exited 10 brands, that took a lot of inventory out of the ecosystem." (Timm)). These statements were highly misleading because the lack of inventory was due, in fact, to poor management in the face of global supply chain issues: issues which would lead to exceptionally weak sales during the biggest holiday shopping weeks of the year, and would continue to plague Kohl's all the way through 2022. ¶¶ 120, 122. Defendants make no argument at all with regards to these inventory statements, except for categorizing them as "strategic plan" statements in their Appendix.

### 2. Misstatements and omissions regarding the potential sale of the Company

The Complaint also alleges that Defendants made a series of materially false or misleading statements and omissions regarding the potential sale of the Company. First, on January 18, 2022, after Macellum broke news that Kohls had "been approached and rebuffed overtures from credible buyers," Kohl's published a press release calling the news "unfounded speculation." ¶¶ 128-29.

Then, just a few days later, after several credible news outlets reported that Kohl's had, in fact, received offers, and after witnessing the extremely positive affect news of a potential sale had on its share price, Kohl's published another press release revealing it "ha[d] received letters expressing interest in acquiring the Company." ¶ 131. While Defendants attempt to put forth their own competing version of these facts (Defs. Br. at 14), at this stage, "the court is to construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts and drawing all possible inferences in the plaintiff's favor." *SEC v. Stifel*, No. 11-C-0755, 2012 U.S. Dist. LEXIS 131179, at *3 (E.D. Wis. Sep. 14, 2012).

Next, Plaintiff challenges statements made by Kohl's in a February 4, 2022 press release that "The Kohl's Board of Directors (the Board) has determined…the valuations indicated in the current expressions of interest which it has received do not adequately reflect the Company's value," and that the poison pill (adopted on that day) "does not preclude the Board from considering an offer that recognizes the value of the Company." ¶¶ 132, 134, Defs. Ex. H at 8. Defendants claim that these statements are inactionable opinions under the framework of *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015) (Defs. Br. at 12); however, Defendants misinterpret the holding in *Omnicare*.[4] In addition to showing a lack of sincere belief or lack of alignment with information in the issuer's possession, "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion." *Id*. at 188. Put another way, "plaintiffs can allege that a statement of opinion, without providing critical context, implied facts that can be proven false." *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (citing *Omnicare*,

---

[4] Defendants also cite *Dixon v. Ladish Co., Inc.*, 785 F. Supp. 2d 746, 756 (E.D. Wis. 2011), claiming the case involved 10b-5 claims. Defs. Br. at 12. However, *Dixon* does not allege any Section 10(b) claims. *Id*. at 748 (Plaintiff brought Section 14(a), 20(a), and state law claims).

575 U.S. at 188). Recently, in *Allison v. Oak St. Health, Inc.*, the Northern District of Illinois, citing *NewLink*, held that plaintiffs adequately alleged the misleading nature of defendants' statement referring to "closely scrutinized" per-patient payments, because that "implied the fact that paying agents on a per-patient basis was not one of the 'arrangements' [defendants] employed." No. 22-C-149, 2023 U.S. Dist. LEXIS 22933, at *26-27 (N.D. Ill. Feb. 19, 2023).

Similarly here, Defendants' statements contained the implied embedded fact that the Company's value was more than the offers, which were reportedly as high as $69/share. ¶ 70. However, these offers were based on the assumption, as represented by management, that Kohl's recent success was due to its strategic plan, rather than the post-Covid reopening of the economy. *See* ¶¶ 110-127. This was why the poison pill contained language preventing bidders from conducting due diligence (¶ 58) and why Kohl's did not give bidders access to up-to-date financial information when they eventually did allow diligence (¶ 85): if the true value of the Company had been revealed before the contested proxy vote, the bids would have dried up, the artificial inflation would have been removed from the stock price, and the Board's battle against the activist investors would have become significantly more perilous. ¶ 59. When the scheme crumbled, the true value of Kohl's stock emerged from its artificial inflation, revealing that the bids, in fact, over-valued the Company by a large margin. ¶ 133.[5]

Additionally, the statement regarding the poison pill was materially false or misleading, and/or omitted information necessary to make it not misleading, because the plan was specifically

---

[5] Defendants state in a footnote that Macellum "thought Kohl's was worth $100 per share." Defs. Br. at 12 n. 4 (citing Ex. I at 4 for the truth of the matter asserted (*see* Section III.A.2, *infra*)). However, the Complaint alleges this very statement (made by Kohl's, not Macellum) was false: Mr. Duskin of Macellum stated that Kohl's *could* be worth $100/share *if* it were to refresh its Board and adopt certain other measures, but that this value could *not* be achieved in Kohl's current state. ¶ 67 n. 4. Kohl's management frequently took this statement out of context. *Id*.

designed to chill buyer interest in the Company and to prevent any unsolicited bids, regardless of how high these bids may value the Company or how favorable such bids might be to shareholders. ¶ 135; *see Dynamics Corp. of Am. v. CTS Corp.*, 805 F.2d 705, 708 (7th Cir. 1986) (reviewing a company's adoption of a poison pill and noting that "there is a potential conflict of interest between the managers and shareholders of the target" when adopting a poison pill). Contrary to Defendants' assertions, Plaintiff cites numerous facts supporting this allegation: (1) poison pills are normally adopted to fend off buyers seeking to try a hostile takeover of a business at a low valuation, not when offers are at a substantial premium to the current stock price (¶ 53); (2) the poison pill was particularly stringent – simply announcing an intent to commence a tender offer would have been enough to trigger it, and "qualified offers" were required to be fully-financed and not subject to any due diligence (¶ 58, *see also* Defs. Ex. H at 3, 5); and (3) the adoption of the poison pill was not subjected to a shareholder vote, despite being adopted shortly before the shareholder meeting (¶ 53). Nevertheless, Defendants argue, "Plaintiff points to no language in the rights plan… indicating that the Board could not terminate the rights plan in the face of an offer which, in the Board's business judgment, fairly valued Kohl's." Defs. Br. at 14. But this is because no such language exists: exempting an offer from the poison pill required calling "a special meeting of the Company' s stockholders" or waiting 180 business days, another hurdle indicating the plan was adopted to chill, not facilitate, a sale. Defs. Ex. H at 5.

Defendants also characterize Plaintiff's allegations as merely wanting Kohl's to be more of an "open book" regarding the sales process. Defs. Br. at 23. Not so. Here, as the Complaint alleges, the Board had no intention of selling the Company. *See* ¶ 138; *see also* ¶ 159 ("sources tell The Post the Wisconsin-based company may be privately rooting for an outcome in which bidders fade away."). Therefore, Defendants' repeated statements that the sales process was

"ongoing" were materially false or misleading. ¶ 137. *See Eisenstadt v. Centel*, 113 F.3d 738, 745 (7th Cir. 1997) ("'Going smoothly' may mean nothing more than--going; but it means at least that; if the process has been stopped, a representation that it is continuing may well induce purchases of the stock at a price that reflects the prospect that the process will continue to its end.").

### 3. Misstatements and omissions indicating that Kohl's results for Q1:22 were positive

Further, the Complaint alleges that Defendants made materially false or misleading statements and omissions indicating that Kohl's financial results for Q1:22 were positive, when, in fact, Gass herself called the quarter "disappointing" and "a challenging few months." ¶¶ 139-51. For example, on April 21, 2022 (one week before the end of the quarter), Kohl's released a presentation deck stating that management's initiatives were driving "sustainable Low-Single-Digits % Sales Growth," "a consistent 7% to 8% operating margin," and "mid-to-high single digits % EPS growth"; however, at the time these statements were made, sales were steeply declining, Q1:22 operating margin was just 2.2%, and EPS for Q1:21 was just $0.11, compared to $2.10 the previous quarter, an approximately 95% decrease. ¶¶ 144-45. Additionally, in a letter to shareholders on April 29, 2022, Boneparth stated the Company was "continuing to deliver on the strategy…which helped us achieve record EPS last year." ¶ 146.[6]

Notably, Gass and Timm both later admitted that sales "considerably weakened" in April–*before* these statements were made. ¶ 139. Defendants claim that the slowing in sales did not occur before the April statements were made. Defs. Br. at 15-16. However, the statements were made on April 21 and 29, in the last week of the quarter ending April 30. It is extremely unlikely, bordering on impossible, that one day's worth of sales could have caused the disastrous Q1:22 results. At

---

[6] Contrary to Defendants' assertions (*see* Defs. Br. at 16), Plaintiff alleges the misleading part of this statement is *not* that EPS grew the previous year, but rather that the EPS growth was *continuing* in 2022, when, in fact, EPS for the quarter decreased approximately 95%. ¶¶ 145, 147.

this stage, when courts "draw all reasonable inferences in favor of the plaintiff," Defendants' less likely interpretation of the facts should not be credited. *Great Neck*, 137 F. Supp. 2d at 1119.

While Defendants cite dicta from *Higginbotham v. Baxter Int'l, Inc.* (Defs. Br. at 15), they stop short of the actual holding, which is: "Silence is not 'fraud' *without a duty to disclose*." 495 F.3d 753, 760 (7th Cir. 2007). Here, Defendants were not silent; they *chose* to speak positively about the Company's financials to garner support for the Board in the face of a contested proxy contest, even after they admittedly knew the quarterly results were poor. ¶¶ 139-51; *see also In re Shopko*, 2002 U.S. Dist. LEXIS 23887, at *35 ("If one speaks, he must speak the whole truth."). And "incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements." *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989). Stating that they expected "sustainable Low-Single-Digits % Sales Growth" and "a consistent 7% to 8% operating margin" but omitting that quarterly sales had "considerably weakened," and that the Company was experiencing "a challenging few months" is a classic example of such a "half-truth." ¶¶ 139, 144.

### D. Defendants' Boilerplate Falsity Arguments Fail
#### 1. <u>The alleged misstatements were not mere puffery</u>

Defendants argue that "many of the challenged statements" were immaterial puffery. Defs. Br. at 16-17. The materiality requirement is satisfied when there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011). In order to reach the conclusion that a statement is inactionable puffery, the statements must be "so obviously unimportant to an investor that reasonable minds [could not] differ on the question of materiality." *Schultz v. TomoTherapy Inc.*, No. 08-CV-314, 2009 U.S. Dist. LEXIS 58631, at *48 (W.D. Wis. July 8, 2009). "The Court of Appeals for the

18

Seventh Circuit cautions against determining materiality on a motion to dismiss." *Id.* at *47. Seventh Circuit law has recognized that "[t]he determination of materiality requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts… thus, a materiality determination is rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Centers, Inc.,* 122 F.3d 363, 370 (7th Cir. 1997).

First, Defendants once again misinterpret the Complaint, which does not merely challenge "vague statements" about the success of the strategic plan, but rather alleges: 1) certain statements implied that Kohl's success was due primarily to the plan management had in place rather than macroeconomic factors, and 2) statements in late April and May 2022 stated or implied that Kohl's success in the previous year, as measured by concrete metrics such as EPS growth, would continue. The strategic plan statements were material to investors: repeatedly attributing the positive results of the quarter to the strategic plan signaled to investors that management expected the success to continue long-term and to even accelerate (as Gass stated, "much of our opportunity is still ahead of us…"); however, the fact that the positive results were due to macroeconomic factors strongly indicated that the success would be short-term and not sustainable. ¶ 126. Additionally, according to Gass, the success of the strategic plan was a key factor in the valuation of the Company for the sales process: "The plan we're executing is very powerful and it will deliver substantial value to our shareholders – ***so that's a high bar that the board is looking at when evaluating these alternatives***." ¶ 142; *see Hedick v. Kraft Heinz Co.*, No. 19-CV-1339, 2021 U.S. Dist. LEXIS 151343, at *36 (N.D. Ill. Aug. 11, 2021) (explaining that when assessing whether statements are puffery, "[c]ontext matters, and 'the context can add concreteness to otherwise vague, inactionable statements.'"). Admitting that the strategic plan had very little to do with the Company's success in Q2:21 and Q3:21 would mean admitting that Kohl's was worth far less than management and

the Board represented, and that the reason the Board rejected the offers was not because they were too low, but because it wanted to remain in control of the Company.

The court in *Pub. Emples. Ret. Sys. of Miss. v. Treehouse Foods* found similar statements actionable, holding: "TreeHouse made repeated representations that their management was handling business in a successful fashion. When such representations are taken in context, a sophisticated investor could believe that such comments were made in reference to actual current handling of actual risks and challenges." No. 16-C-10632, 2018 U.S. Dist. LEXIS 22717, at *9-10 (N.D. Ill. Feb. 12, 2018). The case Defendants rely on, *Eisenstadt v. Centel* (*see* Defs. Br. at 17), further supports Plaintiff's position. As the court explained there, a statement is not puffery if "the announcement is concealing a disaster." 113 F.3d at 745. The statements here, particularly the late April statements, were concealing a disaster: an unsustainable business model leading to quarterly results that the CEO herself called "disappointing." ¶ 82.

### 2. The PSLRA safe harbor does not shield Defendants

The PSLRA's safe harbor protects certain issuers from liability for making a forward-looking statement if it is "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5. "[T]he safe harbor applies only to statements that are truly *forward*-looking. In other words, a 'mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'" *Phx. Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, No. 21-CV-04349, 2023 U.S. Dist. LEXIS 157803, at *21 (N.D. Ill. Sep. 6, 2023) (emphasis in original) (citing *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008)). For example, the statement "'still going strong,'" says "both that current sales were strong and that they would continue to be so," so the maker is not entitled to safe harbor protection "with regard to the statement's representation concerning current sales." *Tellabs*, 513 F.3d at 705.

The statements cited by Defendants are all mixed statements of past/present and future

conditions. *See* Defs. Br. at 18. For example, the statement "Kohl's *is* well-positioned to deliver *continued* robust EPS growth" implies that, at the time the statement was made, EPS was growing, especially when followed by language conveniently left out by Defendants: "Combination of sales growth and solid margins, coupled with commitment to share repurchases, *drives* mid-to-high single digits % EPS growth." ¶ 144. Each of the emphasized words is in past or present tense. However, at the time this statement was made, April 21, 2022, sales had already taken a downturn, and Defendants knew that EPS was neither growing nor in the "mid-to-high single digits" (EPS for the quarter was just $0.11, compared to $2.10 the previous quarter, an approximately 95% decrease). ¶ 145. The same is true of the other statements cited by Defendants, several of which were notably edited to omit the past/present parts of the statement. Each of the cited statements falsely implies that the Company was experiencing success a*t the time the statement was made*: "As pleased as we are with *our ongoing strategic progress*, much of our opportunity is still ahead of us"; "Our strategic effort . . . *continues* to gain traction . . ."; "The plan *we're executing is* very powerful and it will deliver substantial value to our shareholders . . ."; initiatives were "[d]riving sustainable Low-Single-Digits % Sales Growth" which would "support sales growth in 2022 and beyond"; Kohl's associates "*continued to execute* on our strategy and focus on customers during this process." Defs. Br. at 18; ¶¶ 110, 117, 142, 144, 148.

Without citing any law, Defendants claim, "Plaintiff cannot argue that these statements are false due to what they signaled about the future without conceding they are forward-looking statements subject to the PSLRA's safe harbor." Defs. Br. at 19. Defendants' bold proposition finds no support in the law, as it would sweep virtually all statements of historical and present fact under the safe harbor that is designed to only protect certain forward-looking statements. *See In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 590 (D.N.J. 2001) ("'Information concerning

the firm's current and past earnings is likely to be relevant in predicting what future earnings might be.' The fact that investors might make future predictions and investment decisions based on this information does not somehow make the information itself 'forward-looking.'"). To hold otherwise would have the exception swallow the rule. Nevertheless, Plaintiff's actual challenge to the cited statements is that Defendants misrepresented the *past* and *current* state of the Company.

To the extent Defendants' statements are forward-looking, however, they were not accompanied by meaningful cautionary language. To invoke the safe harbor, "'generic disclaimer[s]' and 'boilerplate warnings' will not suffice." *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 989-90 (W.D. Wis. 2003). "Rather, the warned risk must be sufficiently similar to the subsequent adverse events to provide 'notice of the danger of the investment' so that the investor can make 'an intelligent decision about it according to her own preferences for risk and reward.'" *Id*. Generalized risks such that "consumer spending habits" may be affected by "prevailing economic conditions" (*see* Defs. Br. at 19) are not sufficiently particular, as they could be true of any company at any time, and as such would not provide "notice of the danger of the investment." *Id*. Further, "[c]autionary statements are not meaningful if they warn of potential risk that has already materialized." *Coll. Ret. Equities Fund v. Boeing Co.*, No. 22-CV-3845, 2023 U.S. Dist. LEXIS 164802, at *64 (N.D. Ill. Sep. 18, 2023). The Complaint alleges that, by April 2022, management had already seen a downturn in "consumer spending habits," and as such, to the extent the alleged April and May statements were forward looking, Defendants had actual knowledge of the statements' falsity and the cautionary language cited by Defendants was not meaningful. ¶ 189.

### E. The Complaint Adequately Alleges Scienter

#### 1. Legal standard for scienter

"Scienter is a 'mental state embracing intent to deceive, manipulate or defraud,' and encompassing 'reckless disregard of the truth.'" *In re Shopko*, 2002 U.S. Dist. LEXIS 23887, at

*15. A strong inference of scienter may arise where a complaint sufficiently alleges that defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *In re Motorola Sec. Litig.*, No. 03-C-287, 2004 U.S. Dist. LEXIS 16857, at *88 (N.D. Ill. Aug. 25, 2004). In assessing scienter, "the court's job is not to scrutinize each allegation in isolation" but rather to assess whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313, 322-23 (2007) (emphasis in original). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences'"; rather, it need only be "at least as compelling" (*i.e.*, in "equipoise") as any opposing inference of scienter. *Id.* at 324. Moreover, when evaluating a complaint's scienter allegations, a court must "constantly assume[e] the plaintiff's allegations to be true." *Tellabs*, 551 U.S. at 326.

### 2.  Scienter is Properly Pleaded

Defendants claim that Plaintiff has not pled scienter with sufficient particularity because "only Kohl's, Ms. Gass, Ms. Timm, and Mr. Boneparth are alleged to have made any challenged statement." Defs. Br. at 20. First, this statement ignores that scienter is also an element of scheme liability, and each of the Individual Defendants are alleged to have participated in the scheme. *See* ¶ 214. Additionally, the Complaint alleges a number of statements that were purportedly made by or at the behest of the Board. For example, on February 4, 2022, the Company issued a press release titled, "***Kohl's Board of Directors Provides Update*** on Review of Unsolicited Expressions of Interest," which the Complaint alleges contained several materially false or misleading statements. ¶¶ 132-35. The Company repeatedly confirmed in various SEC filings that the Board was monitoring and overseeing the sales process. ¶ 173. These allegations do not give rise to

improper group-pleading. *See Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 662 (N.D. Ill. 2021) (allegations not improper "group pleading" when the complaint "pleaded several facts indicating that each individual defendant repeatedly mischaracterized RTI's OEM business revenue to the SEC, investors, and analysts").

### 3. <u>Each of the Individual Defendants benefitted in a concrete and personal way from the alleged fraud</u>

Each Individual Defendant benefitted in a concrete and personal way from the fraud. The Non-Employee Board Members were able to defeat a rival in a hotly contested proxy contest, thereby retaining their lucrative and otherwise beneficial seats on the Board. ¶ 170. Gass and Timm also benefitted from the Board remaining in place, as the Board made retroactive modifications to the Kohl's Long Term Incentive Plan ("LTIP") that allowed Gass to collect record earnings in 2020 – a 43% increase from her 2019 salary) – despite extensive store closings and lay-offs of Kohl's employees that year due to the Covid-19 pandemic. ¶ 171. Macellum had stated that, were its candidates to be elected, this incentive plan would be reviewed and spending on executive compensation would be curbed in future years. ¶ 171.

These motives are tied specifically and directly to the alleged scheme to mislead investors regarding the potential sale of the Company. *See Allison*, 2023 U.S. Dist. LEXIS 22933, at *33 (scienter found when allegations "directly tie[d] the defendants' incentive awards to the concealment of Oak Street's patient acquisition tactics"; differentiating from *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012) (finding that generalized motives such as a desire "to keep their jobs, improve their bonuses, and increase the value of their stock options" are not sufficient to prove scienter)). Unlike any of the cases cited by Defendants, the Individual Defendants' motive in this case was more than a generalized desire to retain their jobs, salaries, and perks such as access the Company's private

24

jets (see ¶ 172) because they were facing the real and imminent possibility of losing these benefits. The purpose of the scheme was to defeat this active threat. ¶¶ 170-172.

While Defendants point to a lack of allegations that Defendants sold stock during the Class Period, courts have also repeatedly rejected Defendants' argument that a lack of stock sales is indicative of a lack of fraud. Defs. Br. at 22; *cf Lowry*, 532 F. Supp. 3d at 662 ("RTI and the individual defendants suggest that if the individual defendants wanted to commit fraud, they would have sold their RTI stock at 'supposedly artificially inflated prices.'…The defendants' arguments are unsupported by the law."); *Tellabs*, 513 F.3d at 710 ("[T]hat a gamble–concealing bad news in the hope that it will be overtaken by good news–fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble."); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1247 (N.D. Cal. 2008) ("[T]he fact that there was no sale of stock does not cut in defendants' favor").

Alternatively, even if the Court finds no motive in this case, the Supreme Court and Seventh Circuit agree that "the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S. at 325; *see also Pierrelouis v. Gogo, Inc.*, No. 18-C-4473, 2021 U.S. Dist. LEXIS 78942, at *24 (N.D. Ill. Apr. 26, 2021) ("plaintiff succeeds in making allegations that permit a strong inference of scienter even without allegations that directly establish a clear motive.").

4. **Each of the Individual Defendants knew facts or had access to information suggesting that their public statements were not accurate and their conduct was fradulent**

a. Admissions re knowledge of poor Q1:22 results

Q1:22 was, by Defendant Gass's own admission, "a challenging few months" for Kohl's business. ¶ 82. Timm stated that sales "considerably weakened *in April* . . . which resulted in a 5% decrease in net sales to last year." ¶ 82. Gass also stated, "*[I]n April*, demand considerably weakened." ¶ 139. However, in late April and early May, after management admitted to knowing

about declining sales, Kohl's released statements indicating their quarterly results were positive, for example, an April 21, 2022 presentation which stated Kohl's was experiencing "sales growth in 2022," "a consistent 7% to 8% operating margin" and "mid-to-high single digits % EPS growth." ¶¶ 144-45. Courts routinely find such admissions contribute to a strong inference of scienter. *See, e.g., Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, No. 16-C-10510, 2018 U.S. Dist. LEXIS 31195, at *16 (N.D. Ill. Feb. 27, 2018) (when executive "admitted during an August 4, 2015, earnings call that the reduced underwriting standards contributed to the increased claims frequency…[executive's] statements attributing the increase in claims frequency to external factors were made with an intent to deceive investors is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"); *Brasher v. Broadwind Energy, Inc.*, No. 11-C-991, 2012 U.S. Dist. LEXIS 55194, at *70-71 (N.D. Ill. Apr. 19, 2012) ("The inference that Defendants acted with scienter is further supported by the fact that Defendants, by their own admission, had been conducting impairment testing" yet misleadingly stated assets were not impaired in prospectus); *In re Credit Suisse First Boston Corp.*, 431 F.3d 36, 48 (1st Cir. 2005) ("a speaker's confession that his or her opinion was false when made would suffice, on its own, to show subjective falsity.").

In addition to the aforementioned admissions, other factors confirmed that Kohl's management had visibility into its financial results in advance of the end of the quarter. For example, the Company released a preview of the quarter ending July 30, 2022 on July 1, 2022: a month before the quarter ended. ¶ 140. "[T]he ability to monitor…and analyze trends" is another factor that contributes to the strong inference of scienter. *Azar v. Grubhub, Inc.*, No. 19-CV-07665, 2020 U.S. Dist. LEXIS 258187, at *16 (N.D. Ill. Sep. 7, 2020).

b. <u>Gass and Timm attended weekly meetings</u>

Executive attendance at regular meetings in which the alleged issues are discussed weighs

in favor of the inference of scienter. *See, e.g., Hedick*, 2021 U.S. Dist. LEXIS 151343, at \*40-41. CW1, a former VP of User Experience and Digital Operations at Kohl's, stated that Gass and Timm participated in regularly scheduled "business review" meetings that were held every Monday (and sometimes Tuesday) morning, remotely during the pandemic and then, in 2022, in-person in a boardroom located amongst the Company's executive suites. ¶ 116.[7] Courts routinely credit allegations from anonymous sources when, like in this case, "the accounts of the anonymous sources are 'set forth in "convincing detail" and the witnesses provide enough information about their jobs to demonstrate that they "were in a position to know at first hand the facts to which they are prepared to testify.""" *Pierrelouis*, 2021 U.S. Dist. LEXIS 78942, at \*23; *see also Ross v. Career Educ. Corp.*, No. 12-C-276, 2012 U.S. Dist. LEXIS 155037, at \*24 (N.D. Ill. Oct. 30, 2012) (scienter sufficiently alleged when CW stated the company's problems were "discussed on weekly conference calls.").

c.      Board responsibility for overseeing the sales process

Throughout the Class Period, Defendants repeatedly represented that the Board was closely monitoring and overseeing the sale process, and that keeping the Board in place would "ensure the [sale] process is not disrupted or hindered." ¶ 173. Moreover, Gass represented that, in the process of evaluating a potential sale, the "Board [was] thoroughly testing Kohl's standalone strategic plan against potential alternatives." ¶ 173. The Board adopted a poison pill on February 4, 2022, ensuring they would have even more control over who could submit bids, how, and when. ¶ 174. The Board set the record date by which investors had to purchase shares to be eligible to vote in the 2022 shareholder meeting. ¶ 175. The Board rejected Macellum's request to use universal

---

[7] Given these very specific allegations, it is difficult to understand Defendants' assertion that CW1 "does not give any details about the locations or dates of the meetings he attended, who was in attendance, or what was discussed." Defs. Br. at 25.

proxy cards. ¶ 177. This extremely close level of oversight strongly indicates that each member of the Board (including Defendant Gass, who was also a Board Member) was either aware of the alleged scheme or recklessly disregarded the existence of the scheme. *See Pampena v. Musk*, No. 22-CV-05937, 2023 U.S. Dist. LEXIS 220240, at \*46-47 (N.D. Cal. Dec. 11, 2023) (finding scienter where "Defendant was heavily involved in the Merger Agreement process" and "tout[ed]" his "intimate knowledge" of the deal.).

Additionally, the potential sale of the Company was of the utmost importance to shareholders, as evidenced by the significant stock price changes each time news regarding the potential sale of the Company was released. ¶ 173. Courts have also found a strong inference of scienter when the alleged statements and/or conduct is exceptionally important to a company. *See Coll. Ret. Equities Fund*, 2023 U.S. Dist. LEXIS 164802, at \*70 ("Considering the importance of the 737 MAX's return to service to Boeing, there is a strong inference that corporate officials…would have been involved in authorizing statements estimating when it would return to service."); *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 937 (7th Cir. 2018) ("leases are a significant part of Kohl's financial picture that cannot be expected to evade executive knowledge altogether"); *Hedick*, 2021 U.S. Dist. LEXIS 151343, at \*44 ("scienter inferred where defendant speaks 'extensively' on topic that he knows is 'a subject about which investors and analysts often inquired'").

### 5. <u>The Individual Defendants' scienter is imputed to the Company</u>

"Where an individual acts within the scope of his position as a corporate principal, his alleged scienter can be imputed to the corporate entity." *SEC v. Bluepoint Inv. Counsel, LLC*, No. 19-CV-809, 2021 U.S. Dist. LEXIS 34373, at \*64 (W.D. Wis. Feb. 24, 2021). Since the Complaint sufficiently alleges the scienter of the Individual Defendants, contrary to Defendants assertions (*see* Defs. Br. at 20), scienter is imputed to the Company.

### F. The Complaint Adequately Alleges Loss Causation

"Allegations of loss causation are governed by the notice pleading standard of Rule 8." *In re Boeing Co. Aircraft Sec. Litig.*, No. 19-CV-02394, 2022 U.S. Dist. LEXIS 150985, at *95 (N.D. Ill. Aug. 23, 2022) (citing FED. R. CIV. P. 8(a) (requiring only "a short and plain statement of the claim showing that the pleader is entitled to relief")). "While ***proving*** loss causation is often a complex and fact-intensive exercise that typically requires expert testimony . . . ***pleading*** loss causation requires no proof, just plausible allegations that when corrective information became available to the public, that information caused the share price to drop." *Id*. (emphasis in original).

This is a very straightforward case regarding loss causation: every time Defendants announced news regarding a potential sale, the stock price went up, and when they announced there would be no sale (which Plaintiff alleges was their goal all along), the stock price crashed. *See* ¶¶ 154-166. Defendants do not dispute this, instead only arguing that none of the alleged corrective disclosures "revealed anything about Kohl's Strategic Plan." Defs. Br. at 27-28. However, "Courts around the country have found that plaintiffs may satisfy the loss causation pleading requirement 'without identifying a corresponding, mirror-image prior representation for every disclosure that precedes a share price decline.'" *Hedick*, 2021 U.S. Dist. LEXIS 151343, at *58. Even if there was such a requirement, the May 19, 2022 results announcement *did* reveal the falsity of Defendants' statements about the strategic plan.[8] When the macroeconomic trends ended, it became clear that the success of the previous year had nothing to do with management's actions,

---

[8] Defendants state that the market's reaction to the release of Kohl's Q1:22 financial results was "positive" because the stock price went up after the Q1:22 Earnings Call. *See* Defs. Br. at 8. However, the price of Kohl's stock actually *fell* 6.8% in pre-market trading, after the results were first announced, and only rebounded after Gass informed the market that Kohl's would be reviewing "actionable bids" in "the coming weeks." ¶¶ 157-58. At this stage, no more is required. *See City of Birmingham Ret. & Relief Sys. v. Credit Suisse Grp. AG*, No. 17-CV-10014, 2019 U.S. Dist. LEXIS 26962, at *27 (S.D.N.Y. Feb. 19, 2019) ("a complaint can sufficiently plead loss causation without alleging facts that disaggregate losses or that rule out other causes.").

revealing the falsity of Defendants' statements and causing the stock price to drop. ¶¶ 156-57. Additionally, the results revealed that the Company was not experiencing growth "in 2022," was not experiencing a "consistent" 7-8% operating margin (the Q1:22 operating margin was just 2.2%), and was not experiencing "mid-to-high single digits % EPS growth" (EPS for Q1:21 was just $0.11, an approximately 95% decrease from the previous quarter), contrary to the investor presentation released by the Board just a few weeks earlier. ¶ 145. Thus, it is hard to imagine a more direct correlation between a misleading statement and subsequent disclosure.

### G. The Complaint Adequately Alleges Section 14(a) and Rule 14a-9 Claims

Defendants' sole argument to Plaintiff's Section 14(a) claims is that Plaintiff did not plead material misrepresentations (*see* Defs. Br. at 29-30), which makes sense, as "[t]here is no required state of mind for a violation of section 14(a)." *Beck*, 559 F.3d at 682. As discussed in Section III.C above, the Complaint adequately pleads material misstatements and omissions. Therefore, Plaintiff's Section 14(a) claims should survive dismissal.

### H. The Complaint Establishes Control Person Liability

Because Plaintiff adequately pled a primary violation of Section 10(b), and has adequately alleged control person violations (*see* ¶¶ 158-161), Plaintiff's Section 20(a) claims should not be dismissed. *See In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 336 (S.D.N.Y. 2014).

## IV. LEAVE TO AMEND

If this Court grants Defendants' Motion, Plaintiff respectfully requests leave to amend. "The Seventh Circuit has 'repeatedly [] said that a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed.'" *Hunter v. Elanco Animal Health Inc.*, No. 20-CV-01460, 2022 U.S. Dist. LEXIS 147087, at *77 (S.D. Ind. Aug. 17, 2022).

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in full.

DATED: January 18, 2024                      Respectfully submitted,

*/s/ Kim E. Miller*
Kim E. Miller (NY-6996)
J. Ryan Lopatka
**KAHN SWICK & FOTI, LLC**
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
E-Mail: kim.miller@ksfcounsel.com
E-Mail: j.lopatka@ksfcounsel.com

-and-

Lewis S. Kahn
Jyoti Kehl
**KAHN SWICK & FOTI, LLC**
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
E-Mail: lewis.kahn@ksfcounsel.com
E-Mail: jyoti.kehl@ksfcounsel.com

*Lead Counsel for Lead Plaintiff Thomas Frame and the Class*

K. Scott Wagner (SBN 1004668)
**ATTOLLES LAW, S.C.**
222 E. Erie Street, Suite 210
Milwaukee, Wisconsin 53202
Telephone: (414) 644-0391
Facsimile: (414) 455-0758
E-Mail: swagner@attolles.com

*Local Counsel for Lead Plaintiff Thomas Frame*

31